JACK E. SMINKEY, Pro Se
3402 Edgmont Avenue #333
Brookhaven, PA 19015

0 6 - 2 6 3

    Plaintiff
        v.
    Defendants

State of Delaware, Department of Correction, (DOC)
Ruth Ann Minner, Governor, State of Delaware (SOD)
Stanley Taylor, Commissioner of Delaware, (DOC)
Alan Machtinger, Director of Training and Development, (DOC)
Kathleen Mickle-Askin, Training Academy Administrator, (DOC)
Louise Layton, Administrator, (DOC)
Ronald Sauls, Administrator, (DOC)
Alison Stevens, Supervisor, (DOC)
Donna Watson, Primary Instructor, (DOC)
Annette Franze, Primary Instructor, (DOC)
Nichole Shuler, Assistant Instructor, (DOC)

## COMPLAINT

### Nature of Action, Jurisdiction and Venue

1. This is a civil action seeking damages against Defendants, pursuant to 42 U.S.C. § 1981, §1983 and §1985 for committing acts, under color of state law, which deprived plaintiff of rights secured by the First and Fourteenth Amendments of the United States Constitution. Plaintiff was illegally terminated on April 28, 2005.

2. This civil action also seeks damages for discrimination based on age, sex, and race under provisions of Title VII of the civil rights act of 1964, as amended, 42 U.S.C. § 2000(e), et seq (Title VII). The discrimination affected the terms, conditions, and privileges of employment with the State of Delaware (SOD) and Department of Correction (DOC), by singling out plaintiff and subjecting him to disparate treatment on the basis of age, sex and race and by creating a harassing, intimidating, hostile, and offensive work environment.

3. This action also seeks damages and other relief for retaliation against plaintiff for actions protected under Title VII and the United States Constitution as a result of Plaintiff exercising these rights and opposing infringement of these rights by the employer and their agents, servants, and employees.

2

4. Damages and other appropriate legal and equitable relief, including attorney fees, are sought pursuant to 42 U.S.C. § 1981, 1983, 1985, 1988 and the civil rights act of 1964, as amended, the civil rights act of 1991, and 42 U.S.C. § 2000(e).

5. Jurisdiction of this court is invoked pursuant to 42 U.S.C. §§ 2000(e) – 5 (F) and 28 U.S.C. § 1331, 1332 and 1343. The claims arose in this judicial district.

Parties

6. Plaintiff, Jack E. Sminkey, is an individual who maintains an office mailbox at 3402 Edgmont Avenue, #333, Brookhaven, PA 19015 and who is a citizen and a resident of the Commonwealth of Pennsylvania, and at all times relevant hereto, was employed with the DOC as a Probation and Parole Officer (P&P) cadet.

7. Defendant, Ruth Ann Minner, was/is the Governor of the SOD and the highest ranking policy maker in state government.

8. Defendant, Stanley Taylor, was/is the Commissioner of the DOC and the highest ranking policy maker in the DOC.

9. Defendant, Alan Machtinger, was/is the Director of Training and Development for the DOC.

10. Kathleen Mickle-Askin, was/is the probation and parole (P&P) Training Academy Administrator for the DOC.

11. Louise Layton, was/is a P&P academy administrator for the DOC.

12. Ronald Sauls, was/is a P&P academy administrator for the DOC.

13. Alison Stevens, was/is a P&P supervisor and guest instructor for the DOC.

14. Donna Watson, was a primary P&P instructor at the DOC until her promotion.

15. Annette Franze, was/is a primary P&P instructor and probation and parole officer for the DOC.

16. Nicole Shuler, was/is an assistant P&P instructor and probation and parole officer for the DOC.

17. Defendant, Department of Correction, is a division of the State of Delaware, charged with, among other things, hiring, training, promoting new hires, as well as, supervising persons incarcerated or under court supervision and jurisdiction.

3

18. The DOC is located at 245 McKee Road, Dover, DE 19904. All Defendants can be contacted thru this address.

19. All individuals above, at all times relevant hereto, were employed in their official capacity as state employees. All defendants are sued in their official and individual capacity.

Facts Giving Rise To The Action

Probation and Parole Hiring Process

20. On or about November 24, 2003 plaintiff applied for a position as a probation and parole officer I.

21. Around February 10, 2004 plaintiff was notified that he passed the written examination.

22. The process continued and plaintiff passed a) an oral board interview b) drug test c) a background investigation, and d) psychological exam.

23. Plaintiff completed all other requirements but was delayed in starting probation and parole training after he disclosed to the employer his concern about being able to pass physical fitness training due to his medical conditions (chronic pain and osteoarthritis in his back and neck).

24. Upon plaintiff getting clearance from his doctor and physical therapist, and being advised by Jill Rush (DOC human resources) that the intensity of the physical training regiment was at the discretion of the instructors, plaintiff agreed to start the February 25, 2005 training class.

25. On the first day of training, Plaintiff believed, based on what he was told, and observed, that instructors would train cadets in a professional and safe manner without creating unnecessary risk of harm to Plaintiff. At this time Plaintiff had no reason to believe the instructors were unqualified for their position or would attempt to harm Plaintiff in any way.

26. The training academy ran from February 25, 2005 thru April 29, 2005. On April 28, 2005, plaintiff was advised he would not be graduating with his class (promoted from probation and parole officer cadet to probation and parole officer I).

27. Around May 5, 2005, plaintiff received a letter from Defendant Stanley Taylor indicating his employment was terminated on April 28, 2005.

4

About the Plaintiff

28. Plaintiff is a Caucasian male, forty-three years of age who retired as a police officer in 2000.

29. Plaintiff is a licensed private investigator with twenty-five years of diversified public safety experience. Plaintiff possesses a doctorate degree in criminal justice and has been retained many times to serve as a subject matter expert regarding law enforcement matters.

30. Plaintiff has been certified by the Pennsylvania State Police in the capacity of a police and security instructor. Plaintiff has taught about two thousand students in approximately thirty areas of law enforcement related training.

31. Plaintiff has held positions as a police officer, licensed private investigator, security manager, security supervisor, law enforcement training academy administrator and instructor, correctional officer, volunteer fireman, etc.

32. Plaintiff believes the employer, and relevant instructors, knew or had access to Plaintiff's background while attending the training academy.

The Training Academy

33. Plaintiff arrived at the Department of Correction's Training Academy on February 25, 2005 where he met eight fellow cadets.

34. Primary instructor Defendant Watson introduced herself along with assistant instructor Defendant Shuler.

35. All cadets were issued a "code of conduct" (SEE EXHIBIT "A"). The first class assignment was to work in a group and present to the class examples of departmental violations.

36. Defendant Watson told the class to: 1) abide by DOC's code of conduct 2) it applies to all DOC employees 3) If you fail any two tests, you fail training 4) cadets are expected to help each other throughout training. Defendant Watson told the class the instructors were "perfectionists". Plaintiff viewed these statements and the code of conduct as an implicit and explicit contract.

37. Around March 7th the class began physical fitness circuit training. Sometime between March 8 and 15th Defendant Shuler saw Plaintiff doing "girl style" pushups. When Defendant asked Plaintiff why he was not doing "guy style" pushups, Plaintiff replied he had a back condition.

5

38. On March 15th Defendant Shuler ran Plaintiff into exhaustion in front of the entire class. Plaintiff believes that Defendant Shuler did this to embarrass and humiliate him in front of his classmates.

39. Around this same time frame, Defendant Watson told Plaintiff "your underwear is showing", Plaintiff replied "why are you looking", and fixed his attire.

40. On or about March 16th, Defendant's Shuler and Watson met with Plaintiff in private to discuss his comments. Plaintiff believed this was merely a discussion. Plaintiff advised Defendant Shuler he did not appreciate being "run into the ground" in front of his class and publically embarrassed.

41. On March 17th Plaintiff received a behavior assessment committee report (BAC). The BAC attacked Plaintiff's personality and further stated they (the instructors) were in control of Plaintiff's career. Plaintiff received a copy of this document but it was later stolen out of his training binder. No classmates knew of the BAC document.

42. On March 30th the class did hearing presentations at the Kent County Courthouse. While there, Plaintiff noticed that all of his violation of probation reports were much more complex then his fellow cadets. It was later learned that Defendant Shuler prepared the assignments.

43. Around March 30th primary instructor Defendant Franze took over in place of Defendant Watson, who was promoted.

44. On April 1st Defendant's Franze and Shuler were teaching "pat-downs". Plaintiff was instructed to remain seated and watch, Plaintiff complied. Defendant Franze instructed Cadet Rauh. Defendant Shuler, moments later, told Cadet Rauh it was wrong. When Plaintiff advised Defendant Shuler that Defendant Franze taught her that way, Defendant Shuler scolded Plaintiff. Later that day Defendant Shuler scolded Plaintiff again for whispering something into Cadet Stevens-Arbaugh's ear, even though this was common practice.

45. On April 4th while waiting for the instructor, the entire class was talking about how their weekend was, and how tired they are. Defendant Shuler then came in and said "are you ready for PT"? "Nicole you look tired." Plaintiff doesn't recall Nicole's response. Plaintiff jokingly said yes, I'm ready to go home, as if it was the end of the day. Defendant Shuler said "there's the door", and pointed to it, as if to say, "then get the hell out of here". Defendant Shuler looked annoyed.

46. Later that day, Defendant Franze asked Plaintiff if he would like to share what he whispered into Cadet Rauh's ear with the entire class, Plaintiff replied "no".

47. Plaintiff made the decision not to talk, or participate as least as possible in class. No matter what Plaintiff does, it's wrong. It became obvious to Plaintiff he was not welcome at the Training Academy.

48. Plaintiff was completely demoralized and humiliated by Defendant's Franze and Shuler on a daily basis.

49. April 6th Defendant Franze pulled Plaintiff to the side (in the middle of a fire drill) and asked what was wrong. Plaintiff told her basically nothing, class will be over soon. Defendant Franze said she wanted to talk to Plaintiff. Plaintiff told her this class was not a real good experience for him but it would be over in a few weeks.

50. On April 7th Plaintiff advised Defendant Franze by letter that he was not interested in talking to her about training.

51. On April 8th Plaintiff and Defendants Saul and Franze compelled Plaintiff to meet and discuss training issues.

52. On April 11th Cadet Jack Reyes attacked instructor Harold Mack during boxing training after being told cadets cannot "hit back". The entire class and Defendants Sauls, Franze and Shuler witnessed this.

53. On April 12th Plaintiff met with Instructor Franze. Plaintiff told her he would not respond to the BAC as it is distracting from his studies. Defendant Franze advised Plaintiff that sometimes Cadets fail training during the tac house or even the last day or two before graduation.

54. On April 13th Mr. Callaway was instructing the academic portion of defensive tactics in the class room. Plaintiff asked him questions about Cap Stun and ASP. Mr. Callaway exploded and said "I thought you were an expert". Plaintiff explained to Mr. Callaway he never trained in Cap Stun or the ASP. When class was dismissed for lunch, Mr. Callaway asked to meet with Plaintiff in private, Plaintiff agreed. Mr. Callaway said that he was told that Plaintiff would be in class putting my head down and that Plaintiff was a subject matter expert in defensive tactics, or something to that affect. Mr. Callaway apologized for his outburst, his embarrassing Plaintiff, and said he felt embarrassed by the whole thing. Shortly after this statement, Defendant Franze left the meeting. Mr. Callaway and Plaintiff continued our conversation. Toward the end of the meeting, Mr. Callaway said to Plaintiff "what you are going through must be difficult", Plaintiff said "it is". Plaintiff got the feeling he actually felt sorry for him. Obviously, Mr. Callaway was filled with misinformation about Plaintiff and to some extent he felt duped.

7

55. On April 14th during defensive tactics, Cadet Dawn Stevens-Arbaugh motioned to kick Plaintiff in the groin and said she would kick Plaintiff in the nuts. Defendant Shuler said "I'll pretend I didn't hear that" and left. Defendant Shuler saw the entire thing. Plaintiff believes Cadet Stevens-Arbaugh was kidding but Plaintiff still thinks it was inappropriate. On April 1, 2005 Instructor Franze heard Cadet Stevens-Arbaugh say something about a thong in class. Defendant Franze told Cadet Stevens-Arbaugh this was inappropriate and some classmates appeared offended.

56. On April 28th approximately 3PM Plaintiff was told he would not be graduating the following day. Plaintiff was told to contact Defendant Alan Machtinger.

57. Plaintiff contacted Defendant Machtinger to request a meeting. Defendant Machtinger advised Plaintiff that the only issue would be whether Plaintiff would be placed in another cadet class.

58. On May 16th Plaintiff sent Defendant Machtinger a certified letter detailing why his termination was unlawful and unjust.

59. On May 16th Plaintiff sent Defendant Sauls a certified letter indicating he has opened an investigation of the DOC and anticipates litigation.

60. On May 16th Plaintiff sent Defendant Taylor a letter in response to his dismissal letter. Defendant received no response.

61. On May 16th Plaintiff sent a letter to Defendant Minner regarding the "culture" within state government.

62. Plaintiff sent all of the letters in hopes to find a resolution to the dispute. The only response Plaintiff got was a bureaucratic letter from the Governor's office referring the matter back to the DOC.

63. On May 25th Plaintiff arrived at the meeting in Dover, DE and was told the meeting would need to be rescheduled.

64. On June 6th Plaintiff met with Defendants Machtinger, Mickle-Askin, and Mr. Grinstead for about an hour. Nobody asked about Plaintiff's previous correspondence or questioned the propriety of the instructors, etc. The trio appeared more concerned about Plaintiff being a Private Investigator. The meeting closed with Defendant Machtinger advising Plaintiff he may, or may not, receive a response. To date, Plaintiff has not received a response.

65. On June 7th and June 27th Plaintiff sent Defendant Machtinger a letter requesting to see his personnel file. As of this date, no response.

66. On July 1st Plaintiff received a copy of documents the DOC sent to Pennsylvania Department of Labor and Industry regarding Behavior Assessment Committee Meetings. Plaintiff had no idea such documents existed. If Plaintiff had not field for unemployment he would have never had knowledge of such documents, or what was said about him.

67. On July 7th Plaintiff sent a Freedom of Information Act request to Defendant Taylor and State Police Commissioner Mach Leish. Plaintiff received no response from Defendant Taylor and a letter from Colonel Mac Leish referring him to the U. S. Courthouse in Wilmington.

68. On July 7th Plaintiff sent a complaint to the EEOC via certified mail. On November 14, 2005 Plaintiff signed a charge of discrimination. On January 30, 2006 Plaintiff received a "Dismissal and Notice of Rights" (SEE EXHIBIT "B").

69. Around Christmas 2005 Plaintiff completed his investigation of the State of Delaware/Department of Correction. During the course of his investigation, Plaintiff reviewed the following documents:

70. Executive Order #10 EEO hiring standards for Delaware Government dated January 23, 2001.

71. Review of the Delaware State Police/Executive Order #19 dated December 1, 2001.

72. Beliefs & Principles dated September 10, 2002.

73. A statement of management principles for the workplace dated December 18, 2002.

74. Policy on Sexual Harassment Prevention dated December 18, 2002.

75. Hostage incident at the Delaware Correctional Center dated February 7, 2005.

76. Task force on security issues at the Delaware Correctional Center (created by executive order sixty) dated February 14, 2005.

77. Delaware Department of Correction employee handbook *undated.

78. DOC Code of Conduct handbook dated 9/24/98 issued to him on 2/25/05.

79. The only document Plaintiff was given or was mentioned by instructors at P&P training was the document mentioned in #78.

9

80. Most relevant News Journal articles about the DSP and DOC.

81. All relevant lawsuits not archived.

82. All relevant executive orders, state personnel policies, investigative reports, etc.

83. EXHIBIT "C" is a chart of lawsuits filed against the state police and DOC all by employees, except for one case, which Plaintiff believes is not relevant.

The Results Of Plaintiff's Investigation

84. In the late 1990's the Delaware State Police (DSP) was sued by several black troopers and the United States Department of Justice for racial discrimination.

85. The disposition of the lawsuits were 1) judgments against the State of Delaware 2) Settlements, and 3) a consent decree between the Justice Department and the DSP.

86. When Governor Minner was elected into office, in January 2001, she promulgated executive orders, set statewide written policies regarding management principles, sexual harassment, and forced the current state police colonial into retirement, apparently because he was not supportive of her policies to hire and promote more minorities and females.

87. Defendant Minner's policies were disseminated to department heads and received wide media coverage over the years.

88. Plaintiff's investigation reveals, among other things, disturbing practices of retaliating against anyone who opposes Governor Minner policies or practices. Plaintiff believes there is a widespread custom, pattern, or practice to retaliate against anyone who speaks out or opposes illegal practices of the employer.

89. While in training, Plaintiff asked Defendant Franze if there was a custom or practice of retaliating against employees who speak out. Defendant Franze (a twenty year employee) paused, and replied, "yes".

90. Based upon Plaintiff's investigation, and supported by Defendant Franze, Plaintiff believes there is a deeply embedded culture within the DOC, the DSP, and likely throughout state government that supports and encourages supervisors, managers, and administrators to engage in practices that violate Title VII, and the United States Constitution. Plaintiff believes that this is so deeply embedded in the culture of state government and the DOC that it amounts to "official policy".

10

Count I
Sminkey v Ruth Ann Minner
42 U.S.C. Section 1983
Unconstitutional Policies

91. Plaintiff repeats and re-alleges paragraphs 1 – 90 set out above.

92. Defendant Minner's executive order Number 10, dated January 23, 2001,
directed that all Delaware executive branch agencies "strive for a work
force that reflects the diversity of the state's population and labor market".
It also directed that each executive branch agency pursue a "specific
statement of goals and objectives designed to assure equal employment
opportunities in hiring and promotion".

93. On August 17, 2001, Defendant Minner removed State Police
Superintendent Gerald R. Pepper Jr. by forcing him to retire because his
office had not complied with her goals for racial diversification of the
Delaware State Police (DSP).

94. In September 2001, it's alleged that former state police superintendent
Aaron Chaffinch and James L. Ford, former Secretary of the Department
of Public Safety, eliminated a promotional list because both top candidates
were white.

95. On or about November 1, 2001, it's alleged Superintendent Chaffinch
ordered the Director of Personnel of the State Police to tamper with a new
promotional list for the ranks of Sergeant and Lieutenant in order to carry
out Governor Minner's policies.

96. The information in this count comes from a lawsuit filed by two white
State troopers, case number 02-CV-1315. Verdict for Plaintiff's in the
amount of $550,000.00.

97. When civilian Director of Human Resources of the DSP, Mr. John
Dillman III, expressed his concern regarding illegal efforts to promote
diversity, he was eventually terminated.

98. Mr. Dillman filed Civil Action 02-CV-509. The case was settled for over
$500,000.00.

99. Based on Plaintiff's investigation and the lawsuits above, Plaintiff
believes, and therefore avers, that Defendant Minner set written policy
aimed at promoting more minority and women in state government.

100.   Plaintiff believes, and therefore avers, that Defendant Minner failed to adequately train department heads in the application of her policies and executive orders so as not to discriminate against Caucasians with respect to their employment or constitutional rights.

101.   Plaintiff believes, and therefore avers, that Defendant Minner also set "unwritten policy" detrimental to Caucasian males to bolster hiring, retention, and promotion of minorities and women in state government.

Count II
Sminkey v Ruth Ann Minner
42 U.S.C. Section 1983
Retaliation for Engaging In Protected Speech
Retaliation For Opposing Discrimination Under Title VII

102.   Plaintiff repeats and re-alleges paragraphs 1 – 101 set out above.

103.   Based upon Plaintiff's investigation, Plaintiff believes, and therefore avers, that Defendant Minner promotes and encourages agents, servants, and employees in a position of control, to retaliate against any subordinate who dare attempt to oppose employment practices that violate Title VII or the Constitution of the United States.

Count III
Sminkey v Watson
Failure to adequately train Plaintiff
42 U.S.C. Section 1983

104.   Plaintiff repeats and re-alleges paragraphs 1 – 103 set out above.

105.   Defendant Watson had a duty to train Plaintiff in DOC policy. Defendant Watson failed to adequately train Plaintiff on the Behavioral Assessment Committee. She failed to give the class a power point presentation. She failed to warn Plaintiff that he could be disciplined or terminated for: 1) failure to follow instructions 2) an inappropriate attitude 3) disrespectful responses to an instructor, or anything else the DOC desires.

106.   Plaintiff had no idea at the time that a power point presentation was not given, nor was he ever taught what an inappropriate attitude is, or what a disrespectful response was or could be. In fact, on the first day of class, Mr. Alan Grinstead, Director of Probation and Parole, told the class to "be yourself".

107.   Plaintiff believes, and therefore avers, that the failures of Defendant Watson impacted greatly on Plaintiff right to gainful employment, and his First Amendment right to free speech, or to refrain from speech.

<u>Count IV</u>
<u>Sminkey v Shuler/Franze/Watson</u>
<u>Sexual Harassment/Retaliation</u>
<u>Title VII CRA of 1964, as amended,</u>

108.    Plaintiff repeats and re-alleges paragraphs 1 – 107 set out above.

109.    Sometime between March 7 and 14th, Plaintiff was told "your underwear is showing" during physical fitness training by Defendant Watson. Plaintiff replied, "why are you looking"?

110.    In retaliation for Plaintiff's verbal offense to Defendant Watson looking at his buttocks, Defendant Shuler initiated a (sexual) harassment and retaliation campaign against Plaintiff, Defendant Franze soon joined in.

111.    On March 15th, Defendant Shuler, who purported to be helping Plaintiff finish physical fitness training, ran Plaintiff into exhaustion in front of his class in an effort to embarrass and humiliate him.

112.    On March 30th, Defendant Shuler, assigned hearing presentations to each cadet for mock trials purposes. Defendant Shuler gave Plaintiff the most complex and difficult presentations. Plaintiff believes this was done to harass, embarrass, and humiliate him in front of his class.

113.    On April 1st, Plaintiff was instructed by Defendant Franze to watch Cadet Reyes and Rauh do pat downs. When Defendant Shuler corrected Cadet Rauh on her pat-down technique, Plaintiff politely advised Defendant Shuler that Defendant Franze taught her to do it that way. Defendant Shuler then scolded Plaintiff in front of his classmates, again embarrassing Plaintiff.

114.    Later this day, Defendant Shuler yelled at Plaintiff yet again in front of his peers when Plaintiff whispered something into Cadet Stevens-Arbaugh's ear. It was common practice for one Cadet to whisper to a neighboring Cadet if the Cadet did not catch something that was said.

115.    On April 4th, Defendant Franze asked Plaintiff if he would like to share what he whispered into Cadet Rauh's ear, creating a scene in front of the class, Plaintiff replied "no".

116.    On April 4th while waiting for the instructor, the entire class was talking about how their weekend was, and how tired everyone was. Defendant Shuler then came in and said are you ready for PT? "Nicole you look tired." Plaintiff does not recall Nicole's response. Plaintiff jokingly said, I'm ready to go home, as if it was the end of the day, Defendant Shuler said "there's the door", and pointed to it, as if to

13

say, "then get the hell out of here". She looked annoyed. Plaintiff was very embarrassed.

117. On April 8th, Plaintiff attended a meeting with Defendants Saul and Franze. While there, Plaintiff was told by Defendant Saul that he was required to participate in class, even though other Cadets did not participate in class with no negative effects.

118. On April 13th Mr. Callaway was instructing academic portion or defensive tactics in the classroom. Plaintiff asked him questions about cap stun and ASP. Mr. Callaway exploded and said "I thought you were an expert". Plaintiff told Mr. Callaway he was never trained in Cap Stun or the ASP. The entire class and Instructor Franze witnessed this. When class was dismissed for lunch, Mr. Callaway asked to meet with Plaintiff in private, Plaintiff complied. Mr. Callaway said that he was told Plaintiff would be in class putting his head down and that Plaintiff was a subject matter expert in defensive tactics, or something to that affect. Mr. Callaway apologized for his outburst, his embarrassing Plaintiff, and said he felt embarrassed by the whole thing. Shortly after this, Defendant Franze left the meeting. Toward the end of the meeting, Mr. Callaway said to Plaintiff "what you are going through must be difficult", Plaintiff said "it is". Plaintiff got the feeling he actually felt sorry for him.

119. On April 14th during defensive tactics, Cadet Dawn Stevens-Arbaugh motioned to kick Plaintiff in the groin and said she would kick Plaintiff in the nuts. Defendant Shuler said "I'll pretend I didn't hear that" and walked away. Defendant Shuler saw the entire thing. On April 1st Defendant Franze heard Cadet Stevens-Arbaugh say something about a thong in class and pointed out that this was inappropriate and some Cadets appeared offended.

120. Based on the cumulation above, Plaintiff believes, and therefore avers, that all three Defendants intentionally engaged in conduct that created an intimidating, harassing, embarrassing, humiliating, and hostile work environment for Plaintiff.

### Count V
### Sminkey v Shuler/Franze
### Conspiracy to Deprive Civil Rights
### 42 U.S.C. Section 1985

121. Plaintiff repeats and re-alleges paragraphs 1 – 120 set out above.

122. Plaintiff believes, and therefore avers, that Defendants Shuler and Franze conspired with each other to violate Plaintiff's right to free speech and gainful employment by:

14

123.   Retaliating against Plaintiff when he spoke or participated in class by
       intentionally embarrassing him, harassing him, humiliating him, and
       attacking his personality in front of his classmates.

124.   By "counseling" and meeting with Plaintiff for no legitimate reasons.

125.   By arbitrarily issuing behavior assessment letters to him when other
       Cadets engaged in conduct much worse than Plaintiff, without
       ramification.

126.   By bringing him before administrators, or telling administrators he is,
       or is not participating in class.

127.   By ultimately getting him fired for nothing that was fireable.
       Plaintiff's conduct was better than other Cadets who were not
       disciplined at all.

### Count VI
### Sminkey v Shuler/Franze
### Discrimination based on sex (Title VII)

128.   Plaintiff reports and re-alleges paragraphs 1 – 127 set out above

129.   Throughout training, Defendants Shuler and Franze intentionally
       discriminated against Plaintiff because of his sex, by ignoring
       violations of State and DOC policies by females, to wit:

130.   Around April 1st, Defendant Franze heard Cadet Stevens–Arbaugh talk
       about a thong during class. Defendant Franze pointed out that some
       classmates appeared offended by her statements.

131.   Around April 14, during defensive tactics training Cadet Stevens-
       Arbaugh motioned as if to kick Plaintiff in the groin, Defendant Shuler
       said "I'll pretend I didn't see that" and walked away.

132.   The SOD and the DOC has strict written policies prohibiting sexual
       harassment and sexually inappropriate conduct.

133.   Both Defendants Shuler and Franze each have in excess of eight years
       service with the DOC, they knew, or should know company policies
       regarding (sexual) harassment and discrimination.

134.   At a meeting around March 15, Defendant Shuler told Plaintiff we (the
       instructors) document "everything". The evidence reveals they don't.

135.   After being terminated, Plaintiff asked Cadet Stevens-Arbaugh if she
       received any discipline while attending training, she replied "no".

136.    Based upon the facts above, a reasonable jury could conclude that
        Defendant(s) have discriminated against Plaintiff based upon his sex,
        by ignoring infractions committed by female cadets.

Count VII
Sminkey v Shuler/Franze
Discrimination Based On Race (Title VII)

137.    Plaintiff repeats and re-alleges paragraphs 1 – 136 set out above.

138.    On April 11th, prior to the start of boxing training, the class was told
        by Administrator Ronald Sauls that Cadets are not allowed to "hit
        back".

139.    While Cadet Reyes, Hispanic male, was boxing with assisting
        instructor Harold Mack, he attacked the instructor. The entire class
        had to break up the fight.

140.    Later that day, Defendant Shuler told Plaintiff and several Cadets that
        Cadet Reyes could be terminated.

141.    After graduation, Plaintiff asked Mr. Reyes if he was disciplined while
        in training, he replied "no".

142.    Throughout training, Cadet Julio Sanchez, Mexican male, frequently
        cursed, told lewd jokes, gave sarcastic answers to instructors, etc.

143.    When training was over Plaintiff asked Mr. Sanchez if he received any
        BAC (behavioral assessment committee) write ups while he attended
        training. He replied, what's that? Plaintiff explained what the class
        was told the first day of class regarding the BAC. Mr. Sanchez had no
        recollection of this instruction.

144.    Plaintiff asked if he was ever written up or disciplined during training,
        he replied "no".

145.    Based upon the facts above, a reasonable jury could conclude that
        Plaintiff was treated with disparity because of his race, Caucasian.

Count VIII
Sminkey v. Shuler/Franze
Discrimination Based On Age
Age Discrimination In Employment Act

146.    Plaintiff repeats and re-alleges paragraphs 1 – 145 set out above.

16

147. Mr. Sanchez and Ms. Stevens-Arbaugh both admit, and are known to all Cadets, instructors, and employer to be under the age of 40.

148. Plaintiff admits, and are known by all Cadets, instructors, and the employer, to be over the age of 40.

149. Throughout training, Plaintiff was always treated less favorably then his younger colleagues, no doubt because of his age.

150. Plaintiff believes, and therefore avers, that all defendants intentionally treated Plaintiff with disparity because of his age.

## Count IX
### Sminkey v Franze/Sauls
### 42 U.S.C. Section §1983 and §1985
### Free Speech/Conspiracy To Deprive Civil Rights

151. Plaintiff repeats and re-alleges paragraphs 1 – 150 set out above.

152. On April 7th, Plaintiff gave Defendant Franze a letter indicating he did not wish to talk to her about training.

153. In retaliation for Plaintiff exercising his right to free speech, or refusing to speak, Defendant Franze brought Plaintiff before training administrator Defendant Sauls. Together they compelled Plaintiff to talk about training issues by placing him in fear of his job. Plaintiff was then placed on "Formal Notice" and subsequently terminated one day before he was due to graduate training.

154. Plaintiff believes, and therefore avers, that he has a constitutional right to refrain from speaking if he so desires.

## Count X
### Sminkey v Franze/Stevens
### 42 U.S.C. Section §1983 & §1985
### Conspiracy To Deprive Civil Rights

155. Plaintiff repeats and re-alleges paragraphs 1 – 154 set out above.

156. On April 27th, Plaintiff was taking computer refresher training two days before graduation.

157. Defendant Stevens asked if Plaintiff needed help, he replied "yes".

158. About half hour later, Plaintiff heard Defendant Franze tell Defendant Stevens they would "debrief" the next day (April 28th).

17

159.   On April 28th, at about 3:00 PM Plaintiff was told he was separated from training for giving Supervisor/Instructor Stevens sarcastic answers and for not following directions.

160.   Plaintiff believes, and therefore avers, that he has a constitutional right to answer "yes", to a question asked by a supervisor.

161.   Plaintiff believes, and therefore avers, that the conduct of both Defendants amount to a breach of his First Amendment right to free speech and his right to gainful employment.

Count XI
Sminkey v Shuler/Franze/Stevens
Harassment (perception)
Title VII

162.   Plaintiff repeats and re-alleges paragraphs 1 -161 set out above.

163.   Substantiated by what is alleged in this lawsuit, Plaintiff believes that Defendants Shuler, Franze, and Stevens subjected Plaintiff to a bullying and harassment campaign by:

164.   Repeatedly intimidating Plaintiff.

165.   Slandering Plaintiff.

166.   Isolating Plaintiff from his classmates.

167.   Embarrassing and humiliating Plaintiff.

168.   Participating in, or allowing vulgar, offensive, or inappropriate conduct in the presence of Plaintiff, or committing these offenses against Plaintiff.

169.   And, ruining Plaintiffs career with the DOC.

Count XII
Sminkey v Stevens
42 U.S.C. Section §1983
Free Speech

170.   Plaintiff repeats and re-alleges paragraphs 1 - 169 set out above.

171.   Defendant Stevens testified at an unemployment hearing that she was offended by Plaintiff's "smirk".

172.   Plaintiff admits to having a "smirk".

173.  It's common knowledge to virtually everyone who knows Plaintiff or
has had contact with Plaintiff, that he has an occasional "smirk".

174.  Plaintiff believes, and therefore avers, that his "smirk" was
instrumental in his discharge from employment.

175.  Plaintiff believes, and therefore avers, he has a constitutional right of
free speech and expression by having a "smirk", if he so desires.

Count XIII
Sminkey v Sauls/Layton
42 U.S.C. Section §1983 and §1985
Failure To Adequately Train, Investigate, Supervise

176.  Plaintiff repeats and re-alleges paragraphs 1 – 175 set out above.

177.  Both Defendants are administrators with authority over all instructors,
who have a duty to train, investigate, and supervise.

178.  Throughout the entire training academy, Plaintiff saw Defendant Sauls
observing training a total of less than one hour.

179.  Throughout the entire training academy, Defendant Layton taught a
very small portion of firearms training. At no other time did Plaintiff
see Defendant Layton observing classroom training.

180.  As a result, both Defendants took the word of instructors as to what
was happening throughout training.

181.  The failure to adequately train, investigate, and supervise subordinate
instructors caused Plaintiff's Title VII and constitutional rights to be
violated along with his right to gainful employment.

Count XIV
Sminkey v Sauls/Layton/Mickle-Askin
42 U.S.C. Section §1983 and §1985
Negligent Failure To Train/Negligent Entrustment/Negligent Retention
Unsafe Work Environment

182.  Plaintiff repeats and re-alleges paragraphs 1 – 181 set out above.

183.  Defendants Watson, Franze, and Schuler are/were instructors who
taught academic and circuit training portions of probation and parole
officer training.

184.  Throughout training, all Defendants acted improperly by engaging in
practices that:

185.   Violate State or DOC written Policies.

186.   Intentionally and unnecessarily harassed, embarrassed, humiliated and exploited Plaintiff.

187.   Violated Plaintiff's Title VII, First Amendment, and other Constitutional Rights.

188.   And, ignored Plaintiff's request to do "girl style" push ups due to his medical condition, let boxing matches go too long, and have a history of sending Cadets to Kent General Hospital for unnecessary and preventable injuries.

189.   Clearly, Defendant's Sauls, Layton, and Mickle-Askin knew, or should have known, that Defendants Watson, Franze, and Shuler are unfit to teach. The failure of their duties significantly contributed to Plaintiff's dismissal and injuries, as well as, injuries of other Cadets in the past.

Count XV
Sminkey v Mickle-Askin/Taylor
42 USC §1983 and §1985
Inadequate or Negligent Training

190.   Plaintiff repeats and re-alleges paragraphs 1 – 189 set out above.

191.   Throughout training, instructors negligently trained cadets by:

192.   Not teaching Cadets using a "building block" format. In many cases, Cadets were taught "ad hoc". In some cases, one instructor did not know what the other instructor taught, or, they thought an instructor taught things when they, in fact, did not.

193.   Some instructors did not follow their lesson plans.

194.   Some required subjects/presentations were missed.

195.   Some instructors don't appear qualified to teach at a Law Enforcement Academy.

196.   Accurate record keeping appears to be questionable.

197.   There appears to be no remedial training provisions for Cadets having trouble with training.

198.   Training appears to be largely based on instructors subjective standards.

199.  There is a lack of supervision and oversight by supervision and management regarding training.

200.  Based upon this and more, its foreseeable there is a deliberate indifference to the Title VII and constitutional rights of Plaintiff.

### Count XVI
### Sminkey v Taylor/Mickle-Askin/Machtinger
### Wrongful Discharge

201.  Plaintiff repeats and re-alleges paragraphs 1 – 200 set out above.

202.  Defendant Mickle-Askin was appraised of Plaintiff's progress during training without ever speaking to him, or requesting to meet with Plaintiff. On the words of her subordinates, she recommended to Commissioner Taylor that Plaintiff be terminated.

203.  Defendant Taylor, based solely on Defendant Mickle-Askin's recommendation, terminated Plaintiff.

204.  Plaintiff met with Defendant Machtinger, Defendant Mickle-Askin, and Mr. Grinstead to discuss whether they would consider Plaintiff for another cadet class.

205.  When the trio met with Plaintiff, no one mentioned the letters Plaintiff sent or, asked Plaintiff any questions regarding his concerns of retaliation, discrimination, or public policy violations.

206.  Based upon what is stated above, Plaintiff believes, and therefore avers, his discharge to be wrongful and in violation of public policy.

### Count XVII
### Sminkey v Mickle-Askin/Machtinger/Taylor
### Covenant of Good Faith and Fair Dealing/Breach of Contract

207.  Plaintiff repeats and re-alleges paragraphs 1 – 206 set out above.

208.  Plaintiff was informed on the first day of training what the DOC expected of him as an employee. Throughout training Plaintiff complied with all written policies of the DOC and SOD.

209.  Defendant DOC, along with their agents and servants terminated Plaintiff's employment for subjective reasons not consistent with written policy.

210.  Plaintiff was never trained or adequately informed what the BAC was.

211.    Plaintiff believes the "behavior assessment committee" is really just an impromptu meeting instructors occasionally have together without a Cadet's knowledge to subjectively document what they want to.

212.    There is no definition of what a counseling session is, a meeting, a discussion, a talk, etc.

213.    Plaintiff does not believe instructors are qualified to "counsel" anyone.

214.    Plaintiff was never informed he was under investigation.

215.    Plaintiff was never informed that he violated any written policy or procedure as set out by the SOD, DOC, or Defendant Taylor.

216.    Plaintiff believes discussions he had with instructors were solely for their documentation purposes and not for learning or instructional purposes.

217.    Plaintiff can't think of one good or legitimate reason to embarrass, humiliate, harass, or risk injuring a student.

218.    Plaintiff believes the "post termination" meeting he had was nothing more than a "sham".

219.    For all the reasons indicated above and more, Plaintiff believes, and therefore avers, the employer violated the covenant of good faith and fair dealing and, breached an implicit/explicit contract.

Count XVIII
Sminkey v Taylor
42 U.S.C. Section 1983/Title VII
Unconstitutional Policies

220.    Plaintiff repeats and re-alleges paragraphs 1 – 219 set out above.

221.    Defendant Taylor has been employed with the DOC for approximately thirty years and rose through the ranks of the DOC.

222.    Defendant Taylor is the highest-ranking policy maker within the DOC.

223.    Defendant Taylor encourages and supports a custom, pattern, practice, "unwritten policy" of violating the constitutional rights of both prisoners and employees.

224.    Defendant Taylor has, encourages, and supports a custom, pattern, practice, and "unwritten policy" of unlawful discrimination and retaliation against prisoners or employees of the DOC. In the last ten years, Defendant Taylor has been sued around three hundred times and

has had judgments against him for violating the constitutional rights of citizens.

225.   Plaintiff believes, and therefore avers, that Defendant Taylor has no regard for the Title VII or constitutional rights of Plaintiff.

<u>Count XIX</u>
<u>Sminkey v Machtinger</u>
<u>Personnel File</u>

226.  Plaintiff repeats and re-alleges paragraphs 1 – 225 set out above.

227.  Plaintiff wrote Defendant Machtinger on two occasions in June 2005 seeking access to his personnel file pursuant to State Law.

228.  Plaintiff was denied access by Defendant Machtinger in violation of State Law.

229.  Defendant Machtinger has been sued several times in the last five years and has had at least one judgment against him personally.

230.  Plaintiff believes, and therefore avers, that Defendant Machtinger has no regard for state laws, federal laws, or the constitutional rights of Plaintiff.

<u>Count XX</u>
<u>Sminkey v Minner</u>
<u>42 USC Section 1983</u>
<u>Failure To Supervise, Investigate, Discipline</u>

231.  Plaintiff repeats and re-alleges paragraphs 1 - 230 set out above.

232.  Defendant Taylor is the political appointee of Defendant Minner, who serves at the pleasure of the Governor (Defendant Minner).

233.  Over the last five years, there has been numerous, and wide spread media coverage regarding incidents and lawsuits involving the DOC and Defendant Taylor.

234.  In 2005, Defendant Minner received copies of reports regarding "Hostage incident at the Delaware Correctional Center" and "Task force on security issues at the Delaware Correctional Center".

235.  Despite blistering reports, hundreds of lawsuits, judgments against many DOC officials, wide spread media coverage, a DOC employee being raped, an inmate being killed by a DOC employee, and millions of tax dollars spent to compensate persons victimized by the DOC,

Defendant Taylor remains employed and not held accountable for his agency.

236. Plaintiff believes, and therefore avers, that Defendant Minner's failure to supervise, investigate and/or discipline Defendant Taylor allows for a culture to exist where there is a deliberate indifference to the constitutional rights of Plaintiff, or anyone else having contact with the DOC, or it's agents, servants, or employees.

237. Wherefore, Plaintiff Jack Sminkey, respectfully requests that judgment be entered in his favor for compensatory, special and punitive damages, back pay, front pay, pre-judgment and post-judgment interest in an amount to be determined at trial. Plaintiff also requests reasonable attorney's fee's (when applicable); and the cost of this proceeding, be assessed against the Defendants.

Jack Sminkey, Ph.D.
3402 Edgmont Avenue, #333
Brookhaven, PA 19005
(610) 620-3670
Plaintiff, Pro Se

Dated: April 24, 2006

** There is no page #1.
Exhibits A, B, C are attached.

# MISSION STATEMENT

The mission of the Delaware Department of Correction is to:

● provide protection to the public by incapacitating offenders in prison--by providing intensive supervision to offenders in the community;

● provide safe and humane facilities and services for offenders in prison; and

● promote long-term public safety through programs and rehabilitation for offenders by addressing problems which lend to future criminal activity.

Our guiding operational philosophy is, above all, to provide for the safety of the public at large, and corrections staff and offenders.

We acknowledge that in accordance with this mission, the Department must develop and maintain a competent and professional staff through active recruitment and proper training of qualified individuals.

The Department values the qualities of leadership and integrity, and strives to provide staff with opportunities for personal and professional growth, and to recognize their achievements. We seek to develop a spirit of teamwork, unity and dedication among staff to work towards the mission of the Department.

Furthermore, we recognize our duty to provide for treatment, rehabilitation and restoration of offenders as useful, law-abiding citizens within our communities. Those in our charge shall receive fair and humane treatment, and be housed in secure and sanitary environments.

We believe that the Department, as a public entity, is responsible for its operations and is accountable to the public. As such, we will work cooperatively and maintain open communications with those authorities in the judicial, legislative and executive branches of government.

# FOREWORD

The following code of conduct was developed nearly 10 years ago. A lot has changed in the Department of Correction since 1988. The offender population has exploded to record numbers. The Department's budget and staff complement have also increased substantially, as have the mix of treatment and rehabilitative services and approaches.

In spite of all this growth and change, the Code of Conduct remains as fresh and current as it was when it was written. Issues relating to intoxicants; on and off duty conduct, use of force and conflicts of interest are just as critical, if not more critical, than they were 10 years ago.

If the Code of Conduct is to be used as direction and guidance, it cannot just be read once and filed away somewhere. It must be revisited periodically to reinforce its principles and remind us of its content.

For those of you who are new employees about to read the Code for the first time, I want to extend my welcome to the Department of Correction. For current employees reading it for the 10th, 20th or 100th time, I hope it serves to renew your commitment to the Mission of the Department.

Stan Taylor, Commissioner

9/14/98

Exhibit "A" p1 of 7

A Note from the Commissioner.....

First of all, I'd like to personally welcome you to the Department of Correction. We hope you will find your work with us challenging and gratifying.

As a State of Delaware employee, you will be expected to meet our high moral and ethical standards. We trust that you will always use your best judgement in daily work and will strive ti fulfill our overall mission. Many times, your actions and attitudes will be dictated by common sense.

However, we realize that without a formal code of conduct, you may not always understand what is required and expected of you. This manual is designed to provide you with specific examples and definitions of appropriate and inappropriate behavior. It outlines formal guidelines and principles on a wide range of topics, including organizational memberships, political activities, conflicts of interest, discrimination, unprofessional conduct, insubordination and misuse or abuse of property or equipment. This code of conduct is applicable to all Department of Correction employees.

One of your first responsibilities is to become familiar with the code and its contents. We suggest you read through the manual several times, and then refer back to it periodically to refresh your memory. Any questions that you have about the content of this manual may be directed to your immediate supervisor.

Again, welcome to the Department of Correction.

*Robert J Watson*

Robert J. Watson

Acknowledgements:

The Delaware Department of Correction extends its gratitude to the Departments of Correction in the states of Alaska, Colorado, Illinoise, Indiana and Washington for sharing their codes of conducts with us and granting their permission to use portions of them in this manual.

## TABLE OF CONTENTS

1.  Code of Conduct ............................................... 1
2.  Departmental Responsibility .............................. 1
3.  Staff Responsibility ......................................... 1
4.  General Principles of Conduct ........................... 1
5.  Membership in Employee Organizations ............ 2
6.  Employee Organization Activities ..................... 2
7.  Solicitation ..................................................... 3
8.  Political Activity ............................................. 3
9.  Conflicts of Interest ........................................ 3
10. Personal Gain .................................................. 4
11. Discrimination ................................................ 4
12. Use of Slang, Gestures or other Derogatory References ...... 4
13. Reporting of Unprofessional Conduct ............... 5
14. Use of State Equipment ................................... 5
15. Reporting ....................................................... 5
16. Contact with Offenders .................................... 5
17. Use of Physical Force ...................................... 6
18. Prior Relationship with Offender ..................... 6
19. Availability and Timely Performance of Duties ... 6
20. Use of Intoxicants .......................................... 6
21. Insubordination .............................................. 6
22. Disregard of Another's Rights .......................... 7
23. Conduct Unbecoming Staff ............................... 7
24. Sleeping on Duty ............................................ 8
25. Convictions or Arrest ...................................... 8
26. Search of Staff and Personal Property .............. 8
27. Department Investigations ............................... 8
28. Disciplinary Action ......................................... 8
29. Definitions ..................................................... 8
30. Certification of Receipt .................................. 10

# DEPARTMENT OF CORRECTION
## CODE OF CONDUCT FOR DEPARTMENTAL STAFF

1. **CODE OF CONDUCT:**

   The Department of Correction has as its mission the protection of the public through confinement, supervision and rehabilitation of offenders. To that end, all employees are responsible for the security and safety of the public, their fellow employees and the offender. This code sets out high moral and ethical standards for correctional employees to assure unfailing honesty, respect for dignity and individuality of human beings and a commitment to professional and compassionate service.

2. **DEPARTMENTAL RESPONSIBILITY:**

   The Department shall ensure that all staff are given the opportunity to become familiar with this code. A copy of this code and all other administrative procedures shall be available to staff in a conspicuous and accessible area of each facility/institution/office. The existence of this code shall be presented at orientation and on-the-job training at each facility/institution office. All staff shall be issued a copy of this code.

3. **STAFF RESPONSIBILITY:**

   The ultimate and continuing responsibility for familiarity with and adherence to this code shall reside with each individual staff member. This code shall pertain to all staff unless otherwise specified.

4. **GENERAL PRINCIPLES OF CONDUCT:**

   a. Staff should be courteous in their dealing with any person, will discharge their duties in a fair and impartial manner, and shall recognize their responsibilities as public employees.

   b. Staff are encouraged to be on time for their engagements and perform their duties in a timely fashion.

   c. Staff shall treat their office as a public trust, and in the discharge of their duties, shall be mindful that their primary obligation is to serve the public efficiently and effectively consistent with applicable laws and departmental policies.

   d. Staff shall avoid misuse and waste of public property.

   e. Staff should take initiative in cooperating with governmental agencies, officials and employees in performance of their duties to the end that the safety and welfare of the general public and the betterment of the Department will be assured.

f. Staff should not hesitate to offer respectful criticism to other staff or supervisors coupled with a suggestion of how a task may be better performed. Staff should not, however, criticize other staff or their supervisors for the mere sake of criticism.

g. Staff should maintain a positive attitude toward the job and take pride in the profession. They should reflect a professional demeanor and maintain a professional appearance at all times.

As members of the criminal justice community, staff shall strive to be honest and set a good example for others. Staff shall not engage in the commission of any act prohibited by law or the omission of any act required by law, when said commission or omission is defined as prohibited conduct under the State of Delaware statutes or Federal statutes.

**MEMBERSHIP IN EMPLOYEE ORGANIZATIONS:**

Employees shall have the right to participate in employee organizations or not to do so, as they choose. No employee shall infringe upon the right of another employee in making the decision to form, join or assist an employee organization.

Any employee who feels that pressure is being exerted in regard to these decisions may report the facts of the situation to the immediate supervisor or the facility/institution/office head.

**EMPLOYEE ORGANIZATION ACTIVITIES:**

Employee organization information may be posted on designated staff bulletin boards with the approval of the facility/institution/ office head or designee. Employee organizations are advised that the posting of notices involves the use of state property and notices are not to include materials which are racist, inflammatory or derogatory in nature nor are notices to endorse a political party or candidate.

The solicitation and distribution of non-departmental literature or petitions by employees during hours of duty or on facility/institution/ office grounds by either employees or non-employees is prohibited absent authorization by the commissioner or his designee.

Representatives of employee organizations who are not Department employees may be granted access to a facility/institution/office with the prior approval of the facility/institution/office head. If access is granted, the representative shall be subject to the rules governing all visitors to the facility/institution/office. Representatives may have access to personnel files and employees in accordance with applicable State statutes and rules.

Work actions (e.g., strikes, sick-ins, or work slowdowns), either sanctioned or unsanctioned by employee organizations, are

prohibited. Participation in such actions shall result in disciplinary action which can result in dismissal.

7. **SOLICITATION:**

Solicitation of staff for funds, membership, or individual commitment to outside organizations or causes within any facility, institution, office, or physical confines during staff's working hours shall be permitted only with the prior written approval of the commissioner or his designee. Such approval will only be granted if the activity does not disrupt the security or efficiency of the facility, institution, office or physical confines.

8. **POLITICAL ACTIVITY:**

Individual staff are entitled to hold whatever political beliefs the individual desires, unless said beliefs adversely affect his ability to perform his duties in a fair and appropriate manner. No staff shall be forced or coerced to make political contributions, nor be required to participate in any form of political activity whatsoever. However, a staff person is encouraged to express freely his views as a citizen and to cast his vote in an election. Staff may engage in political activity during off-duty hours consistent with applicable law. However, no staff may engage in political activity while in uniform, or within the physical confines of the institution/facility/office. This section does not prohibit voluntary contributions to any political party, but such contributions shall not be made or solicited during working hours.

9. **CONFLICTS OF INTEREST:**

Staff shall perform their duties in such a manner that appearances of impropriety or conflicts of interest do not exist. Compromising activity may include any activity that gives rise to a suggestion of impropriety or conflict of interest. Staff shall not accept gifts nor gratuities from anyone with whom the Department conducts business. Any questions regarding potential conflicts of interest shall be discussed with the staff member's immediate supervisor for advice and direction. No staff person shall supplement any state salary through activities engaged in the physical confines of the institution or office, rendering service to other, rendering service to other staff, offenders or the public.

10. **PERSONAL GAIN:**

No staff person shall use a position with the Department, or use any knowledge obtained from that position, or use any state property for personal gain or the gain of others.

## DISCRIMINATION:

It is public policy of the State of Delaware not to discriminate against any person based upon race, age, religion, color, sex, handicap, national origin or ancestry. Department staff shall not discriminate, in any manner, against any other staff member, offender, offender's family or member of the public.

Sexual harassment is a form of discrimination and will not be tolerated. Disciplinary action shall be taken where evidence exists to indicate that discrimination or harassment exist or has occurred.

## 2. USE OF SLANG, GESTURES OR OTHER DEROGATORY REFERENCES:

Staff shall perform assigned job duties in a professional manner. Staff shall not use slang, make obscene or indecent gestures or remarks, or make derogatory references to other staff, members of the public or offenders in relation to another individual's;

a. Race;
b. Religion;
c. Color; •
d. Sex;
e. Handicap;
f. National origin or ancestry or;
g. Creed.

Staff shall refer to offenders by first name or surname. Staff shall refer to other staff by rank designation, first name or surname. Use of nicknames is to be evaluated according to the following criteria:

a. the response a reasonable person might be expected to give if the nickname is used publicly;
b. the nickname is used publicly;
c. the reaction of the person to whom the nickname is addressed;
d. the obscenity or crudeness of the name;
e. the origin of the nickname and,
f. the effect of the use of the nickname on the operation of management of the facility or institution.

## 13. REPORTING OF UNPROFESSIONAL CONDUCT

It is the duty of all staff persons to report unprofessional conduct which is observed. The report shall be in writing, and is to be made to the immediate supervisor of the staff person who observed the unprofessional conduct. The report is to include:

a. the name of the alleged offending staff person;
b. the date and time of the alleged unprofessional conduct;
c. a description of the alleged unprofessional conduct;
d. a statement of circumstances relating to the alleged unprofessional conduct and;
e. a list of other witnesses to the alleged unprofessional conduct.

It is the responsibility of the immediate supervisor to inform the offending staff person of the complaint, investigate the alleged conduct and respond in writing to all reports of alleged unprofessional conduct.

All reports and disposition of allegations concerning unprofessional conduct shall be made a part of an investigations file. Any record concerning a verified complaint of unprofessional conduct is to be made a part of the staff person's personnel file. A staff person shall not direct any reprisal against any other staff person who has filed a report of unprofessional conduct.

## 14. USE OF STATE EQUIPMENT:

Staff shall not use State-owned or leased equipment or property in such a fashion as to reflect discredit on the Department or show a careless disregard to the public funds represented by this equipment or property.

## 15. REPORTING:

Staff shall submit true, accurate and appropriate reports in a timely fashion when required to do so by the policies or procedures of the Department, by the operating procedures of the institutions or facilities, or by the facility/institution/office head. Staff shall not knowingly convey false information to other staff concerning official departmental business.

## 16. CONTACT WITH OFFENDERS:

Trafficking with incarcerated offenders is prohibited. No staff person shall have any personal contact with an offender, incarcerated or non-incarcerated, beyond that contact necessary for the proper supervision and treatment of the offender. Examples of types of contact not appropriate include, but are not limited to, living with an offender, offering an offender employment, carrying messages to or from an offender, social relationship of any type with an offender, and physical contact beyond that which is routinely required by specific job duties. Any sexual contact with offenders is strictly prohibited. Contact for other than professional reasons with offenders outside of the work place shall be reported in writing to the employees supervisor.

## 17. USE OF PHYSICAL FORCE:

Physical force shall be used only as authorized by policy. Excessive use of force shall result in disciplinary action which can result in dismissal.

18. **PRIOR RELATIONSHIP WITH OFFENDERS:**

Upon learning of the commitment to the Department of a friend or relative, staff shall notify the facility/institution/office head, in writing, of such a relationship. New staff shall advise the existence of such relationships upon accepting employment with the Department or upon discovery, if not known at the time of accepting employment.

19. **AVAILABILITY AND TIMELY PERFORMANCE OF DUTIES:**

Staff shall be available to duty as necessary to ensure that the safety and security of the Department is maintained at all times. No staff shall fail to report to work on time without a good and sufficient reason. All staff shall provide a telephone number at which the Department may contact the staff member. To ensure the safety and security of the facility/institution/office, staff may be required to come to or stay at work beyond the normal hours of the assigned shift. In any case staff shall remain at their assigned post until properly relieved.

20. **USE OF INTOXICANTS:**

Use or possession of intoxicants by staff while on duty, in the performance of any duty in an official capacity, or within the physical confines of any facility, institution or office shall be strictly prohibited. Such prescription does not include substances prescribed by a physician for the staff person processing such substance, when used as directed. However, staff utilizing intoxicating medication shall notify their immediate supervisor of that fact and may be required to show proof that the effect of the medication does not affect their performance level adversely.

No staff person shall be intoxicated while on duty, in the performance of any duty in an official capacity, or within the physical confines of any facility/institution/office. Where evidence exists to indicate an employee is impaired, disciplinary action shall be taken.

As a condition of employment, all staff shall consent to a chemical test upon request. Such requests shall be based upon a reasonable suspicion that the staff person has used intoxicants. Refusal to submit to a chemical test shall constitute insubordination and be grounds for disciplinary action, up to and including dismissal.

The presence of any controlled substance in any amount within a staff person, without a proper physician's authorization, shall be grounds for disciplinary action up to and including dismissal.

21. **INSUBORDINATION:**

A staff person shall obey job-related orders from duly recognized supervisors. The failure to obey lawful orders constitutes

insubordination. Staff may require review of the order by a higher authority within the department only after the order is obeyed.

22. **DISREGARD OF ANOTHER'S RIGHTS:**

Staff shall respect the personal or property rights of others. Staff should seek to avoid the negligent loss or destruction of the property of another. Staff shall seek to avoid conduct likely to lead to the capricious or negligent endangerment of the life or limb of another person.

23. **CONDUCT UNBECOMING STAFF:**

Staff shall conduct themselves at all times so as to reflect favorably on the Department. Unbecoming conduct shall mean, but not to be limited to:

a. consumption of intoxicating (alcohol) beverages and/or drugs while on duty or being intoxicated while on duty;

b. overbearing, oppressive, or tyrannical conduct in discharge of duty;

c. neglect of duty;

d. acts of incompetence;

e. absent from duty without leave;

f. abuse of sick leave;

g. discourtesy or insolence

h. tardiness;

i. dissemination of confidential information contrary to the rules and procedures of the Department;

j. any conduct that would interfere with the staff member's ability or fitness to effectively perform required duties;

k. unauthorized destruction of state property;

l. conviction of a felony or misdemeanor or adverse judgement of an infraction;

m. gambling;

n. insubordination;

o. failure to submit true and accurate reports;

p. violation of any federal or Delaware statute;

q. failure to cooperate in any official department investigation.

24. **SLEEPING ON DUTY:**

Attentiveness to duties and responsibilities is of primary importance in a correctional setting. Anyone found sleeping on the job or being inattentive to their duties because of the appearance they are sleeping shall be subject to disciplinary action. Except when significant mitigating circumstances exist, the employee can expect to be dismissed.

**5.  CONVICTIONS OR ARREST:**

A staff person shall report in writing any arrest and/or conviction for a misdemeanor or felony, or summons for an infraction within five (5) days of such action to the immediate supervisor.

**26.  SEARCH OF STAFF AND PERSONAL PROPERTY:**

Staff shall be subject to search of their person, effects and vehicles upon entering or leaving a facility/institution or at any time while within the physical confines of such a facility/institution. Refusal to submit to a search shall result in the denial of entry into a facility/institution and/or disciplinary action. Searches of a more intensive nature (i.e. strip searches) shall only be conducted when based upon a reasonable suspicion that the staff is carrying contraband or violating the procedures of the Department and only when approved by the institution/facility/office head.

**27.  DEPARTMENT INVESTIGATIONS:**

All staff persons shall cooperate to the fullest extent in any Department investigation upon request. Failure to cooperate with any department investigation, shall result in disciplinary action. Staff also have an affirmative duty to report, in a timely fashion, any violation of the Department's code of conduct to the appropriate supervision or institution/facility/office head. Should an institution/facility/office head be involved in the misconduct, staff should report the violation to the office of the Commissioner. Failure to report a violation will be considered as serious as the violation itself.

**28.  DISCIPLINARY ACTION:**

Disciplinary action may be taken for the violation of any part of this policy. However, the Department is not limited to this code of conduct as a basis for disciplinary action and may impose appropriate discipline for any just cause.

**29.  DEFINITIONS:**

For the purpose of this policy, the following definitions are presented:

a.  **Anyone with Whom the Department Conducts Business:** Any individual, partnership, corporation or other association, whose interest in a particular matter may be dissimilar to those of the Department and by, with, through or for whom the Department carries out its statutory and constitutional charge of rehabilitating offenders and members of their families, members of other agencies, contractors and vendors (prospective or otherwise), attorneys or private clients, etc.)

b.  **Chemical Test:** Analysis of blood, breath, urine, or other bodily substance for the determination of the presence of intoxicants.

c.  **Commissioner:** Chief Executive of the Department.

d.  **Controlled Substance:** A drug, substance.

e.  **Department:** Department of Correction.

f.  **Facility:** A correctional unit with a warden or director in charge, operated or controlled by the Department for the purpose of housing offenders.

g.  **Facility/institution/Office Head:** The chief administrator of a facility/institution/office.

h.  **Incarcerated:** A condition of those offenders not assigned to Community Corrections.

i.  **Institution:** A correctional unit with a warden or director in charge operated by the Department for the purpose of housing offenders.

j.  **Intoxicants:** Under the influence of an intoxicant or in an impaired condition of thought or action to such an extent that the normal performance of duty is or could be affected.

k.  **Offender:** Any person committed by a court to the care, custody, or control of the Department.

l.  **Office:** A correctional unit operated by the Department which conducts departmental business but does not have as a purpose the housing of offenders.

m.  **Physical Confines:** All areas of any facility or institution, in which offenders are housed and/or receive treatment, the public offices of the facility, institution, or office and the parking areas for the facility, institution or office.

n.  **Public:** Any person including the news media, with the exception of departmental staff, or members of any local, state or federal agency providing to the Department, or receiving therefrom a lawful service during the course of their official duties.

o.  **Staff:** Any full-time, part-time, temporary, or volunteer employee of the department, including members of the Council on Correction.

Mr. Gregory E. King, Jr., Supervisor
EEOC Philadelphia Office
21 South 5th St., Suite #400
Philadelphia, PA 19106                    January 28, 2006

RE: Charge number 170-2005-03060

Dear Mr. King;

Per our brief conversation a couple weeks ago, I am writing to respond to
your offer for me to send you further information regarding the above
captioned matter.

In July 2005 I sent charge discrimination to your agency via the U.S. Mails.
In November I met with an investigator. My understanding at that time was
that your agency was not going to investigate; however, the charge was
docketed.

Around Christmas 2005 I completed my investigation of the Department of
Correction. My findings do change some of the allegations and further
supports Title VII charges (in my opinion). Since my investigation reveals
that virtually all allegations involving the State of Delaware are not resolved
at the EEOC level, I don't see the need to amend my complaint or waste the
resources of the EEOC chasing something they really can't resolve.

Additionally, I intend on bringing other claims against the Department of
Correction not in the purview of the EEOC. With this said I will patiently
await a Right-to-Sue letter and seek redress in United States District Court.

Thanks for your prompt attention to this matter.

I am,

Jack Sminkey, Ph.D.
3402 Edgmont Avenue #333
Brookhaven, PA 19015
(610) 620-3670

cc: Delaware Department of Labor
    Mr. Ronald Sauls, DOC

Exhibit "B" P1 oF3

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Jack E. Sminkey**
**3402 Edgmont Avenue**
**Apt. 333**
**Brookhaven, PA 19015**

From: **Philadelphia District Office - 530**
**21 South 5th Street**
**Suite 400**
**Philadelphia, PA 19106**

| | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))* | |
|---|---|---|
| EEOC Charge No. | EEOC Representative | Telephone No. |
| **170-2005-03060** | **George E. King, Jr.,** **Supervisory Investigator** | **(215) 440-2659** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| | While reasonable efforts were made to locate you, we were not able to do so. |
| | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| **X** | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| | Other *(briefly state)* |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosure(s)

**Marie M. Tomasso,**
**District Director**

*January* 27, 2006
*(Date Mailed)*

cc: **DELAWARE DEPARTMENT OF CORRECTIONS**

I received 1/30/06

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --** **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you** *receive* **this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date** this Notice was *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit <u>before</u> 7/1/02 – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

STATE POLICE

| Plaintiff | Case # | Date Filed | Issue | Outcome | Compensation | Department Head |
|---|---|---|---|---|---|---|
| David L. Baylor | 98-CV-00285 | 06/1/98 | Denied Promotion | Settled | Unknown | Pepper |
| Valerie M. Robinson | 99-CV-00406 | 06/1/99 05/16/02 | Denied Promotion Disparate Treatment | Settled | Unknown | Pepper |
| Ronald F. Tate | 99-CV-00416 | 07/1/99 | Retaliation 1st Amendment | Settled | Unknown | Pepper |
| Herbert J. Douglas | 01-CV-00419 | 06/20/01 | 1983 Claim | Verdict | Unknown | Pepper |
| Penelope Marshall | 01-CV-00494 | 07/20/01 | Discrimination | Settled | $50,000 | Pepper |
| Ram Canaas Inc. | 01-CV-00614 | 09/11/01 | 1983 Claim | Settled | Unknown | Pepper |
| Christopher D. Fornker | 02-CV-00302 | 04/24/02 | Retaliation 1st Amend | Verdict | $100,000 | Chaffinch |
| John A Dillman III | 02-CV-00509 | 06/6/02 | Retaliation Due Process | Settled | $500,000 | Chaffinch |
| William Buller/Jeffrey Giles | 02-CV-01315 | 07/24/02 | Reverse Discrimination | Verdict | $550,000 | Chaffinch |
| Rebecca B. Mcknatt | 02-CV-01659 | 12/03/02 | Retaliation/Harassment | Verdict | $130,000 | Chaffinch |
| Willie E. Smith | 03-CV-00547 | 6/9/03 | Retaliation Hostile Env | Settled | $95,000 | Chaffinch |
| Gregory A. Warren | 03-CV-00908 | 9/25/03 | 1st Amendment | Settled | $136,263 | Chaffinch |
| Chris D. Foraker/B. Kurt Price/Wayne Warren | 04-CV-00956 | 8/1/04 | Retaliation | Pending | Pending | Chaffinch |
| Christopher D. Foraker | 04-CV-01207 | 8/30/04 | Retaliation | Pending | Pending | Chaffinch |
| Barbara L. Conley | 04-CV-01394 | 10/27/04 | Promotion Sexual Harassment | Pending | Pending | Chaffinch |
| State Police Cadet Exam | Unknown | Late 1990's | Racial Discrimination | Settled | $3,480,000 +1,425,000 Pending | Several |
| Diane E. Moss | 05-CV-708 | 09/29/05 | Title VII/Promotion | Pending | Pending | Thomas Macliesh |

Exhibit "C" P1 oF2

DEPARTMENT OF CORRECTION

| Plaintiff | Case # | Date Filed | Issue | Outcome | Compensation | Department Head |
|---|---|---|---|---|---|---|
| Thomas G. Baylor | 99-CV-00627 | 09/20/99 | Retaliation, 1st Amend | Settled | $153,000 | Stan Taylor |
| Dominique Brown | 00-CV-00196 | 03/20/00 | 1st & 14th Amendment | Verdict | $200,000 | Stan Taylor |
| Douglas A. Bounds | 00-CV-00197 | 03/20/00 | 1st & 14th Amendment | Verdict | $51,000 | Stan Taylor |
| Terri S. Massey | 01-CV-00184 | 03/20/01 | 1983 Claim | Settled | Dismissed/closed 01/28/02 | Stan Taylor |
| Lynne R. Copes | 03-CV-00561 | 06/16/03 | Title VII/Retaliation | Settled | $1,000.00 | Stan Taylor |
| Cassandra Arnold | 04-CV-01346 | 10/12/04 | 1983 Claims/Tort Claims Act/Good Faith and Fair Dealing | Settled | $1.65 million | Stan Taylor |
| Daniel L. Mare | 04-CV-01396 | 10/27/04 | Federal Question | Dismissed | Case closed 07/27/05 | Stan Taylor |
| Karen Brandewie | 05-CV-00625 | 08/25/05 | Title VII | Pending | Pending | Stan Taylor |
| Dion Hawkins Karen Hawkins Doneil Winder Christina Bates | 05-CV-00530 | 07/25/05 | Discrimination/ Retaliation/Unsafe Working Conditions | Pending | Pending | Stan Taylor |
| Susie A. Wilson | 05-CV-00821 | 12/01/05 | Wrongful death | Pending | Pending | Stan Taylor |

06-263

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Jack Sminkey

**(b)** County of Residence of First Listed Plaintiff  Delaware (PA)
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Jack Sminkey  3402 Edgmont Ave #333
Brookhaven, PA 19015  (610-620-3670)

## DEFENDANTS

Ronald Sauls,
Dept. of Correction, et al.

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. Section 1983 , Civil Rights Act of 1964 as amended

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**
Excess of $100,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):    JUDGE                    DOCKET NUMBER

DATE  4/24/2006

SIGNATURE OF ATTORNEY OF RECORD  Jack Sminkey

## FOR OFFICE USE ONLY

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

OFFICE OF THE CLERK
**UNITED STATES DISTRICT COURT**
DISTRICT OF DELAWARE

Peter T. Dalleo
**CLERK**

LOCKBOX 18
844 KING STREET
U.S. COURTHOUSE
WILMINGTON, DELAWARE 19801
(302) 573-6170

RE:   C.A.#   06-263

CASE CAPTION:   Sminkey   v. State of DE, et al

## ACKNOWLEDGMENT OF RECEIPT FOR F.R.Civ.P. 4

I hereby acknowledge receipt of a copy of Rule 4 (Summons) of the Federal
Rules of Civil Procedure, and understand that it is my responsibility to make service of
process on defendants in accordance with this rule.

Date Received        APR 2 4 2006        Signed: _____
by Plaintiff:                                           Pro Se Plaintiff

Date Received        APR 2 4 2006        Signed: _____
by Clerk's office:                                      Deputy Clerk

Note: If you received Federal Rule 4 by mail, please sign this receipt and return it to:

Clerk
U.S. District Court
844 N. King Street
Lockbox 18
Wilmington, DE 19801

If applicable, Rule 4 mailed to plaintiff:

_____
Date mailed

_____
By Deputy Clerk

cc:   Docketing Clerk

wp\forms\rule4receipt 2-04