# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF DELAWARE

JACK E. SMINKEY,                          :
                                          :
      Plaintiff,                     :
                                          :
      v.                             :          C.A. No. 06-263-GMS
STATE OF DELAWARE, et al.,                 :
                                          :
      Defendants.                    :

## APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT

## OF SUMMARY JUDGMENT AND/OR DISMISSAL

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Marc P. Niedzielski
Marc P. Niedzielski (#2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8324
marc.niedzielski@state.de.us
Attorney for Defendants

DATED:  June 30, 2008

## TABLE OF CONTENTS

Charge of Discrimination.................................................................................A1

Department of Correction Employment Information .........................................A2

Deposition of Caren DeBernardo, Psy.D. pages 30 through 33 .........................A4

DeBernardo Exhibit 1 .....................................................................................A5

Deposition of Dr. Caren DeBernardo  pages 54 through 65..............................A8

January 19, 1988 Trial Board decision  ...........................................................A11

BOTC Behavior Assessment Report dated March 17, 2005 .............................A46

BOTC Behavior Assessment Report dated April 12, 2005 ...............................A49

BOTC Behavior Assessment Report dated April 28, 2005 ...............................A53

April 29, 2005 letter to plaintiff from Commissioner Stanley Taylor ..............A57

Machtinger Transcript Exhibit 4 ......................................................................A58

Machtinger Transcript Exhibit 5 ......................................................................A59

Deposition of Alan Machtinger pages 42 through45; 58 through 65 .................A66

Machtinger Transcript Exhibit 6 ......................................................................A69

Deposition of Jack E. Sminkey pages 156 through 157 ...................................A70

01/31/2006  02:27   3027396740            DEPT DOC HR                      PAGE  03/03
  01/20/2006  16:49   PERSONNEL OFFICE → 913027396740                      NO. 408   002

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 170-2005-03060 |

**Delaware Department of Labor** _____ and EEOC
State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Mr. Jack E. Sminkey** | (610) | 1962 |

Street Address                    City, State and ZIP Code
**3402 Edgmont Avenue, Apt. 333, Brookhaven, PA 19015**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **DELAWARE DEPARTMENT OF CORRECTIONS** | **500 or More** | **(302) 739-5601** |

Street Address                 City, State and ZIP Code
**245 Mc Kee Road, Dover, DE 19904**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                 City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ OTHER (Specify below)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **03-15-2005** | **04-28-2005** |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On or about March 15, 2005, I believe that my disability was used to hurt, embarrass and create a hostile work environment for me. I believe that race was a factor in how I was treated in that a Mexican male frequently cursed, told lewd jokes and was sarcastic to instructors but received no disciplinary action. I was discharged on May 3, 2005. I believe that age was a factor in that another male and I are both over the age of 40, he attacked an instructor for which he could have been fired but received no disciplinary action and I was discharged. I believe that I was discriminated against based on sex/sexual harassment in that a female cadet motioned as if to kick me in the groin, said she was going to "kick me in the nuts" and talked about women wearing thongs and one of the instructors told me that my underwear was showing. I had been employed since February 25, 2005.

My discharge notice dated April 28, 2005 which was signed by Stan Taylor, White male Commissioner about 53 years old, stated that I was dismissed after being placed on formal notice due to my failure to follow directions, repetitive history of showing an inappropriate attitude and most recently, my disrespectful responses towards a guest instructor and Probation and Parole Supervisor.

I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of my race, White and my sex, male, in violation of the Age Discrimination in Employment Act of 1967, as amended, because of my age, 42 (at the time of my employment), and in violation of the Americans with Disabilities Act of 1990 because of my disability. I believe that I was retaliated against because of my disability.

| | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Nov 14, 2005** _Jack E. Sminkey_ | |
| Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

**A000001**

# DEPARTMENT OF CORRECTION
## EMPLOYMENT INFORMATION
### CONFIRMATION OF UNDERSTANDING

I have received a copy of the information listed below. I understand that it is my responsibility to read and understand the information contained therein.

- Employment Information
- Personnel Information (Career progression…etc.)
- Physical & Mental Aspects of Training

Background Clearance
I understand that my employment history, driving record, criminal record, and personal background are some of the factors that will be used to determine my suitability for the position.

I understand that it is my responsibility to notify the Department of Correction of all criminal charges that have been placed against me and subsequently the dispositions of the charges. Furthermore, I understand that if I fail to disclose this information through negligence or intent and it is found out later that I have outstanding charges or have been convicted of an offense(s) that violates Departmental policy for criminal convictions, it may be cause for rejection of my application or dismissal (if already employed).

I understand that failure to indicate a charge, whether through negligence or intent, will be considered as falsification of information and will result in rejection of my application.

Training
I understand that I must successfully pass all phases of the mandatory training program. I further understand that if I do not successfully pass all phases of the mandatory training program that I will be terminated from employment.

Dress Code/Shift Work/Institutions
I understand that the Department of Correction has a standardized dress code. I further understand that if I violate the dress code, I may receive disciplinary action up to termination from employment. Furthermore, I understand that I must be willing to work shift work and that I must be willing to work at any of the institutions.

---

**Physical and Employment Verification** (circle the correct responses)
I have reviewed the physical & mental aspects of the position. I believe that I can / can not perform these duties either with or without accommodation.  Not sure?

I have / have not had disciplinary action taken against me by an employer. (If you have had disciplinary actions taken against you, you must provide the details on the following page.)

---

Jack Smulkey | 222-587582            Jack Smulkey   8/11/2004
Printed Name/SSN                         Signature/Date

## DEPARTMENT OF CORRECTION
## EMPLOYMENT INFORMATION

Use this sheet to provide additional information about disciplinary actions taken against you by an employer. Please include the employer's name, the approximate date of the action, the reason for the action, and the action that was taken against you.

For this purpose, disciplinary action is defined as verbal counseling, written reprimand, loss of pay, fine, suspension or dismissal.

| Date | Employer | Reason for Action | Action Taken |
|------|----------|-------------------|--------------|
|      |          |                   |              |
|      |          |                   |              |
|      |          |                   |              |
|      |          |                   |              |
|      |          |                   |              |
|      |          |                   |              |

**D000182**
**A000003**

Page 30

1 also, again, the handout that they give you to
2 explain the side effects and the reasons that you're
3 taking the medication and so forth.
4    Q.  How about the dosage of the medication; is
5 that a factor of it?  If you're on a low dosage of
6 something versus a high dosage?
7    A.  Is that a factor for what?
8    Q.  Well, from your standpoint of interviewing
9 somebody and what you're doing.
10    A.  I would ask that.  If somebody told me
11 that they were on medication, I would follow up with
12 a question — a series of questions, actually — but
13 one of the questions would be, what the dosage and
14 how long have you been taking it and so forth.
15        It might be a factor; it might not.  It
16 depends on the medication, it depends on the person.
17 You know, people, obviously, who are on a higher
18 dosage usually have more symptoms.  In general,
19 that's just a —
20    Q.  Do you know what Bextra is?
21    A.  Bextra?  No.

Page 31

1    Q.  Therefore, you don't know what it's used
2 for, the medication?
3    A.  I'm assuming it's a medication, but I
4 don't know what it's used for.
5    Q.  Therefore, you wouldn't know if it's a
6 narcotic, because you're not familiar with the
7 medication.
8    A.  I'm not familiar with the medication.
9    Q.  Before we started today, did you get an
10 opportunity to read some of the documents that you
11 provided to Mr. Niedzielski?
12    A.  That I provided to him?
13        MR. NIEDZIELSKI:  Or that he provided to
14 her.
15 BY MR. SMINKEY:
16    Q.  Well, I'm really thinking — it could be
17 either way.
18    A.  The only thing I provided to him was the
19 report that you already have and my CV and —
20    Q.  Correct.  Did you review the report that
21 you wrote on February 9th, 2005?

Page 32

1    A.  Yes, I did.
2    Q.  I guess that's what I'm actually alluding
3 to.  There is no trick questions here.
4    A.  Okay.
5    Q.  I'll tell you what, rather than root
6 through all that, I'll just give you each a copy and
7 we will mark it as an exhibit.  There's only going
8 to be about three exhibits here.
9    A.  So that's just my report?
10    Q.  That's a copy of it, yes.  And we can mark
11 that as an exhibit.
12        (Deposition Exhibit No. 1 marked for
13 identification.)
14 BY MR. SMINKEY:
15    Q.  So you have read this rather recently?
16    A.  Right.  I read it this morning.
17    Q.  Okay.  Based on your recollection of
18 everything, fair to say you stand behind this
19 report; is that correct?
20    A.  I do, in terms of when I wrote it.
21 Obviously I have more information now that I did not

Page 33

1 have then.
2    Q.  So based on when you wrote this report,
3 did I look like a good applicant for a law
4 enforcement position?
5    A.  Yes.  I recommended you, so I didn't have
6 any problems based on the information I had at the
7 time.
8    Q.  Do you recall what dates I was with the
9 Department of Correction?  Would you have any reason
10 to know that?
11    A.  You mean after you were hired?
12    Q.  Yes.
13    A.  I don't know, no.
14    Q.  So I need to tell you that.
15    A.  Okay.
16    Q.  All right.  So you generated this report
17 on February 9th of 2005.
18    A.  Right.
19    Q.  Human resources received it February 15th
20 of 2005; is that correct?
21    A.  That's correct.

9 (Pages 30 to 33)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

A000004

# *Forensic & Law Enforcement Services*

Caren DeBernardo, Psy.D.
Phone: (443) 901- 0896
Fax: (443) 901- 0897

7801 York Rd
Suite 239
Towson, MD 21204

## LAW ENFORCEMENT PSYCHOLOGICAL CONSULTATION
### CONFIDENTIAL

| | |
|---|---|
| **Type:** | **Applicant Pre-employment Screening** |
| **Date of Interview:** | **2/9/05** |
| **Applicant:** | **Jack Sminkey** |
| **Date of Birth:** | **11/8/62** |
| **Age:** | **42 years** |
| **Agency:** | **State of Delaware Department of Correction** |
| **Position:** | **Probation and Parole Officer** |

**This applicant was <u>Recommended</u>.**

The findings detailed in this report are based on the results of the MMPI-2 and an interview with the applicant. There was no background investigation available on the candidate. These findings represent an opinion of the individual's psychological suitability for employment in law enforcement or corrections and should be combined with all other application materials for a final decision. It is expected that the results will be used as one component in a comprehensive selection process. This evaluation is not valid after one year from the date marked above.

### I. Summary of MMPI-2:

The applicant completed the MMPI-2, a self-report inventory of psychiatric symptoms and personality characteristics. The applicant's validity profile indicates a deliberate attempt to present oneself in a favorable light by denying any emotional problems. This pattern is not uncommon for individuals taking this instrument for employment screening purposes. Clinical scales fall within normal limits. There is no evidence of overt psychopathology or troublesome personality characteristics.

### II. Summary of Findings:

Mr. Sminkey is a 42 year-old, married, Caucasian male. He presented as a friendly, talkative man with a jovial manner. The applicant indicated that he would like to become a probation officer because he "wants to look out for the public and community". He was knowledgeable about the duties of a probation and parole officer. He was realistic about the



DEPOSITION
EXHIBIT #(
DeBernardo
3/28/06 GWT

D000391

- RECEIVED

FEB 1 5 2005

HUMAN RESOURCES

**A000005**

dangerousness and stress associated with the job.

The applicant was born and raised in Philadelphia, Pennsylvania. He resides with his wife and two children (ages 16, 7) in Middletown, Pennsylvania. He has been married 18 years. He reported a good childhood. His parents raised his two sisters and him. He graduated from high school with average grades. He earned a Bachelor degree from American State University in 1997 and a Ph.D. from American State University in 1997 (distant learning program). He has no military history.

The applicant has been self-employed as private investigator for the past five years. He served approximately 15 years as a police officer. He worked 8 months as an officer with Delaware River and Bay Authority, 8 months with Delaware State Capital Police, three years with New Castle City Police, and 10 years with Philadelphia Transit Police. He reported a good work history. He received minor reprimands as a police officer.

Mr. Sminkey denied receiving mental health treatment. He has never been hospitalized in a psychiatric facility. There is no family pedigree for mental illness or substance abuse. His paternal uncle committed suicide. The candidate reported no problems with mood, anxiety, anger control, social relationships or domestic violence. He denied a history of suicidal ideation, intent, plan or past attempts. He described his mood as "good" and himself as "fair, reasonable, and bashful".

He reported that he consumes "6"alcoholic beverages per "year". He stated that he has not been intoxicated since age 21. He denied problems related to alcohol. He denied a history of alcohol blackouts, withdrawal symptoms, or driving under the influence. He denied use of illicit drugs.

In 1981, Mr. Sminkey was arrested for criminal mischief. He indicated that he broke off a car mirror. The charges were dropped. There is no further legal history, pattern of antisocial acts, or history of violence.

**1. Emotional Characteristics:** <u>**Average.**</u> The applicant is appropriately mature for his age and presents as emotionally stable. There is no indication of emotional difficulties or past history of mental disorders. He appears to have good anger control and ability to deal with stress.

**2. Judgment Characteristics:** <u>**Average.**</u> The applicant has shown ability to deal with stressful and conflictual situations as a police officer and investigator. He denies engaging in reckless driving, driving while intoxicated, gambling, excessive drinking/drugging, or extreme sports. He appears to have good judgment and an adequate level of responsibility.

**3. Social Sensitivity Characteristics/respect for offenders:** <u>**Average.**</u> The applicant presents with no question of his personal integrity. He did not evidence prejudice or cognitive inflexibility during the interview. He demonstrated social sensitivity and ability to express empathy. He is able to interact with people from diverse racial, ethnic and socioeconomic backgrounds in a fair and consistent manner.

**4. Interpersonal Characteristics:** <u>Average.</u> This applicant presented as a friendly and likable man. His social skills were good. He reported close relationships with friends and family and no conflict with co-workers or supervisors. He appears capable of forming and maintaining close interpersonal relationships.

**5. Achievement Characteristics:** <u>Above Average.</u> This applicant has achieved a Ph.D, in criminal justice from American State University. He performed well in school. He appears to have the cognitive ability to satisfactorily complete the training academy and perform the duties of this position.

**6. Motivational Characteristics:** <u>Average.</u> The applicant appears well motivated for a career in corrections. He holds realistic expectations about the job.

**7. Use of Force:** <u>Average.</u> The applicant has a sense of the appropriate and inappropriate use of force in law enforcement situations. He appears able to control emotions in stressful situations where force may be utilized. He demonstrated solid judgment when describing his response to a hypothetical scenario involving a decision to use deadly force.

**8. Respect for Authority:** <u>Average.</u> The candidate appears able to operate within a chain of command, accept direction, and understand that individual decisions are subject to management review.

**9. Substance Abuse Risk:** <u>No.</u>

**10. Domestic Violence Risk:** <u>No.</u>

**III. Summary and Conclusions:**

. Based on the available information, which does not include a background investigation, this applicant is **<u>RECOMMENDED</u>** to become a probation and parole officer with Delaware State Department of Correction. He presents as friendly man with no signs of mental illness or instability. He is not emotionally disturbed, does not suffer from any psychological pathology or have personality traits that will prevent him from performing the essential functions of the position. The candidate possesses several positive personality factors including a positive attitude, good judgment, and good stress management, which should contribute to success as a probation officer.

Caren DeBernardo, Psy.D.
Licensed Psychologist

Page 54

1 it never happened before I met them, how would I
2 know that? I'm not psychic.
3      So if we're talking about something that
4 happened that we can have a discussion about and I
5 can evaluate whether that was an impulsive or
6 inappropriate behavior with the candidate that I'm
7 talking with and we can talk about it, that's a
8 different story, but if it never happened before we
9 talked, then I can't make a judgment on it.
10     Q.  Part of being a psychologist, are you able
11 to somewhat predict future behavior?
12     A.  No.  We make a risk assessment and we can
13 present -- basically, my job in the preemployment
14 screening is to rule out high-risk people, try and
15 screen out the people who are probably going to be a
16 big problem for the department.  I in no way say
17 that I can predict behavior; I in no way say that
18 I'm a hundred percent accurate, and we need to put
19 all the information we have available at the time to
20 make a risk assessment, basically.  And we want to
21 get the people who are high-risk out and the

Page 55

1 low-risk people in, basically.  So there is no way
2 that you can predict behaviors.
3      Q.  Is the best prediction of future behavior
4 past behavior?
5      A.  That is accurate.  The best predictor of
6 what would happen in the future is based on past
7 behavior.  That's what they say in psychology and
8 I'm sure you have heard that before, since you
9 quoted that.
10     Q.  I have.
11      Is it possible that you or another
12 psychologist could evaluate somebody, and a month or
13 two later they go rob a bank?
14     A.  Anything is possible, sure.  Again, we try
15 and get as much information as we can and hopefully
16 screen people out, but it's possible that anything
17 could happen.  I mean, I certainly say that I am not
18 predicting behavior.  People can act in
19 unpredictable ways.
20     Q.  So what you're saying is that you
21 basically admit that the science isn't perfect, the

Page 56

1 psychologist is not perfect; you do the best you
2 can.
3      A.  Exactly.
4      Q.  And that's really all you can do?
5      A.  Right.
6      Q.  Is it fair to say that sometimes your
7 interpretation of the data, your clinical
8 interviews, maybe they're not right on all the time.
9 Is that fair to say?
10     A.  I would say so, sure.
11      MR. SMINKEY:  Doctor, I appreciate your
12 time.  It was very nice talking to you, and I hope I
13 didn't interrupt your day too much.
14      MR. NIEDZIELSKI:  I have a few questions I
15 would like to ask the doctor.
16      THE WITNESS:  Okay.
17      EXAMINATION BY COUNSEL FOR THE DEFENDANT
18 BY MR. NIEDZIELSKI:
19     Q.  What I would like to do, Doctor, is have
20 you -- I'm going to have marked as the next exhibit
21 your report, and I'll ask the court reporter to mark

Page 57

1 it and hand it back to you.
2      (Deposition Exhibit No. 5 was marked for
3 identification.)
4 BY MR. NIEDZIELSKI:
5      Q.  Would you just identify this for the
6 record, please?
7      A.  Are you talking to me?
8      Q.  Yes.
9      A.  Okay.
10      (Discussion off the record.)
11     A.  This is a letter that I wrote on March
12 11th, 2008.
13 BY MR. NIEDZIELSKI:
14     Q.  And that was after you were provided
15 certain medical records; is that correct?
16     A.  That's correct.
17     Q.  And you did that at my request; is that
18 correct?
19     A.  That's right.
20     Q.  And you expressed a number of things in
21 here.  What's the central thrust of this report that

15 (Pages 54 to 57)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

A000008

Page 58

1 you issued on March the 11th, 2008?

2    A.  The general theme is that my

3 recommendation in 2005 was not accurate, because I

4 didn't have all the information.

5    Q.  What was that information you did not

6 have?

7    A.  I did not have the information that

8 Mr. Sminkey was on any kind of psychotropic

9 medication.  I also didn't know that he had been to

10 psychiatric treatment and I didn't know that he had

11 a family history of mental illness or any kind of

12 symptoms of anxiety or depression.

13    Q.  Did you specifically ask him those

14 questions to elicit that information?

15    A.  I did.

16    Q.  What were his responses to those

17 questions?

18    A.  His responses were no.

19    Q.  All right.  Now, also in your -- we have

20 another document that you have provided, and I'm

21 going to ask you just to identify this and then hand

Page 59

1 it to Mr. Tudor, if you would, please.

2    A.  Okay.

3    Q.  What is this document?

4    A.  These are my actual notes when I was in

5 the clinical interview with Mr. Sminkey.

6    MR. NIEDZIELSKI:  Okay.  Would you mark

7 this as the next exhibit, please?

8    (Deposition Exhibit No. 6 was marked for

9 identification.)

10 BY MR. NIEDZIELSKI:

11    Q.  Again, those are the actual notes you made

12 while you were interviewing Mr. Sminkey?

13    A.  Correct.

14    Q.  Back to what has been marked as DeBernardo

15 number one, which is the initial consultation report

16 you gave.  If you turn to page two, and you see the

17 second full paragraph there?

18    A.  "Has been self-employed as a private

19 investigator"?

20    Q.  Yes.

21    A.  Yes.

Page 60

1    Q.  At the end, it indicates that he had

2 worked eight months as an officer with Delaware

3 River and Bay Authority, eight months with the

4 Delaware State Capital Police, three years with New

5 Castle City Police, and ten years with the

6 Philadelphia Transit Police.  He reported a good

7 work history; he received minor reprimands as police

8 officer.  Is that what he told you?

9    A.  That's what he told me.

10    Q.  He did not tell you, in fact, he testified

11 on Monday that in fact he was fired from two

12 different agencies.  Did he tell you that?

13    A.  He did not.

14    Q.  Did he tell you that his firing from the

15 Philadelphia Transit Authority was changed into a

16 suspension of six months?

17    A.  He did not.

18    Q.  Would you have considered that a minor

19 reprimand?

20    A.  No.

21    Q.  Did Mr. Sminkey ever tell you that in

Page 61

1 fact, while he worked for SEPTA, the police

2 department, he was required to see a psychiatrist on

3 two separate occasions?

4    A.  He did not.

5    Q.  Did you elicit that kind of information

6 from him?

7    A.  Yes, I asked that question.  I asked the

8 question "Have you ever been to a therapist,

9 counselor, seen a psychologist or a psychiatrist for

10 any reason at all?"

11    Q.  And his response was?

12    A.  No.

13    Q.  In addition to those documents -- and this

14 may be included in the documents you have already

15 reviewed...

16    (Deposition Exhibit No. 7 was marked for

17 identification.)

18 BY MR. NIEDZIELSKI:

19    Q.  Would you take a minute and look at that?

20 I think you were provided with this document.  Am I

21 correct --

16 (Pages 58 to 61)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 62

1   A.  In the pile here?
2   Q.  Yes.  Am I correct that appears to be a
3 handwritten progress note?
4   A.  Yes.
5   Q.  What appears to be the date on it?
6   A.  5/21/04.
7   Q.  If you go down to the middle of the page,
8 can you read what the doctor or whoever is writing
9 that says?
10   A.  Not really.
11   Q.  If I were to suggest it says "Depressed,
12 mood swings"?
13   A.  "Depressed, mood swings --" I can't read
14 the writing, I'm sorry.  I see that where you
15 saying, but I don't see the rest of it.
16   Q.  And you see at the right there, at the
17 lower part of the page it says, "Samples of
18 Lexapro"?  Do you see that?
19   A.  Yes.
20   Q.  And this would have been --
21   A.  "Psychological counseling" here, I see.

Page 63

1   Q.  Oh, it says "Needs psychological
2 counseling."
3   A.  Right.
4   Q.  And that's long before you saw him,
5 correct?
6   A.  That would be, yes, a year -- over a year.
7       MR. NIEDZIELSKI:  That's all the questions
8 I have.  Thank you.
9       MR. SMINKEY:  I would actually like to
10 redirect.
11      MR. NIEDZIELSKI:  Would you?
12      MR. SMINKEY:  I really would.
13      MR. NIEDZIELSKI:  It's your deposition.
14 It's your nickel.
15      FURTHER EXAMINATION BY MR. SMINKEY:
16   Q.  Dr. DeBernardo, do you recall how you
17 asked the question.
18   A.  Yes.
19   Q.  All right.
20   A.  I ask the same questions of everybody.
21 That's why I know.  I'm not saying that I remember

Page 64

1 the particular interview, but I ask the same
2 questions of everybody.
3   Q.  I believe you probably do, so I'm not
4 arguing that point.  What I'm saying is that I have
5 just been handed these notes, okay, and they're
6 fragmented, because they're your notes.
7       For example, it looks to me like -- okay,
8 if you go to the form that says Interview Form
9 FFDIS, or whatever it says?
10   A.  AS, yes.
11   Q.  AS?  Okay?
12   A.  That stands for applicant screening.
13   Q.  Okay.  These notes are reminders to you,
14 it's like your script, that you answer certain --
15 that you ask certain questions.
16   A.  Correct.
17   Q.  Okay.  I have just been handed this not
18 even an hour ago, so when I look at this, is it fair
19 to say that what I really get out of it is something
20 different than what you get out of it?
21   A.  Yes.

Page 65

1   Q.  So I see, you know, a couple of words, you
2 know, grades, peer interaction, behavior, and then,
3 you know, a bunch of handwritten notes that for the
4 most part are pretty legible, and there's three
5 pages of that.  But there is nothing that says how
6 you asked me the question about pain medications or
7 antidepressants.  It doesn't say how you asked the
8 question or what, exactly, you said; is that
9 correct?
10   A.  That's correct, it doesn't say it on my
11 notes, but I do so many of these that I have the
12 same questions that I ask for everybody.
13   Q.  Okay.  If you look at document D002341,
14 which was the notes from my doctor --
15      MR. NIEDZIELSKI:  That's been marked as
16 DeBernardo number 7.
17 BY MR. SMINKEY:
18   Q.  Prior to me bringing suit, would I have
19 known the existence of this note?
20   A.  I don't know if you would have or not.
21   Q.  Would I have known the existence of your

17 (Pages 62 to 65)

TO:               Carl Schnee, Esquire
                    Chairman
                    Criminal Justice Council


FROM:            Major Robert C. McDonald
                    Delaware State Police

                    Inspector Guy I. Sapp
                    Wilmington Bureau of Police

                    Captain Edward R. McGinty
                    New Castle County Police


RE:              <u>NEW CASTLE CITY POLICE DEPARTMENT v.</u>
                    <u>PATROLMAN JACK E. SMINKEY</u>


<u>PROCEDURAL SETTING</u>


     On May 12, 1987, Chief Ray S. Wood, of the New Castle City Police Department, requested the Chairman of the Criminal Justice Council to consider impaneling an impartial Board to consider internal discipline against a member of the New Castle City Police Department. Based upon the statutory authority vested in the Chairman, 11 <u>Del. C.</u> Section 9205(b), the Chairman appointed a Board and scheduled the Board to convene on July 1, 1987. Chief Wood further indicated the initial investigation had been

Jack E. Sminkey Decision
January 19, 1988
Page 2

concluded as of May 4, 1987 (see City Exhibit A). Between that date and the December 8, 1987, memorandum from the Chairman, scheduling a hearing for December 18, 1987, the parties were required to select alternate legal representation, which accounted for the delay in hearing these matters.

On Friday, December 18, 1987, at 9:30 a.m., the Board commenced the proceedings in the New Castle City Council Chambers within the city of New Castle. After three days of hearings (December 18 and 22, 1987, and January 8, 1988) the matter was adjourned pending the submission of the Board's findings to the Chairman.

The City was represented by Gerald P. Kavanaugh, Jr., Esquire. Patrolman Jack Sminkey was represented by Barry M. Willoughby, Esquire.

Initially, the Board met with the attorneys for the parties and discussed procedural objections. Mr. Willoughby raised the issue of notice arguing that the City's notice of administrative investigation and a complaint of misconduct (see City Exhibits B and C) received by the defense on the previous Monday, December 14, 1987, were not properly filed and the City was limited to presenting the issues cited in its May 6, 1987,

Jack E. Sminkey Decision
January 19, 1988
Page 3

Notice of Summary Disciplinary Action. Opposing counsel took the position that notice was timely but would not oppose a continuance if the defense required additional time to prepare their case. The Board agreed that additional time would be provided if Mr. Willoughby requested it. Mr. Willoughby responded that he was prepared to proceed with a defense of all charges against the officer and wished to proceed with the hearing on December 18, 1987. However, he asked that his objection be preserved on the record. It is so noted. No specific objections were raised regarding the Rules and Regulations of the city of New Castle in the resolution of possible internal investigations, nor was any objection heard as to the City's failure to comply with the Law Enforcement Officers Bill of Rights (11 Del. C. Ch. 92). As such, the City's failure to comply with the other procedural defects, if any, were deemed by the Board to be waived by the parties.

Shortly after considering the procedural objection, the Board prepared to receive evidence. At the request of Patrolman Sminkey, the hearing was opened to the public. Both parties took the opportunity to present opening remarks.

D002488
A000013

Jack E. Sminkey Decision
January 19, 1988
Page 5

The City presented its case in chief through Corporal Patrick B. Cannon, who conducted the internal investigation at the direction of Chief Wood.

Given the complexity of the issues, the panel permitted a wide range of testimony, cross examination, and the submission of documents to assist in the decision-making process. All evidence and testimony were considered and given the weight deemed appropriate by the Board. At the conclusion of the City's case in chief, Mr. Willoughby presented a motion for a directed verdict.

In its review of the testimony, the Board, in the light most favorable to the City, concluded that on some issues the City had not presented a prima facie case in that substantial evidence to several of the charges was lacking. As such a directed verdict in favor of the defendant officer was entered as to the following:

1.    Violation of Section 5-9, Page 54, of the City's Rules and Regulations involving a March 6, 1987, accident investigation identified by Complaint No. 33-87-8025 (see City's Exhibits 6 and 6A).

     Finding of Fact

D002489

A000014

Jack E. Sminkey Decision
January 19, 1988
Page 6

On or about March 3, 1987, Patrolman Sminkey was assigned to investigate a "hit and run" traffic accident. The reporting party was John J. Gaworski, Jr. (husband of Helen Gaworski). As part of the investigation, a Standard Property Damage Collision Report was submitted for review on March 6, 1987. The document was returned several times to Patrolman Sminkey to make corrections or to enlarge the narrative portion of the investigation. This is <u>not</u> an uncommon occurrence and the changes were promptly made. The final draft was accepted as departmental record a short time later.

<u>Conclusion of Law</u>

The Board concludes that substantial evidence does not exist to support a finding that Patrolman Sminkey violated Section 5-9, Page 54, of the City's Rules and Regulations on or about March 6, 1987, when he (Sminkey) did submit Accident Report No. 33-87-8025 involving Michelle Weyant and John Gaworski, knowing it contained false and/or inaccurate information.

2.   Violation of Section 2-16, Page 41, of the City's Rules and Regulations involving a March 7, 1987, traffic

D002490
A000015

Jack E. Sminkey Decision
January 19, 1988
Page 7

arrest involving Ms. Michal Sholwalter (see City
Exhibit 7).

3.  Violation of Section 2-1, of the City's Rules and
    Regulations involving conduct unbecoming an officer in
    the March 7, 1987, traffic arrest of Ms. Michal
    Sholwalter (see City Exhibit 7).

Finding of Fact

On March 7, 1987, Officer Sminkey came in contact with
Ms. Michal Sholwalter as the result of an alleged
speeding violation that occurred in the area of Moor's
Lane. A speeding summons was subsequently issued for
that offense.

On that same day, at approximately 1705 hours, Ms.
Sholwalter came to police headquarters to lodge a
complaint against Patrolman Sminkey. The sum and
substance was that Officer Sminkey had, in 1986, issued
her a traffic summons and on several occasions had been
into her place of employment asking for her.
Additionally, during both encounters, the officer is
alleged to have questioned Ms. Showalter's veracity by
asking: "Why do you lie to me?"

On March 13, 1987, in response to a request from
Sergeant Emerson, Patrolman Sminkey wrote an accounting

Jack E. Sminkey Decision
January 19, 1988
Page 8

for his actions involving the complaint.   The response
was  similar  in  nature  to  that  presented  by  Ms.
Sholwalter, except  for  the  discourteous  remarks  that
are alleged.   No  other  action  was  taken  by  the  City
administration until May 26, 1987, when Corporal Cannon
initiated the tape recorded statement attached as part
of the City's exhibit.   Patrolman  Sminkey  was ,not
offered the opportunity to respond to this statement.
Defendant's Exhibit 6 indicates that Chief Wood voided
the March 7, 1987 arrest at the request of the police
chairman.

Conclusion of Law

We unanimously conclude that the City failed to present
a  prima  facie  case  upon  substantial  evidence  to
conclude that a violation of Section 2-16, Page 41, of
the City's Rules and Regulations that on march 7, 1987,
that Patrolman Sminkey disobeyed written directives of
a  superior  officer  by  engaging  in  conduct  during  a
traffic stop with Michal Sholwalter which violated the
order.

Further substantial evidence does not exist to conclude
that a violation of Section 2-1 of the City's Rules and
Regulations on March 7, 1987, when, while on duty., the
officer did conduct himself in a manner which reflected

Jack E. Sminkey Decision
January 19, 1988
Page 9

most unfavorably upon the Department while on a traffic
stop with Michal Sholwalter.

4.    Violation of Section 5-9, Page 54, of the City's Rules
and Regulations Involving the filing of a false depart-
mental employment application (see City Exhibit 8,
Defense Exhibit 3, and Defense Exhibit 4).

Finding of Fact

The City introduced portions of the City's application
for employment which had been completed by Patrolman
Sminkey. As part of that application, prior employers
are identified. Lackawana Detective Agency, a prior
employer was not identified, however, a resume was
supplied by Patrolman Sminkey that reflected the
Lackawana employment. As part of this internal
investigation prior employers wre "reinterviewed."
This resulted in two internal documents from Lackawana
Detective Agency that indicated on "19 Oct. 81" Sminkey
was hired as a dispatcher and "fired: 4 Jan. 84" as a
dispatcher. Further Sminkey was rehired as a guard on
November 20, 1982, and tendered his resignation on
December 31, 1982.

Defendant's Exhibit 4 indicates a letter of reference

Jack E. Sminkey Decision
January 19, 1988
Page 10

concerning Patrolman Sminkey's performance and their
beliefs that he would be a good police officer.

Mr. James Heatherton, President of Lackawana Detective
Agency, testified that he could not "swear" Patrolman
Sminkey was fired or that if he were fired that
Patrolman Sminkey knew of his discharge.    The
suggestion was that Sminkey was released (laid off)
without prejudice.

<u>Conclusion of Law</u>

In agreement with a motion presented by the City, the
Board concludes that substantial evidence does not
exist to conclude a finding of a violation of Section
5-9, Page 54, of the City's Rules and Regulations
occurred in connection with Sminkey's application for
employment that on March 27, 1985, in that he did
intentionally falsify a departmental application by
recording that he was ever discharged or forced to
resign from employment.

5.   Violation of Section 7.04 of the Rules and Regulations
(attention to duty) between July, 1985, and May, 1987,
that overall performance and demeanor have not shown

Jack E. Sminkey Decision
January 19, 1988
Page 11

significant improvement despite administrative efforts to adjust the deficiencies.

Finding of Fact

Corporal Cannon testified throughout his presentation that Patrolman Sminkey was not developing professionally as a city police officer at a rate commensurate with his experience and employment exposure. Corporal Cannon also recalled that those same shortcomings were brought to the attention of Chief Wood in a meeting with other supervisors in their consideration of Patrolman Sminkey during his initial probationary period. The supervisor's recommendation was to release Patrolman Sminkey from employment. The Chief rejected that recommendation and classified Patrolman Sminkey as a permanent employee.

Conclusion of Law

As a matter of law, the Board concluded that the notice of the charge is too broad and vague. Testimony submitted in support of this charge spoke to amorphous attitudes and practices that the Board was unable to clearly grasp.

Jack E. Sminkey Decision
January 19, 1988
Page 12

Finally, the Chief had the opportunity to eliminate such inattention to duty but chose not to do so. We find that substantial evidence does not exist to find that Patrolman Sminkey violated Section 7.04 of the Rules and Regulations.

The defense then presented its case with the defendant officer being the only witness. When the defense rested, the City called, as rebuttal witnesses, two former and two present officers from the Department (former Sergeant Emerson, former Corporal Gerald, Patrolman Duke, and Police Chief Ray S. Wood).

Closing arguments were offered and the Board considered the remaining allegations. Our finding are set forth below:

Charge No. 1 –     Violation of Section 2-16, Page 41, of the City's Rules and Regulations alleging that Patrolman Sminkey intentionally disregarded written and verbal directives by being in the police station on March 4, 1987, between 0905-0940 hours and 1000-1045 hours (see City Exhibit 3, City Exhibit 4).

Finding of Fact

D002496

A000021

Jack E. Sminkey Decision
January 19, 1988
Page '13

New Castle City Police promulgated a patrol procedure Memorandum (33-18) on March 19, 1984, that specified reason(s) a patrol officer would be permitted in the station house. Patrolman Sminkey acknowledged the policy as evidenced by his initials and the date (7-31-85) written upon the document, submitted to the Board. New Castle City Police also have Memorandum 33-19, dated March 19, 1984, which identifies when and where officers may take "meal breaks." This document was also initialed and dated (7-31-85) by Patrolman Sminkey. Of significance in this case, the City allows its officers to take "meal breaks" at the station house.

Officer Sminkey testified, on March 4, 1987, that he was in the station house during the times alleged by the City. This conclusion is also supported by the submission of Patrolman Sminkey's handwritten patrol log and the radio dispatch computer logs (see City Exhibit 3). Between the hours of 0905 and 0940 hours, Patrolman Sminkey, according to his testimony, was completing an accident investigation report and making telephone calls. It would be during this time that Chief Wood telephoned the station house from his residence and learned of Patrolman Sminkey's presence in the station house. A conversation between Chief Wood and Patrolman Sminkey ensued. The content and duration of the conversation is in dispute and not particularly

Jack E. Sminkey Decision
January 19, 1988
Page 14

relevant to the charge; however, there is no dispute that prior
to concluding the telephone call, the Chief instructed the
secretary to inform Patrolman Sminkey that "it would be in his
best interest not to hang around the station."   A short time
after receiving the Chief's message, Patrolman   Sminkey left the
station house.

Later   that   same   day   between   1000   and   1045   hours,
uncontroverted testimony places Patrolman  Sminkey back in the
station house.   Patrolman Sminkey testified that his second
"visit" was permitted under the Department's rules; more
specifically to take a "meal break" and to clean a soiled uniform
that was muddied while completing the measurements associated
with a traffic accident investigation.

The officer's patrol log indicated precisely these events.
It should be noted that the original log had been "corrected" by
Officer Sminkey, however, neither   the City nor the officer was
able to inform the Board of the original entry.

Conclusion of Law

We find that substantial evidence exists to conclude that on
March 4, 1987, between the hours of 0905 and   0940, Patrolman

Jack E. Sminkey Decision
January 19, 1988
Page 15

Sminkey was in the station house in violation of the Department's written directive to the contrary. Further, we conclude that substantial evidence exists to find that on March 4, 1987, between the hours of 1000 and 1040 Patrolman Sminkey was in the station house; however, his presence was permitted by the Department's March 19, 1984, memorandum concerning "meal breaks."

## Recommendation of Discipline

On direct questioning by the panel, Corporal Cannon testified that to his knowledge no member of the Department previously had been subjected to any form of discipline for violating the March 19, 1984, directives.

The City's failure to previously enforce this policy does not excuse the transgression. In similar situations, the panel would recommend a penalty of not less than a verbal reprimand nor more than a written reprimand.

In this case, Chief Wood was personally aware of the transgression and cautioned Patrolman Sminkey. A wider range of discipline was available to Chief Wood, however, deferring to his judgment in this matter, he deemed a verbal reprimand to be

D002499

A000024

Jack E. Sminkey Decision
January 19, 1988
Page 16

sufficient.  Further discipline is not warranted.

> Allegation 2 — violation of Section 2-1, Page 29, of
> the City's Rules and Regulations alleging that
> Patrolman Sminkey, during the summer of 1986, in a
> conversation with Mrs. Gawronski, engaged in conduct
> unbecoming a police officer.

Finding of Fact

Corporal Cannon, with the support of documents, as
(City's Exhibit No. 9), testified that Elizabeth J.
Gawronski came to police headquarters on April 28, 1987,
alleging that sometime during the summer of 1986 (a year
previous), Patrolman Sminkey, while in the 1000 block of
Gray Street, told the complainant that he "can't wait to
split heads," (referring to the complainant's adult
grandchildren).  Testimony from Sminkey and Cannon indicated
that shortly before Mrs. Gawronski presented her charge of
the year before, Sminkey had arrested a Gawronski family
member.  The transcribed interview with Mrs. Gawronski
failed to examine the complainant's motivation or the reason
for her delay in reporting the allegation.

Jack E. Sminkey Decision
January 19, 1988
Page 17

Corporal Cannon's investigation disclosed that Mrs. Gawronski was in the company of three other persons, including Ms. Betty Lloyd. Ms. Lloyd was interviewed and recalled the encounter, but remembered Patrolman Sminkey saying something to the "effect of self defense . . . and that he (Sminkey) would split heads if he had to." Further, Ms. Lloyd did not indicate the conversation, irrespective of its content, constituted an offense or unbecoming act.

While the names of the other potential witnesses to the allegation were known to Corporal Cannon, they were not interviewed and only a minimal attempt was made to locate them.

Patrolman Sminkey has no recollection of the encounter on Gray Street but does acknowledge knowing Mrs. Gawronski and Ms. Lloyd. On direct questioning by the Board, Patrolman Sminkey conceded that he possibly could "have said that" but he does not recall ever making the statement to these people or anyone else.

Conclusion of Law

The Board finds that the City has failed to produce substantial evidence to support this charge of conduct unbecoming a police officer.

Jack E. Sminkey Decision
January 19, 1988
Page 18

While the Board does not question the fact that a conversation took place in the summer of 1986 with the Mrs. Gawronski, the Board does question the content of the conversation as recalled by both women, as well as Mrs. Gawronski's motive in coming forward and raising the issue nearly one year after the fact.

> <u>Allegation 3</u> - Violation of Section 5-9, of the City's Rules and Regulations occurred on December 31, 1986, March 19, 1987, and April 9, 1987, when Patrolman Sminkey allegedly falsified the departmental logs and overtime requests to obtain monetary benefit.

<u>Finding of Fact</u>

Pursuant to a collective bargaining agreement between the city of New Castle and the Fraternal Order of Police, Lodge No. 1, a police officer is entitled, under Section 10 of the Contract, to "receive a minimum of three (3) hours pay at the rate of time and one-half (1 1/2) for hours attended" [in court] when attendance is so required during his off duty hours.

During the City's case in chief, Corporal Cannon described the departmental practice when an officer claimed "court overtime" pursuant to Section 10 of the labor agreement.

Jack E. Sminkey Decision
January 19, 1988
Page 19

Corporal Cannon testified that when an officer received a
subpoena or other document requiring his/her appearance in court,
receipt of the notice would be noted on the secretary's desk top
calendar, and the document placed into the officer's "box." When
the employee attended the particular proceeding during non-duty
hours, an overtime slip was prepared that generally identified
the activity and total overtime hours claimed. The same employee
would make a similar entry on the "foot" of the department's
daily activity log. The individual was free to select payment
for the overtime hours involved or the accrual of uncompensated
leave. Payment due to a specific employee is calculated by the
secretary from the entries on the department's daily activity
log.

Sergeant Emerson testified that it was his responsibility,
during the relevant time period, to review the submitted overtime
slips and compare them to the log entries. Sergeant Emerson
freely acknowledged that he relied upon an officer's honesty and
he exercised his responsibility in this area infrequently.

Corporal Cannon described a practice, within the department,
in which the employee, when submitting a claim for wages or
compensatory time for court overtime, would indicate the total
hours due rather than actual time spent on the assignment. This

Jack E. Sminkey Decision
January 19, 1988
Page 20

practice was justified by the minimum three-hour rule.  Defense
Exhibit 1, which is the actual log books, indicates the
inaccurate entries which Corporal Cannon described.

On the three dates identified in the City's charges,
Patrolman Sminkey was obligated to make two appearances in
different courts at different times.  The City conceded that
Patrolman Sminkey was indeed subpoenaed for appearances in two
different proceedings on each of the three dates set out in the
charges, and those appearances were scheduled during Patrolman
Sminkey's non-duty hours.

Compensation was paid to Sminkey for his December 31, 1986,
and March 19, 1987, overtime requests.  On April 9, 1987, the
request for six (6) hours overtime payment was denied.  From that
denial a properly presented grievance pursuant to the labor
agreement was submitted by Patrolman Sminkey.

Patrolman Sminkey argues that the contract provision in
question permits a minimum of three (3) hours court overtime for
each required appearance.  Sminkey does concede that excessive
claims for court overtime (e.g. ten appearances in court for one
day entitling the employee to thirty (30) hours of court
overtime) would be inappropriate.  He stated  that in cases of

Jack E. Sminkey Decision
January 19, 1988
Page 21

multiple subpoenas he would "let his conscience be his guide."
Corporal Cannon and Sergeant Emerson were unable to identify a
clear departmental policy for claiming overtime hours. Corporal
Cannon partially agreed with Patrolman Sminkey's logic that more
than one, three-hour block of court overtime would be justified
in the same eight-hour period; if there was a reasonable break in
time between the scheduled appearances.   When pressed for a
definition of a "reasonable break," Corporal Cannon was unable to
provide a specific answer.

    On the other hand, Sergeant Emerson believed the policy was
to permit one, three-hour block of court overtime in any eight-
hour period and that multiple appearances permitted additional
court overtime for actual time in excess of the three hours
claimed.

    No document was produced that specifically defined the
methods for determining remuneration due when multiple court
appearances occurred.

Conclusion of Law

    We find that the City failed to produce substantial evidence

Jack E. Sminkey Decision
January 19, 1988
Page 22

to support a charge of violating Section 5-9 (falsification of records) of the City's Rules and Regulations for the following reasons:

1.   No policy exists to the panel's knowledge that would provide guidance to Patrolman Sminkey or any other member of the police department.  This does not infer that the Board agrees with Patrolman Sminkey's understanding for claiming overtime, only that the City failed to show that the application of the provision was consistently understood by members of the Department.

2.   Corporal Cannon and Sergeant Emerson testified inconsistently when describing what overtime compensation is properly due.  Since both were Patrolman Sminkey's supervisor, it is not reasonable to hold the officer to such a vague and inconsistent understanding of an unwritten policy within the Department.

3.   Sergeant Emerson failed to exercise his administrative responsibility to audit requests for overtime to assure that even his understanding of the contractual provision was being followed.  Since Patrolman Sminkey was promptly compensated for

D002506

A000031

Jack E. Sminkey Decision
January 19, 1988
Page 23

overtime hours on December 31, 1986, and again on March 19, 1987,
we conclude that Patrolman Sminkey could reasonably assume that
his understanding was correct and a payment request for overtime
justified.

4.    The properly filed grievance from the April 9, 1987,
denial for overtime payment, and the City's concession that
Patrolman Sminkey was, during his off duty hours, in question
properly before a court speaks to an issue of understanding and
not of falsification of records for personal gain.

5.    Departmental practice developed in which <u>all</u> members
recorded a time period commensurate with the total hours claimed
for overtime purposes rather than reflecting actual time expended
on the assignment.   This practice resulted in the development  of
an agency record that at best was inaccurate and unreliable.    In
view of the Department's practice and procedure, we cannot
conclude that Patrolman Sminkey knew or should have known his
actions were wrong.

> <u>Allegation 4</u> — Violation of Section 5-9, Page 54, of
> the City's Rules and Regulations allege that on or
> about February 23, 1987, Patrolman Sminkey voided a

Jack E. Sminkey Decision
January 19, 1988
Page 24

motor vehicle traffic summons No. NC21100 by recording
a false statement upon the summons.

Finding of Fact

Corporal Cannon testified and submitted documents (City's
Exhibit 10) indicating that on February 18, 1987, Patrolman
Sminkey issued a speeding ticket (No. NC 21100) for a later
appearance in the New Castle City Mayor's Court.

Sometime between the date of arrest and February 24, 1987,
Patrolman Sminkey was contacted by a civilian radio dispatcher
for the Delaware State Police. The dispatcher asked Sminkey to
"do something" about the ticket, explaining that the cited party
was a relative. Sminkey told the dispatcher that he would
"dismiss the ticket." Sometime later, Patrolman Sminkey voided
the summons and wrote "radar not working properly" across the
summons.

This activity was questioned in the form of a memorandum
from Sergeant Emerson on February 25, 1987. On direct testimony,
Patrolman Sminkey admitted the conduct, but contends that his
supervisor, Sergeant Emerson, approved Sminkey's actions and

Jack E. Sminkey Decision
January 19, 1988
Page 25

approved the voiding of the summons. Sergeant Emerson cautioned Sminkey that Sminkey needed to explain why he was voiding the ticket.

Specifically, Patrolman Sminkey testified that Sergeant Emerson required an explanation "in case the Attorney General were to audit the tickets." Sminkey concluded that Emerson's comment meant to fabricate a justification. On direct inquiry from the panel, Patrolman Sminkey conceded that the reason noted in voiding the ticket was his and Sergeant Emerson did not suggest any act of deceit.

The defense introduced a three-page document (Defense Exhibit 6) that reflects a portion of an audit trail for summons issued but not prosecuted by officers of the police department. A review of that document discloses that a number of summonses were dismissed or voided justifiably. There are, however, a number of citations dismissed for questionable, if not inappropriate, reasons. While this document raises serious questions regarding the propriety of the agency's practice in this area, we note that justifications underlying the voiding of most summonses, while misplaced, truthfully reflected the officer's reasoning.

Jack E. Sminkey Decision
January 19, 1988
Page 26

On direct questioning, Patrolman Sminkey does not deny that his actions were wrong and the justification noted on the summons was his creation. Patrolman Sminkey rationalizes his conduct with his mistaken understanding of Sergeant Emerson's comment to provide a reason for voiding the summons.

Conclusion of Law

Reading the evidence, in a light most favorable to the defendant officer, it is the unanimous finding of this Board that the City did present substantial evidence to support the charge that on or about February 23, 1987, Patrolman Sminkey voided a traffic summons by entering a "justification" he knew to be false in violation of Section 5-9 of the City's Rules and Regulations.

Recommendation of Discipline

Every police officer, irrespective of the employing agency, daily exercises discretion in the administration of justice. The rationale for permitting such broad exercises of pre-arrest discretion is to allow for reasonable and fair application of the law. Occasionally, after a traffic arrest is made, facts and circumstances become known to an arresting officer which make a prosecution inappropriate or burdensome.

**D002510**

**A000035**

Jack E. Sminkey Decision
January 19, 1988
Page 27

The discharge of any prosecution rests with the Attorney General or the judicial officer charged with adjudicating the issue. A police officer is obligated, morally and professionally, to make a truthful representation to the court for its consideration. To do less brings impartial application of the law into question and doubt. On or about February 23, 1987, Patrolman Sminkey breached his professional and statutory duty when he worked a fraud upon the Mayor's Court.

We unanimously agree that Patrolman Sminkey's conduct was not only deceitful but an absolute breach of his public trust for which he should suffer the penalty of discharge.

> Allegation 5 - Violation of Section 2-6, Page 39 (insubordination and Section 2-12B Page 40 (neglect of duty) of the City's Rules and Regulations alleging Patrolman Sminkey failed to appear for a January 6, 1987, motor vehicle implied consent hearing.

Finding of Fact

There is no doubt among the Board members that Patrolman Sminkey's present situation developed from his November 29, 1986, arrest of Helen Gaworski for a second offense of driving under

Jack E. Sminkey Decision
January 19, 1988
Page 28 '

the influence of alcohol.    Mrs. Gaworski is the wife of a

Delaware River and Bay Authority police officer, and both are

residents of the city of New Castle.


As part of a driving under the influence prosecution,

Corporal Cannon testified that the arresting officer is

frequently called upon to offer testimony to demonstrate probable

cause at a motor vehicle implied consent hearing.    Such was the

case  when Officer Sminkey was requested to attend the hearing

before the Division of Motor Vehicles for Mrs. Gawronski, on

January 6, 1987.    Patrolman Sminkey acknowledged that he was

aware of the hearing date and without lawful excuse intentionally

failed to respond to the notice to appear.    Further, Sminkey

argued that a notice  to appear for the Motor Vehicle hearing is

not issued by a court; therefore, the Department's rule requiring

an officer to respond to a subpoena or lawful order is not

applicable in this case.    We reject that notion, out of hand.


Sminkey testified that "pressure" was building within the

agency over his arrest of another police officer's wife and that

he felt compelled to act to protect himself.    Specifically a tape

recording was made of conversations between Patrolman Sminkey and

Sergeant Emerson where Sminkey was pleading for some reasoning or

excuse for not testifying against Mrs. Gaworski.    Sergeant

Jack E. Sminkey Decision
January 19, 1988
Page 29

Emerson offered several inappropriate alternatives and offered to support and encourage Patrolman Sminkey not to pursue the criminal prosecution.

Sminkey argues that the same support and encouragement was offered through Sergeant Emerson not to attend the probable cause hearing. Sergeant Emerson responded that he was unaware of the motor vehicle hearing and that no conversation was ever held with Sminkey regarding this phase of the prosecution. Yet he readily admits his actions prior to the court proceedings of Mrs. Gaworski.

Finally, in support of the City's contention that a motor vehicle notice obligates the officer to respond as if a subpoena were issued from a court the City submitted a "speedletter", dated October 14, 1986, written by Patrolman Sminkey. The letter concerned Sminkey's failure to attend a properly noticed Motor Vehicle hearing and was sufficient to find that the city required their employees to attend these proceedings.

Conclusion of Law

Testimony and documents support the fact that Patrolman Sminkey was on notice of a motor vehicle implied consent hearing;

D002513

A000038

Jack E. Sminkey Decision
January 19, 1988
Page 30

that Patrolman Sminkey knew that the policy of the police depart-
ment was to attend these hearings as if subpoenaed by a court of
competent jurisdiction; and finally, with knowledge and without
legal excuse, Patrolman Sminkey neglected his duty.   Therefore,
the Board unanimously agrees that the City presented substantial
evidence to support the charge of neglect of duty in violation of
Section 2-12B of the City's Rules and Regulations.

The Board neither heard testimony nor reviewed any document
that would support a finding of insubordination by Patrolman
Sminkey.   Therefore, the Board unanimously agrees that the City
has not presented substantial evidence to support a charge of
insubordination against Patrolman Sminkey.


Recommended Discipline


Penalties for neglect of duty, on a case-by-case basis
similar to the facts involved here, would   range   from the
imposition of a period of not less than ten (10) days without pay
to a recommendation of discharge from employment.

In the present case, we find that Patrolman Sminkey's
failure to appear for the administrative hearing for Mrs.
Gaworski following her arrest for driving under the influence to
be offensive to the administration of justice and the exercise of
his professional duty, irrespective of the alleged "pressure."

Jack E. Sminkey Decision
January 19, 1988
Page 31

The Board is sympathetic to the pressure, real or imagined, allegedly experienced by Patrolman Sminkey in connection with the arrest of Mrs. Gaworski. We find, however, that performing the execution of the duties of a police officer may involving assuming responsibility for difficult and unpleasant tasks. Pressure does not excuse a police officer from acting always to insure confidence and fairness in the administration of justice. Patrolman Sminkey neglected his responsibility and this neglect of duty is not excused by "pressure." A police officer often will be subject to multiple pressures in executing the law. As a public officer, the police officer is required to pursue the interests of the law rather than act to reduce the pressures on himself. As such, we unanimously recommend that Patrolman Sminkey be discharged from employment.

Summary of the Proceeding

In exercising its statutory and professional duty, the Board believes it has an obligation to speak out on several issues concerning the adjudication of these allegations and the environment in which the investigation was conducted by the Department. Throughout the proceeding, a recurrent theme of retribution or vindictiveness developed. Sergeant Emerson testified that upon his return from an interview with the

Jack E. Sminkey Decision
January 19, 1988
Page 32

Attorney General, he officially presented wrongful acts committed by Patrolman Sminkey to the Chief of Police. This disclosure seems to be the impetus from which the investigation commenced. The panel has no doubt that portions of the investigation resulted from Patrolman Sminkey's surreptitious tape recording of Sergeant Emerson which led to Emerson's resignation. Emerson specifically testified that his motives in disclosing Sminkey's activities were intended to be in retribution of Sminkey's disclosure.

Irrespective of the underlying motives of Sergeant Emerson or the City, the conduct of Patrolman Sminkey was so outrageous and violative of the trust the community places in their police officers that, in our opinion, the appropriate penalty has been recommended by this Board. Motives of others cannot be used to mitigate and justify such a flagrant breach of public duty.

It was particularly disturbing that during the City's investigative phase, Patrolman Sminkey was never interviewed or offered the opportunity to respond to the allegations before a finding of "substantiated" was presented to the Chief of Police. The City's investigator testified that counsel (not Mr. Kavanaugh) advised him not to interview Patrolman Sminkey. As such, the investigation that was conducted was one sided.

Jack E. Sminkey Decision
January 19, 1988
Page 33

Efforts were made by the Department  to justify the slightest allegation of  breach of discipline but there was no enthusiasm to perform the larger duty to collect evidence that could prove exculpatory to the accused officer.  This practice offended our sense of fairness and professionalism.

Finally, the record keeping, customs and practices, policies and procedures of the city of New Castle that were examined in this proceeding were disjointed, non-existent or not enforced. In fact, no testimony was offered by either party that any form of discipline was ever imposed upon any other employee.  Such practices leave the subordinate officer  and, in many cases, the superior officers without adequate notice as to which activities are proscribed or standards by which one is measured.

Once  again,  Patrolman  Sminkey's  actions  transcend  the minimum standard expected of a police officer in this state, regardless of an agency's size.  The internal working of the New Castle City Police its lack of policies and absence of checks and balances permitted this conduct to flower.  The result is the development  of  an  unwritten  policy  that  tacitly  supports inconsistent, if not inappropriate, conduct by members of City Police.

D002517

A000042

Jack E. Sminkey Decision
January 19, 1988
Page 34

The message this decision should send to the New Castle City Police Department is that it was difficult to conclude that Patrolman Sminkey violated Rules and Regulations based upon written directives. We find those records to be generally unreliable. Our findings of "guilt" are based upon the basic expectations of a police officer that transcend administrative control.

Respectfully submitted,

Major Robert C. McDonald
Delaware State Police

Inspector Guy I. Sapp
Wilmington Bureau of Police

Captain Edward R. McGinty
New Castle County Police

## INDEX TO EXHIBITS

CE-A:     First Charge Sheet

CE-B:     Notice of Administrative Investigation

CE-C:     Further Notice of Charges

CE-1:     Overtime Charge

CE-2:     Gaworski PC Hearing

CE-3:     Out-of-Station Charge

CE-4:     Notice of Investigation

CE-5:     Transfer of Administrative Investigation

CE-6:     Traffic Accident Investigation Charge

CE-7:     "Showalter" Investigation

CE-8:     False Application

CE-9:     "Gawrowski" Investigation

CE-10:    Voided Traffic Ticket

CE-11:    Memo 33-26

CE-12:    "Dictating Terms" Memo

DE-1:     Not Attached - Original Station House Log Books

DE-2:     1986 Status Report - Arrest Summaries

DE-3:     Cannon's Letter of Recommendation

DE-4:     Lackawana's Letter of Recommendation

DE-5:     May 6, 1987 - Ticket Voiding Policy

DE-6:     Voided Ticket Summary

DE-7:     "Showalter" Traffic Summons

DE-8:     April 25, 1987, Grievance Letter

DE-9:      City's Response to Grievance

JE 1 & 2: Contract and Rules and Regulations

JE 3:      Tape-Recorded Statement Between (Emerson & Sminkey)

           Heard in Executive Session

# BOTC BEHAVIOR ASSESSMENT REPORT

Cadet's Name :   **Jack Sminkey**

S.S. No:                                    Class No.: **BOTC-1**

Date: **March 17, 2005**

Reasons for this Report:

Tardiness   []        Unauthorized Absence  [ ]      **Inappropriate Attitude  [ X ]**

Unacceptable Academic Performance  [ ]      Unacceptable Physical Performance  [ ]

Other  [ ]

**Remarks:**

    Mr. Sminkey has been advised on two occasions that his sarcastic comments and behavior directed towards instructors was unacceptable and could cause a negative impact on the rest of his class.

    During the week of March seventh, 2005 during physical training Mr. Sminkey was corrected by Instructor Watson regarding an exercise he was performing.  Instructor Watson then proceeded to leave the gym area and this Instructor was still present.  Mr. Sminkey proceeded to make a derogatory remark directed towards Instructor Watson as she was leaving that this Instructor observed but cannot remember.  I then proceeded to advise Mr. Sminkey that "his sarcastic comments were to cease and that if couldn't respect instructors then he will not respect probationer's, therefore he will be unable to perform this job".  He agreed and continued with his physical training.

    On March 16, 2005 during IPC training adjunct Instructor Fentress made a comment to the class that this officer had taught him everything he knows and you have to be assertive with offenders just as he was taught. Mr. Sminkey then proceeded to say "Oh, that makes a lot of sense then if she

trained you". Mr. Sminkey was then asked if he had a problem with authority, which this instructor is not sure; if he answered as the class then proceeded forward. When the class dismissed for a brief break this instructor observed Mr. Sminkey in the common area. Mr. Sminkey asked this instructor "what" and this instructor then asked him again "do you have a problem with authority?" Mr. Sminkey then replied "no, I just have a problem with people who have to have control all of the time'. This instructor then asked Mr. Sminkey if that comment was directed towards his instructors and he did not respond. This instructor then advised Mr. Sminkey that we as instructors do have control over Mr. Sminkey's career at the present moment and sarcastic remarks would not be tolerated.

Instructor Watson and myself met with Mr. Sminkey following the dismissal of class at the end of the day to inform him that his behavior was unacceptable, and to determine his intentions. During this time we explained to him that his behavior could cause a negative environment for his fellow cadets, future fellow officers as well as with offenders. He was also advised that within this profession that it is imperative that you communicate and interact with others well. Mr. Sminkey advised myself and Instructor Watson that his intentions were not to be negative or sarcastic, but also proceeded to advise us that cadet Reyes advised Mr. Sminkey one day in the locker room that he thought that his attitude may be viewed as negative and sarcastic by instructors.

**Recommended Remedies:**

Mr. Sminkey should be given the opportunity to conform his behavior through self-evaluation through out the remainder of the course.  Instructors should also provide him with feedback regarding his attitude, and address any behavior that could be questionable.

These concerns have been reviewed with the Cadet listed above on 3-17-05

(Date)

_____            _____
(Instructor Signature)                    (Cadet Signature)

**Follow-up:**  Constant evaluation and follow up's during the remainder of the BOTC program

Revised Form 01/31/01

# BOTC BEHAVIOR ASSESSMENT REPORT
### (Please Print Firmly)

Cadet's Name:  SMINKEY, JACK E.

S.S. No:                                    Class No.:  BOTC 05-1

Date:  April 12, 2005

Reasons for this Report:

Tardiness  [ ]          Unauthorized Absence  [ ]          Inappropriate Attitude  [X]

Unacceptable Academic Performance  [ ]          Unacceptable Physical Performance  [ ]

Other  [ ]

**REMARKS:**

I was assigned with this BOTC class on Thursday, March 31, 2005.  While instructing Legal Issues and Search Law on Thursday and Law of Arrest on Friday Mr. Sminkey's participation was positive, asking appropriate questions and interjecting statements.  On two occasions during class Mr. Sminkey was addressed with not paying attention by carrying on conversations with another participant.  That matter was closed as Mr. Sminkey did not routinely continue side conversations.

On Monday, April 4, during Emotional Aspects and Search practical classes, I noticed that Mr. Sminkey's participation sharply declined.  Continued observation during the next two days occurred (Officer Survival and First Aid) the same behavior of withdrawing from participating and appearing closed up occurred.  The appearance was that Mr. Sminkey did not want to be here and was going thru the motions.

During First Aid on Wednesday, April 6, a fire drill was conducted and on the way back into the building I asked Mr. Sminkey how he was doing, and how he thought training was going.  Mr. Sminkey stated that there were positives and negatives about training.  Mr. Sminkey stated that he wasn't comfortable with some things that seemed to be going on during training.  I said that we could continue the discussion later since he was due back in class.  We did not get to the discussion later this day.

1

D000275
**A000049**

BOTC BAC Report
RE: Sminkey
April 12, 2005

The next morning, Thursday, April 7, Mr. Sminkey delivered a large white envelope packet to me and stated that 'this was our secret'. Later during a counseling (noted below) with Mr. Sminkey he stated that he was 'joking' when he said the packet was our secret. Mr. Sminkey was informed during the counseling that the packet is not able to remain secret and the information was shared with TE Shuler and Administrator Layton.

When I opened the packet a cover letter dated April 7, first stated that he was 'writing to inform me that he changed his mind with regard for my request to meet. He further stated that he 'didn't believe anything positive could result'. He stated that he appreciated that I pulled him aside to ask about training.

These statements confirmed the observations I saw with regard to the negative attitude toward training. Specifically, he last stated in the cover letter that, 'hopefully, in 16 days, the nightmare would be over'.

Additional information was provided within the packet regarding evaluation of instruction of training and trainers. This was discussed with Mr. Sminkey during the counseling session later this day. Mr. Sminkey was advised that he can provide evaluation input later that would assist EDC, and P&P with enhancing the training program. At this time, I informed Mr. Sminkey that we want him to focus on being a participant of the training.

Also included in the packet was a copy of the BAC report dated March 17, 2005 and a comments page attached reflecting Mr. Sminkey's point of view of that BAC.

Last, Mr. Sminkey provided a copy of a certification and two examples of his work as an investigator.

2

BOTC BAC Report
RE: Sminkey
April 12, 2005

At the end of the day on April 7, TE Shuler and I spoke with Mr. Sminkey in a counseling session. We discussed information (positive, negative and discrepancies) in the packet, the prior situation that had occurred during BOTC (BAC Mar 17), Mr. Sminkeys concerns with that last BAC, what he thought of training, how he felt about continuing with the training, and our concerns of observed negative behavior/progress of Mr. Sminkey at this time.

Mr. Sminkey was explained the BAC process in full again for clarity, that to continue with training a more positive attitude was required, that included full participation (positive), teamwork, no overt challenging of trainers, nor showing of negative behavior, and to become a positive influence with the class that would also enhance the program.

The discussion was healthy, beneficial to TE Shuler and myself. Clarifications and our training concerns were addressed, and Mr. Sminkey was provided an opportunity to share his concerns.

RECOMMENDED REMEDIES:

Mr. Sminkey was informed that the counseling session we had would proceed to the BAC and that recommendations as to whether he continued with training would occur.

In addition, Mr. Sminkey was informed that observation of behavior and progress would continue.

3

BOTC BAC Report
RE: Sminkey
April 12, 2005

These concerns have been reviewed with the Cadet listed above on Date:

4/12-05    _____
          (Instructor Signature)

          _____  4/12/05
          (Cadet Signature)

**FOLLOW-UP:**

Administrator R. Sauls conducted the BAC on April 8, 2005. Mr. Sminkey was informed that the BAC dated March 17 would not be forwarded when Mr. Sminkey was assigned to a District office (One of Mr. Sminkey's concerns regarding his career).

As a result of the current behavior demonstrating a negative attitude, at this time, Mr. Sminkey was placed on formal 'Notice'. Should any inappropriate behavior, poor performance, or negative attitude be demonstrated by Mr. Sminkey another BAC would result, and a recommendation whether Mr. Sminkey is eligible to continue training would be made.

Mr. Sminkey needs to demonstrate a positive attitude toward all aspects of the training program and to participate in all phases for successful completion.

*Mr. Sminkey provided a copy of this report on 4-13-05*

Revised Form 01/31/01

4

# BOTC BEHAVIOR ASSESSMENT REPORT

### (Please Print Firmly)

Cadet's Name:  **SMINKEY, JACK E.**

S.S. No:                                                    Class No.:   BOTC 05-1

Date: **APRIL 28, 2005**

Reasons for this Report:

Tardiness   [ ]          Unauthorized Absence   [ ]        Inappropriate Attitude [X ]

Unacceptable Academic Performance [ ]     Unacceptable Physical Performance [ ]

Other  [ ]

**Remarks:**

It was brought to this instructors attention that during DACS training yesterday Wednesday, April 27, 2005 that Mr. Sminkey displayed a negative attitude toward adjunct instructor Ms. Stevens.

Allegedly, when Mr. Sminkey was completed with one part of DACS application he proceeded to the other classroom and began purging files. Mr. Sminkey still needed to complete the closing process of files on DACS. At some point, Mr. Sminkey told Ms. Stevens that he wasn't getting any help. Ms. Stevens said that she was unaware that he was in need of assistance. Mr. Sminkey said well his partner wasn't helping him. Ms. Stevens said that one of the instructors needed to know if assistance was needed. Ms. Stevens sent another student in to the DACS room to assist Mr. Sminkey. Mr. Sminkey sent that student back to the regular classroom, stating he didn't need the help. Ms. Stevens resent the same student back to assist Mr. Sminkey and informed him he was going to accept the assistance of that student.

Mr. Sminkey, during this confrontation displayed an inappropriate negative attitude toward Ms. Stevens.

D000156

A000053

BAC  04-28-05  pg 2 of 2
RE:  Sminkey, Jack

**Recommended Remedies:**

---

**These concerns have been reviewed with the Cadet listed above on Date:**

_(signature)_ _____

(Instructor Signature)          (Cadet Signature)

**Follow-up:**

Revised Form 01/31/01

This report was written and submitted as indication of information being Reduced to EDC Instructor (BOTC).

---

D000157

A000054

DATE: April 28, 2005

Behavioral Assessment Meeting

RE:                    BOTC-1

TIME:                 01:30 PM

Attendance:         Louise Layton
                    Ronald Sauls
                    Annette Franze
                    Nicole Shuler
                    Barbara Roscoe

RE: Cadet Jack E. Sminkey

PAR : None

DESCREPENCIES:

Cadet Jack E. Sminkey displayed an inappropriate attitude toward the guest
instructors for DACS Refresher, PO Supervisor Alison Stevens and Sr. PO Christina
Brzezicki. The class was given assignments with steps to follow to complete the
assignments and was instructed to leave the room to purge files when their lesson was
finished. Cadet Sminkey asked Sr. PO Brzezicki for help during the assignment and
was given help at that time. Later Cadet Sminkey left the room to purge files before
his assignment was finished. He returned to the project and remained there after the
rest of the class had finished. PO Supervisor Stevens sent Cadet Dawn Stevens in to
help him. He said he didn't want her help and the class could wait until he was done.
PO Supervisor Stevens went in to ask him if he needed help and his answer was
sarcastic, using nasty abrasive language.

RECOMMENDATION

Cadet Jack E. Sminkey should be separated from training because of his
repetitive history of inappropriate attitude toward authority and his inability to
follow directions.

The above information was taken to Director Kathy Mickle-Askin who concurred
with the BAC recommendation.

TIME: 02:40 PM

Attendance:   Ronald Sauls
              Louise Layton
              Annette Franze
              Cadet Jack E. Sminkey
              Barbara Roscoe

Cadet Jack E. Sminkey was asked about the incident on April 27, 2005. He stated that he had asked two Cadets, Stacy Raugh and Dawn Stevens-Arbaugh if they would sit next to him during the DACS refresher because one was familiar with DACS and the other was knowledgeable about the computer. He had hoped to sit between them, but they sat him at the end. He had problems with the computer seeing strange screens that he hadn't seen before. He asked Sr. PO Brzezicki to help him with the computer and she did. He was disappointed in the lack of help that he received from his fellow Cadets. He left the classroom to purge files, then returned later to finish his project with still more computer problems. When Cadet Raugh returned to offer her help, he refused her help. Shortly after that, PO Supervisor Stevens returned and seemed annoyed that he was still there and asked him if he needed help. He doesn't recall his exact answer to her question. He expressed his feelings of being let down by his fellow Cadets.

Cadet Sminkey asked about his request to have copies of the BAC report and the packet that he turned in. Administrator Louise Layton explained that it is not the policy to do that and his request is refused. He could ask Administrator Alan Machtinger for it at a later time.

Trainer/Administrator Ron Sauls reminded him that he had been placed on formal notice at an April 8, 2005 meeting. Cadet Sminkey acknowledged the meeting and the formal notice with the stipulation that if there were one more problem with him, his employment would be terminated. Ron Sauls then told him that a guest instructor who was also a P&P Supervisor had written a complaint on his inappropriate behavior during the previous day's training. Based on the BAC report from PO Supervisor Alison Stevens, Cadet Sminkey was being separated from training at the end of business, April 28, 2005. He was counseled that he could ask for a meeting with Administrator Alan Machtinger and with Administrator Kathleen Mickle-Askin to appeal this decision.



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 MCKEE ROAD
DOVER DELAWARE 19904
Telephone: (302) 739-5601
Fax: (302) 739-5751

Office of the
Commissioner

April 29, 2005

Via Certified and Regular Mail

Jack Sminkey
3402 Edgmont Ave. #333
Brookhaven, PA 19015

Dear Mr. Sminkey:

This is to confirm that you are being dismissed from employment with the Department of Correction, effective 4:00 p.m., Thursday, April 29, 2005. This action is being taken after you had been placed on formal notice, due to your failure to follow directions, repetitive history of showing an inappropriate attitude and most recently, your disrespectful responses towards a guest instructor and Probation and Parole Supervisor, Alison Stevens.

If you have any questions, please feel free to contact the Employee Development Center.

Sincerely,

Stan Taylor
Commissioner

cc:     Kathleen Mickle-Askin, Training Academy Administrator
Personnel file

**D000098**

**A000057**



**STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 MCKEE ROAD
DOVER, DE 19904**

OFFICE OF
HUMAN RESOURCES

TELEPHONE: (302) 739-5601
FAX: (302) 739-6740

### <u>MEMORANDUM</u>

TO:      Jack Sminkey

FROM:    Tami Golt
         Administrative Specialist II

DATE:    May 26, 2005

REF:     Meeting notice

This is to notify you that your meeting has been re-scheduled as follows:

DATE:            June 6, 2005

TIME:            9:00 a.m.

LOCATION:        HR Hearing Room
                 Administration Building
                 245 McKee Rd.
                 Dover, DE

cc:   Kathy Micle-Askin
      File/Crono



Certified Mail: 7005 0390 0001 1251 4895

May 16, 2005

Mr. Alan Machtinger, Director of Human Resources and Development
State of Delaware, Department of Correction
245 McKee Road
Dover, DE  19904

RE:  Future Class/Post Termination Meeting

On April 29, 2005 I was referred to you by Mr. Ronald Sauls, Administrator, at the Department
of Correction Training Academy.

In preparation for our May 25th meeting I have chosen to provide you with my position in writing
in case you wish to investigate further.

First, thanks for taking time out of your busy schedule to meet with me to discuss this matter. I
apologize for mis-spelling your name in my last letter.

I realize you have access to all relevant records. Unfortunately, most records that bring us
together were not written by me, viewed by me, or have been scrutinized by an independent
unbiased body. Therefore, a lot of the documents can say anything, without investigation,
substantiation, or refute.

To determine your willingness to have me in a future class or rescind this termination, you are the
last employer representative that can correct this situation. However, I seriously doubt you would
rescind Mr. Taylor's termination.

Brief Background

As I am sure you are aware, I was a police officer for approximately 16 years. While employed as
a Police Officer, I was never sued for any action or inaction, I never had a "founded" complaint
filed against me, was never arrested, nor did I ever have to shoot anyone. I think this is a pretty
impressive background. I then became a Private Investigator and worked as a security supervisor
and manager.

In 1980 I was a correctional officer for a brief period of time. I graduated from cadet class #4 at
the age of 17. In 1985 I was a Capitol Police Officer. Both positions were for the State of
Delaware and both experiences were pleasurable.

Education/Specialized Training

I possess a Doctorate Degree in Criminal Justice. I have attended 3 Law Enforcement Training
Academies, 33 other (related) documented training courses. The only problem I have ever had
was here at Probation and Parole Training.

EXHIBIT
Machtinger-5
3-19-08
Dottyann Y. Walsh, CSR

Also Date Stamp
D000347 - D000353

D000447

Additionally, I have been retained many times as a Law Enforcement subject matter expert. I have taught approximately 2000 police and security officers in about 25 areas of law enforcement training, everything from defensive tactics to ethics and professionalism. My areas of expertise are: 1) Civil rights 2) Police Procedure 3) Use/Justification of Force 4) Law Enforcement Training and 5) Labor Relations.

My instructors and administrators at the Department of Correction Training Academy pretty much know what is stated above.

<u>Just Prior to the Start of Training</u>

I delayed training one class because Jill Rush and I were concerned about the physical fitness part of training. This delay gave me a chance to become more fit and prepared for training.

In January 2005 I had Lasik Surgery and was told (after surgery) not to do physical exercise because of concern for pressure behind the eyes, as well as, sweat getting in my eyes. This lasted several weeks.

Once able to engage in exercise, I got that bad flu that was going around. This lasted about a month. Although not quite back to normal, I started BOTC training on February 25, 2005.

Upon my entry into BOTC, it became obvious to everyone that I was over the age of 40, a Caucasian male, and overweight. Nonetheless, I did the best I could with all areas of training and left puddles of sweat all over the mats.

You may not know, but I was only allowed to skip one BOTC class, so I had to attend this class or all of our previous efforts would have been wasted. I came to BOTC training with an open mind and ready to learn. This was after a battery of pre-employment interviews and testing, etc. Suffice to say, I think I am well qualified for my job.

The class started with Instructor Donna Watson as the primary instructor and Nicole Shuler as the Assistant Instructor. About five weeks into class, Instructor Watson was promoted, and replaced by Instructor Annette Franze.

During the five weeks with Instructor Watson, I had no known issues with her. For class purposes, Instructor Watson and Franze were my main supervisors.

About three weeks into training, I received a BAC from Assistant Instructor Shuler. Ms. Shuler was present here and there throughout training. The only classes I have her logged in as teaching is first aid and on April 6, 2005 and TAC house on April 25 and 26, 2005. The BAC was well before these dates.

The above three paragraphs are noteworthy to demonstrate that I have had a lot of negative contact with Assistant Instructor Shuler despite the fact that she was not the class instructor or my primary supervisor. I found this interesting.

<u>First Days of Class</u>

This is important because it addresses BACS, discipline, rules, and my state of mind.

Instructor Watson gave us a "code of conduct" manual issued to ALL Department of Correction employees. This official written policy was signed by Commissioner Stan Taylor on 9/24/98.

The "Foreword" makes reference to "new employees about to read the code for the first time". It also states, "The following code of conduct was developed nearly 10 years ago". I interpret this to be "well settled" policy issued by the highest ranking policymaker at the Department of Correction (DOC).

Since there is no disclaimer, I also interpret this as an explicit, implicit, and unilateral contract. Page 8 of this contract states discipline will be meted out by a "just cause" standard. If my understanding is incorrect, then it's my position that Instructor Watson failed to adequately train me in DOC policy. Also, Ms. Watson failed to give us a power point presentation on the Behavior Assessment Committee. Why is Ms. Watson NOT following her lesson plan?

Our first (team) role play was examples of discipline as we studied Commissioner Taylor's Code of Conduct.

When I presented, Instructors Watson and Shuler "picked my brain" in this area, needless to say, everyone watched my sense of humor quickly disappear. Later, a fellow cadet told me "your right by the book". I answered, yes, I take discipline and law enforcement misconduct real seriously.

There were a few things Ms. Watson did make clear: 1) Abide by Commissioner Taylor's "code of conduct" policy 2) It applies to ALL DOC employees 3) Fail two tests and you will disappear and, 4) help each other throughout training.

<u>The First BAC</u>

Ms. Shulers conduct on March 15, 2005 (attempting to run me into the ground) and her BAC dated March 17, 2005 violates enough pages of Commissioner Taylor's Code of Conduct to warrant discipline for Assistant Instructor Shuler. There are no instructional benefits to exploiting any cadet's weaknesses, embarrassing them, or creating an offensive and hostile work environment. This can only be counter productive.

On April 1, 2005 Instructor Franze told me Ms. Layton asked if I was "challenging her", Ms. Franze told me "no", I don't find your participation challenging at all.

After more harassment and embarrassment by Ms. Shuler, I decided on April 4th that perhaps not making eye contact and minimal class participation may be the safest position in this increasingly uncomfortable, intimidating, threatening, and hostile environment. I guess it was my dignity or my job.

Instructor Franze confirms the above paragraph in her April 12, BAC in the center of page 2.

Instructor Franze verifies the damage the Instructors did to me on page 3, paragraph 2 of the April 12th BAC.

For clarity, in the words used in class by Administrator Layton, the instructors "put me behind the eight ball" intentionally threatened me, harassed me, humiliated me, and created an offensive and hostile work environment, this produced the responses they got from me.

Realizing Ms. Shuler is "out of bullets" (figure of speech), unknown persons started telling visiting instructors negative things about me prior to class to continue their theme that Sminkey is _____ (whatever).

An April 12, I signed for and received a copy of the BAC authored by Instructor Franze. I read it and advised her I would not be responding because it distracts from my studies. During this meeting she advised me that cadets still fail even a day or two before graduation. I interpreted this to mean something was going to happen on April 27th or 28th.

On April 13th, Mr. Callaway was instructing academic portion of defensive tactics in the classroom. I asked him questions about Cap Stun and the ASP. Mr. Callaway exploded and said "I thought you were an expert". I think he thought I was asking questions to be a jerk. I explained to Mr. Callaway either at that time or at the meeting that followed that I used pepper spray from 1998 – 2000. I was never trained in Cap Stun or the ASP. The entire class and Instructor Franze witnessed this. When class was dismissed for lunch, Mr. Callaway asked to meet with me in private. We spoke for a good half hour and had a nice conversation. I briefly explained my background. I advised him (basically) that I was a police officer from 1984 – 2000. I am presently a Licensed Private Investigator (from 2000 to present). Mr. Callaway said that he was told that I would be in class putting my head down and that I was a subject matter expert in defensive tactics or something to that affect. Mr. Callaway apologized for his outburst, his embarrassing me, and said he felt embarrassed by the whole thing. Shortly after this, Ms. Franze decided to leave the meeting. Mr. Callaway and I continued our conversation. Toward the end of the meeting, Mr. Callaway said to me "what you are going through must be difficult", I said, "It is". I got the feeling he actually felt sorry for me. He said I was ok with him and that everything will be ok with him. We shook hands and went to lunch. Obviously, Mr. Callaway was filled with misinformation about me and to some extent he felt duped.

Nothing noteworthy during defensive tactics and weapons training, as these instructors are not part of the scheme.

On April 27th, two days before graduation, Instructor/Supervisor Alison Stevens again taught DAC'S. EVERYONE knew I was "weak" in DAC'S. This was the Academies last chance at their obsession not to have me graduate.

At the end of the day, Instructor Franze said to Instructor Stevens, in an excited manner, I will call you tomorrow to debrief about DAC'S.

No doubt, throughout April 28th the training academy and Ms. Stevens conspired on what to write in her memorandum about me. I have not seen this memo but Mr. Sauls made reference to it so I assume it exists.

At about 3PM on April 28th, I was told to contact you about my training status.

Why should you reinstate me or consider me for a future class? Answer — There is no "just cause" for discipline/termination as promised in Mr. Taylor's Code of Conduct.

1.　　It's my position that I responded as a "normal" person would have under the circumstances, which were intentionally created by the instructors.

2.　　My conduct was a product of the atmosphere and training environment created by the training academy instructors.

3.    The allegations were subjectively created (What is an inappropriate attitude? What is an inappropriate incident?) I don't know what an inappropriate attitude or incident is, do you?

4.    The allegations by instructors were not thoroughly investigated or factually proven.

5.    Cadets and instructors (employees) who committed more serious infractions were not questioned, investigated, disciplined or received a BAC at all.

6.    I did not receive progressive discipline as indicated on page 88 of the "Hostage Incident Report at DCC). The CEIT class operates the same way as the BOTC class in this regard. Mentoring, coaching, or counseling is not discipline.

7.    The credibility and integrity of instructors and the entire DOC training program is in question (based upon the publicly published Hostage Incident Report at DCC dated February 7, 2005 pages 87 through 95).

      * It should be noted that the CEIT class is taught by the same instructors in the same building as the BOTC class. The BAC committee, Code of Conduct, and administrators are the same for both classes.

8.    The employer violated their own policies and procedures, and engaged in prohibited (unlawful) conduct in their obsession not to graduate me.

9.    Mr. Sauls was negligent in failing to warn me and reasonably define what "inappropriate behavior, poor performance or negative attitude" is.

10.   Mr. Sauls was negligent in failing to advise me that any infraction WILL RESULT IN TERMINATION FROM TRAINING/EMPLOYMENT. Recommending "whether Mr. Sminkey is "eligible to continue training would be made" is NOT FINAL LANGUAGE" (see page 4 of BAC date 4/12/05)

For all of the reasons stated above, I believe you should rehire me and allow me to graduate immediately or allow me to redo the entire training program next class.

   • I must note that I was a new hire/probationary employee at the time of training. Just because I was on probation, this, in and of itself, does not excuse the employer from complying with their own policies, contracts, procedures, Title VII, and all constitutional rights.

While I believe I gave you numerous reasons to reinstate me immediately, I feel, in fairness to you I must address specific "incidents" and examples of discrimination and disparate treatment. I will refrain from addressing Breach of Contract or Constitutional Claims at this time or in this forum.

Example #1    <u>Discrimination based on Age</u>

On April 11 Cadet Jack Reyes ATTACKED instructor Harold Mack during boxing training after being told we were not allowed to hit back. Obviously, Mr. Reyes disobeyed this directive. Other Cadets and I had to physically restrain Mr. Reyes.

On April 28th around 6pm, I asked Mr. Reyes via telephone if he received, or signed for any BAC'S as a result of this incident, or any other, while attending BOTC training. He replied "no".

<u>Analysis</u>

Based on what Ms. Shuler says, this was a fire able offense. If Mr. Reyes and I are both Caucasian males over the age of 40, why was I consistently treated harsher and less favorable then Mr. Reyes?

A reasonable jury could infer that I was a victim of discrimination based upon my age.

Example #2     <u>Sexual Harassment</u>

   A.     On or about 3/16/05 Instructor Watson tells me "your underwear is showing". My response, "why are you looking". All Instructor Watson had to do was ask me to tuck my shirt in (which I promptly did anyway)

   B.     On or about 4/1/05 Instructor Franze scolded Cadet Dawn Stevens-Arbaugh for talking in class about a thong. Instructor Franze said the class appeared offended by her comments.

   C.     On or about 4/12/05, while doing the practical portion of defensive tactics, Ms. Arbaugh motioned (on purpose) as if the kick me in the groin; Assistant Instructor Shuler said "I'll pretend I didn't see that" and walked away.

<u>Analysis</u>

Instructors have participated in, or condoned, sexually inappropriate conduct.

After graduation, I asked Ms. Arbaugh if she received any BAC'S as a result of her conduct while in training, she replied "no".

A reasonable jury could infer that a hostile work environment existed and that the employer did nothing to prevent or stop such conduct.

Also, a reasonable jury could infer that I was a victim of discrimination based upon my sex (male) since no female employees were disciplined for violating Mr. Taylor's policy on sexual harassment and discrimination.

Example #3     <u>Discrimination Based on Race</u>

Julio Sanchez admits to being a Mexican male age 22. I admit to being a Caucasian male age 42, and therefore, in a protected class.

Consistently throughout training Mr. Sanchez frequently cursed, told lewd jokes, and gave "smart" replies to instructors.

After graduation, I asked Mr. Sanchez if he received any BAC'S while in training for anything (including his speeding ticket a few days before graduation), he replied, "what's a BAC"?

I attempted to refresh his memory but he had no recollection of what a BAC was. I asked if he signed for anything, or was counseled during training, he said "no".

Analysis

A reasonable jury could infer that I was a victim of discrimination based upon my race and age.

Conspiracy to Deprive Civil Rights

Although I don't want to get into constitutional issues, I will mention this. The facts and evidence seem to stack up that Instructors Nicole Shuler, Annette Franze, Alison Stevens, and possibly others engaged in an intentional conspiracy to deprive me of my right to free speech and employment. If proven, this could be a violation of Federal Criminal Law. I also consider this a Title VII violation because these instructors refuse to discipline female cadets but were real eager to "control my career". Assistant Instructor Shuler even told me this in writing.

In closing, I am confirming our appointment on May 25, 2005 at 10:00AM. I will be there unless you cancel. In the mean time, I would strongly encourage you to verify my assertions.

I look forward to meeting you and Ms. Askin.

Very truly yours,

Jack Sminkey, Ph.D.
Former BOTC Cadet
3402 Edgmont Avenue, #333
Brookhaven, PA 19015
610-620-3670

Enclosures

A000065

-ALAN MACHTINGER

Page 42

1  BY MR. SMINKEY:
2  Q.   If a person sends a letter
3  to a person one time, could that be
4  construed as harassment?
5  A.   **The answer would be yes.**
6  MR. SMINKEY:  We have
7  another exhibit here.
8  (Exhibit Machtinger-8 marked
9  for identification.)
10 BY MR. SMINKEY:
11 Q.   Feel free to read the entire
12 thing, but I'm actually going to ask you
13 questions about 11 -- basically 11
14 through 14.  Read No. 11, I have a couple
15 of questions on that one.
16 A.   **Okay.**
17 Q.   Fair to say that as you
18 handle this matter as the department
19 head, you basically --
20 MR. NIEDZIELSKI:  Objection.
21 He's not the department head.
22 MR. SMINKEY:  As director of
23 training?
24 THE WITNESS:  Director of

Page 43

1  human resource.  Ms. Mickle-Askin
2  is the director of training.
3  MR. SMINKEY:  That's right.
4  Thank you for correcting me.
5  BY MR. SMINKEY:
6  Q.   As the director of HR, fair
7  to say that you relied on the notes from
8  the instructors in the class in making
9  your decisions at least in part?
10 A.   **Yes.**
11 Q.   When we had our meeting on
12 June 6th --
13 MR. NIEDZIELSKI:  Or was it
14 May 6th?
15 MR. SMINKEY:  Whichever
16 date, that meeting did take place,
17 whatever date that was, June 6th,
18 May whatever.  Did you ever ask me
19 about sarcastic comments, being
20 inconsistent, going from one
21 extreme to another, and all of
22 these things I allegedly did?
23 THE WITNESS:  I don't recall
24 whether I asked you.  I remember

Page 44

1  you talked about those things.
2  BY MR. SMINKEY:
3  Q.   I don't recall when you read
4  your handwritten notes that there was any
5  response to these kind of things, do you
6  recall?
7  A.   **You confirmed that you put**
8  **your head down at a desk and refused to**
9  **participate.**
10 Q.   Did you ever ask me why?
11 A.   **I believe you -- I don't**
12 **remember what you said in that regard.  I**
13 **don't recall.  But you did confirm that**
14 **you did that.**
15 Q.   Do you recall asking me why
16 I did that?
17 A.   **I don't recall enough about**
18 **the meeting to be able to make that**
19 **recollection.**
20 Q.   Now, I'm required to see a
21 psychologist before I'm hired by the
22 Department of Correction, is that
23 correct?
24 A.   **Yes, you are.**

Page 45

1  Q.   Do you believe the
2  psychologist is competent?
3  A.   **Yes, I believe she is.**
4  Q.   Fair to say that if I was a
5  goofball or had some real mental issues
6  that she probably would have detected it
7  and I would have never been hired, is
8  that right?
9  A.   **I'm not really qualified to**
10 **make that -- make that judgment.**
11 Q.   The psychologist recommended
12 me for hire based on her exam of me at
13 the time.
14 A.   **She made the recommendation**
15 **based upon whatever procedure she**
16 **employed at the time.**
17 Q.   And this would have been a
18 month or two prior to my starting the
19 training Academy, is that correct?
20 A.   **Approximately.**
21 Q.   If a cadet doesn't quite
22 agree with an instructor, does that make
23 the cadet wrong?
24 A.   **It would depend upon the**

(Pages  42  to  45)

Page 58

1 at will employees.
2 Q. As an at will employee, we
3 still have the same constitutional rights
4 as permanent employees.
5 MR. NIEDZIELSKI: Objection.
6 You are asking for a legal
7 conclusion.
8 BY MR. SMINKEY:
9 Q. Do you know if this code of
10 conduct says that this is a contract?
11 A. I don't know if it says that
12 or not.
13 Q. Fair to say it doesn't say
14 one way or the other?
15 A. You would have to direct me
16 to the language and it speaks for itself.
17 Q. The language speaks for
18 itself. Fair to say that as a new hire,
19 I'm issued this code of conduct book and
20 every other cadet is, could we interpret
21 this book differently?
22 A. It would depend upon what
23 you are referring to specifically.
24 Q. I will just pick out a

Page 59

1 paragraph, 12. If I read paragraph 12,
2 whatever it says it says, and the cadet
3 sitting next to me reads the same thing,
4 could we have two understandings of
5 paragraph 12?
6 MR. NIEDZIELSKI: Two
7 different understandings you mean?
8 MR. SMINKEY: Yes.
9 A. Are you going to show me
10 paragraph 12?
11 Q. Paragraph 12 doesn't matter.
12 It could say anything. I'm using it as
13 an example. Is it fair to say that if
14 I'm a cadet and I have a cadet sitting
15 next to me, we both read paragraph 12, or
16 we could both read paragraph 26, doesn't
17 matter. Could that person's
18 understanding of the paragraph and mine
19 differ?
20 A. If you are asking me people
21 could read virtually anything and come to
22 different conclusions as to what it
23 means, the answer is probably they can.
24 Q. That is what I'm asking. Is

Page 60

1 it the instructor's responsibility to
2 teach me this code of conduct at
3 training?
4 A. I believe it is.
5 Q. Fair to say it is their duty
6 to teach me what is acceptable and not
7 acceptable while attending the training
8 Academy?
9 A. Yes.
10 Q. What is an inappropriate
11 attitude?
12 A. It would depend upon the
13 circumstances, but it may include
14 anything from insubordination to defiance
15 to sarcasm.
16 Q. Fair to say that one cadet
17 could have a different understanding of
18 what an inappropriate attitude is as
19 compared to the next cadet?
20 A. I guess that's possible.
21 Q. Fair to say that same thing
22 goes for the instructor, one instructor
23 could think this is sarcastic, the other
24 could think it is funny, could that

Page 61

1 happen?
2 A. Could happen.
3 Q. How about inappropriate
4 behavior, what is your definition or
5 understanding of what would be
6 inappropriate behavior in a training
7 Academy setting?
8 A. Well, it could range from
9 anything to putting your head down during
10 instruction, it could be talking out of
11 turn. It could be failing to follow
12 instructions.
13 Q. Would it be inappropriate
14 behavior if I was putting my head down to
15 write something?
16 A. It would depend upon the
17 circumstances.
18 Q. If a person was putting
19 their head down to write notes in their
20 book, would that be inappropriate
21 behavior?
22 A. I would have to, you know,
23 have more information. I guess it could
24 be, it may not be.

(Pages 58 to 61)

-ALAN MACHTINGER

17

Page 62

1  Q.   Is it possible for the
2  instructor at the front of the class
3  looking to the guy sitting in the back of
4  the class thinking he's putting his head
5  down and he is putting his head down but
6  it is to write something?
7  A.   It is possible.
8  Q.   Do you believe that the
9  policies and procedures at the Department
10  of Correction are clear and concise?
11  A.   We have hundreds of policies
12  and procedures, I cannot tell you that I
13  believe all of them are clear and
14  concise.
15  Q.   Fair to say that with
16  hundreds of different employees, it could
17  be interpreted hundreds of different
18  ways, is that correct?
19  A.   I guess it is possible.  It
20  would depend upon the language.  I don't
21  know if one policy could be perceived
22  hundreds of different ways.
23  Q.   Is there a standard of
24  progressive discipline at the training

Page 63

1  Academy?
2  A.   You're going to have to --
3  Q.   Progressive --
4  A.   -- qualify your question.
5  Q.   Progressive discipline maybe
6  we start out with coaching.  Cadet Smith,
7  I observe you doing this, just want to
8  bring it to your attention, let's see if
9  we can improve.  I suggest you to A, B,
10  C, D.
11  A.   That is not discipline.
12  Q.   I understand.  Second time
13  around you are caught doing the same
14  thing.  I'm going to give you a verbal
15  reprimand.  Then I'm going to give you a
16  written reprimand.  Then I'm going to
17  give you a suspension.  Then I'm going to
18  terminate.  That is what I mean by
19  progressive discipline.
20  A.   None of those things would
21  happen during training.  It would not be
22  written reprimands and suspensions.  That
23  would apply to employees who are on the
24  job, not to those who are in training.

Page 64

1  Q.   So a new hire doesn't get
2  progressive discipline.  There is no
3  standard of progressive discipline.  They
4  can just be fired, period, that's it.
5  A.   They are at will employees.
6  Q.   Can they be fired for no
7  reason at all?
8  A.   Well, the answer is yes,
9  they can't be fired for an illegal
10  reason, but people can be fired for good
11  reason, bad reason or no reason at all.
12  Q.   Have you fired somebody for
13  no reason at all?
14  A.   No.
15  Q.   Why doesn't the state do
16  that if they are allowed to?
17  A.   Well, they might be allowed
18  to do a lot of things.  But we -- we are
19  always trying to recruit good employees,
20  we would never fire an employee for no
21  reason at all.  To my knowledge, we have
22  never done so.
23  Q.   Does a new hire have any
24  employment protection whatsoever because

Page 65

1  they work for the state government?
2  A.   It would depend.
3  Q.   Please explain.
4  A.   Depends upon what their
5  union contract says, and if they are not
6  covered by union contract, then the merit
7  rules would apply.
8  Q.   So in the case of a cadet,
9  there is no union contract because they
10  are not in a union, there is no merit
11  rules because they are not a permanent
12  employee.  So what is the prevailing body
13  of law that we are going by?  What is the
14  prevailing procedure?
15  A.   The union contract which
16  specifies that employees serve a
17  probationary period for I believe seven
18  months.
19  Q.   Would the cadet know that
20  they are on probation for seven months?
21  A.   I don't know.
22  Q.   Would the cadet know what
23  the union contract says?
24  A.   I don't know.

(Pages 62 to 65)

ESQUIRE DEPOSITION SERVICES

**A000068**

June 7, 2005                    certified mail 7005 0390 0005 4552 6359

Mr. Alan Machtinger, Director of Training and Development
245 Mckee Road
Dover, De 19904

RE: Access to personnel file

I am writing to request access to my personnel file. Please contact me so that
we can find a date and time mutually agreeable for my inspection.

Thanks for meeting with me yesterday. I enjoyed our conversation. I hope
we can all benefit from what was discussed and takes place in the future.

Thanks for your prompt attention to this matter.

Respectfully,

Jack Sminkey, Ph.D.
Former Cadet BOTC #1
3402 Edgmont Ave. #333
Brookhaven, PA 19015
(610) 620-3670



EXHIBIT
Machtinger- 6
3-19-08
Dottyann Y. Walsh, CSR

**A000069**

Jack E. Sminkey

156

1     fully, one way or the other.

2          Q.   Are you saying the First Amendment says in a work

3     place training environment you can refuse to communicate

4     with your instructors?  Is that what you are contending?

5          A.   I don't know.  I mean, a lot of this stuff

6     involves certainly some more research, and, you know, we

7     still have more depositions to go.  So...

8          Q.   Well, they are not going to help you with the

9     law.

10         A.   Well, no, they are not going to help me with the

11    law.  But they are going to help me with the facts of

12    what took place.

13         Q.   That's what I'm asking you.  You made an

14    allegation.  I asked you in interrogatories the specific

15    factual basis for all your allegations and all your

16    claims.

17         A.   Right.

18         Q.   And what did you do?  You referred me back to

19    your complaint?

20         A.   Right.

21         Q.   So I'm going through the complaint now with you

22    and I'm asking you to give me the factual basis for your

23    allegations.

24         A.   Right.  They are pretty much the same.  They are



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jack E. Sminkey

157

1    in the complaint.

2        Q.    Okay.  Count X against Franze and Stevens, you

3    are alleging a conspiracy to deprive your civil rights.

4    What is the factual basis of that claim?

5        A.    Count X?

6        Q.    Yes.

7        A.    Give me one second.

8              Again, it is stated right in the paragraphs

9    156 through 161 or 160, okay.  I think I have a

10   constitutional right to tell the instructor, yes, I need

11   help.  And they are acting like I was sarcastic and I did

12   all these crazy things when I didn't.

13             So I think I have a constitutional right to

14   tell an instructor, yes.  I think I have a constitutional

15   right to have a smirk.  I think I have a constitutional

16   right to have a sense of humor, to be my own person.

17       Q.    All right.  So they asked you if you needed help,

18   and you said, "Yes."  You have a constitutional right to

19   say yes, right?

20       A.    Yes.

21       Q.    And you have a constitutional right to have a

22   smirk?

23       A.    Yes.

24       Q.    That is the factual basis for this allegation?



WILCOX & FETZER LTD.
Registered Professional Reporters

CERTIFICATE OF SERVICE

I certify that on the date indicated below I served two copies by regular U.S. Mail

of the attached document on the following:

Jack Sminkey
3402 Edgemont Avenue, #333
Brookhaven, PA  19005

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Marc P. Niedzielski
Marc P. Niedzielski (#2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8324
marc.niedzielski@state.de.us
Attorney for Defendants

DATED:  June 30, 2008