# ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE 2008 JUN 30  PM 2: 51

$S$

| | | |
|---|---|---|
| JACK E. SMINKEY, Pro se | : | |
| Plaintiff, | : | |
| STATE OF DELAWARE, et al., | : | C.A. NO. 06-263-GMS |
| Defendants | : | |

COMES NOW, Plaintiff Jack E. Sminkey, and respectfully moves to striking the use of Dr. Caren DeBernardo as a defense expert.

1. Dr. DeBernardo submitted a psychological evaluation of plaintiff to defendant Department of Correction (DOC) in February 2005. She recommended Plaintiff for employment.

2. Pursuant to Rule 702 F.R.C.P, Dr. DeBernardo submitted a six (6) page curriculum vita (CV) indicating her background in the field of psychology.

3. The CV reflects an overall strong educational background with weak employment background in law enforcement evaluations.

4. The CV lists the start of "Forensic and Law Enforcement Services, LLC February 1, 2005 to present". Dr. DeBernardo just started her private practice less than two (2) weeks of her interviewing the Plaintiff for his position with the DOC.

5. Dr. DeBernardo's CV lists very few specific entries related to pre-employment interviewing, hiring, investigation, evaluations, etc.

6. Dr. DeBernardo provided a document dated March 11, 2008 indicating she provided expert testimony in four (4) cases over the last four (4) years (all involving DISABILITY RETIREMENT, none involving pre-employment evaluations).

7. On March 28, 2008, Dr. DeBernardo's deposition testimony was opposite her recommendation in February 2005. She now states Plaintiff should not have been hired as Probation and Parole Officer for "integrity" reasons, of which, Dr. DeBernardo testified she fails only 1% of applicants for this.

8. Excerpts from the February 9, 2005 clinical interview report state "the applicant (Plaintiff) present with no question of his personal integrity." "This evaluation is not valid after one year from the dated marked above."

9. Plaintiff cannot avoid providing a complete copy of the doctor's deposition as it is virtually all subjective. The only objective test available is the MMPI-2 test (which the doctor has refused to release).

10. It must be noted that there are a few discrepancies in some of the questions, statements, documents, notes, etc. However, this does not mean the Plaintiff lied to the psychologist, as she now is hired and paid to suggest). Defense Counsel would have you believe Plaintiff should not have been ever hired. (No need to see McDonnell Douglas v Green, 411 U.S. 792 (1973).

11. Dr. DeBernardo provided expert testimony in an areas she lacks expertise (employment hiring, prescription drugs, medical doctor, etc).

For all of the reasons indicated above, and stated throughout Dr. DeBernardo's deposition, Plaintiff respectfully moves the court strike Dr. DeBernardo as a defense expert as there is no objective, reliable or scientific evidence what-so-ever to suggest Dr. DeBernardo's testimony meets the burden(s) of Daubert v Merrell Dow Pharm, Inc., 509 U.S. 579 (1993).

Dated: June 17, 2008
Filed by hand: June 30, 2008

Jack Sminkey, Plaintiff

3402 Edgemont Avenue #333
Brookhaven, PA 19015
(610) 620-3670

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3 JACK E. SMINKEY,            :

4         Plaintiff,          :

5         v.                  : Case No. 06-263-GMS

6 STATE OF DELAWARE,          :

7         Defendant.          :

8                             : Pages 1 - 81

9

10

11

12      Deposition of CAREN R. DeBERNARDO, Psy.D.

13             Friday, March 28, 2008

14                  Towson, Maryland

15

16

17

18

19

20 Reported by:  George W. Tudor, RPR

21 Job No. 10771

Page 2

```
1
2
3
4
5                    March 28, 2008
6                    2:30 p.m.
7
8
9 Deposition of CAREN R. DeBERNARDO, Psy.D., held at the
10 offices of:
11
12        Forensic & Law Enforcement Services
13        7801 York Road
14        Suite 239
15        Towson, Maryland 21204
16
17 Pursuant to notice, before George W. Tudor, RPR, a Notary
18 Public of the State of Maryland.
19
20
21
```

Page 4

```
1                    CONTENTS
2 EXAMINATION OF CAREN R. DeBERNARDO, Psy.D.
3 BY:                         PAGE:
4 MR. SMINKEY:                        5
5 MR. NIEDZIELSKI:                    56
6
7 EXHIBITS  DESCRIPTION                  PAGE
8 No. 1    Psychological Consultation      32
9 No. 2    Photocopy of prescription & label 37
10 No. 3    Employment advertisement       45
11 No. 4    Summary of Behavioral Assessment
12           Meeting            52
13 No. 5    Letter dated 3/11/08       57
14 No. 6    Interview Form FFD/AS        59
15 No. 7    Handwritten notes        61
16 No. 8    Curriculum vitae          76
17
18
19
20
21
```

Page 3

```
1 APPEARANCES:
2
3 Jack E. Sminkey
4 Pro Se
5        3402 Edgmont Avenue
6        Apt. 333
7        Brookhaven, Pennsylvania 19015
8        610.620.3670
9
10 Department of Justice
11 For the Defendant
12        820 North French Street
13        6th Floor
14        Wilmington, Delaware 19801
15        302.577.8324
16 BY:  Marc P. Niedzielski, Esquire
17        Deputy Attorney General
18        Marc.Niedzielski@state.de.us
19
20
21
```

Page 5

```
1        Thereupon,
2              CAREN R. DeBERNARDO, Psy.D.,
3 a Witness, called for oral examination by the Plaintiff,
4 having been duly sworn by the Notary Public, was examined
5 and testified as follows:
6              EXAMINATION BY THE PLAINTIFF
7 BY MR. SMINKEY:
8      Q.  Hi, Dr. DeBernardo.  I am Jack Sminkey;
9 I'm the plaintiff in this matter.
10      A.  Hello.
11      Q.  My first question to you is, do you know
12 why we're here today?
13      A.  Yes.
14      Q.  Tell me your version, if you don't mind.
15      A.  I understand that there is a suit against
16 Delaware Department of Corrections in which you're
17 the plaintiff for discrimination, I think is my
18 understanding of it.
19      Q.  And, Dr. DeBernardo, how old are you?
20      A.  Thirty-nine.
21      Q.  What is your race and gender?
```

2 (Pages 2 to 5)

Page 6

1    A. Caucasian.
2    Q. You're a female?
3    A. Last I checked, yes.
4    Q. And your marital status?
5    A. Single.
6    Q. In what city and state were you born?
7    A. Washington, D.C.
8    Q. And what high school did you attend?
9    A. Trumbull High School in Trumbull,
10 Connecticut.
11    Q. What college did you obtain your doctorate
12 degree from?
13    A. Indiana State University.
14    Q. And what year was that?
15    A. 1997.
16    Q. And what year did you become a licensed
17 psychologist?
18    A. 1999.
19    Q. Presently you're a licensed psychologist
20 in the State of Maryland?
21    A. Correct.

Page 7

1    Q. Are you licensed in the State of Delaware?
2    A. No.
3    Q. Is your license reciprocal in Delaware?
4    A. It is not reciprocal in any state but
5 Maryland; however, you are allowed to work for
6 agencies that do psychological work if the agency is
7 aware of your licensing status.
8    Q. Do you carry malpractice insurance?
9    A. Yes, I do.
10    Q. Are you required to carry malpractice
11 insurance?
12    A. Yes, I am.
13    Q. How many times have you been deposed in of
14 the last four years, approximately?
15    A. I think it was four. Let me just check
16 before I -- yes, four.
17    Q. How many written expert opinions have you
18 wrote in the last ten years, approximately?
19    A. Including those?
20    Q. Yes.
21    A. I don't believe I have written anything

Page 8

1 for court. I testified and they deposed me and that
2 was written, but I didn't submit any kind of written
3 document other than these four cases.
4    Q. Okay. So with the four cases that you
5 listed, did you have written expert opinions prior
6 to your depositions, or not?
7    A. No. No, just appeared in court and
8 answered questions.
9    Q. And in the last four years, you appeared
10 in court on the four cases that you gave us --
11    A. Correct.
12    Q. -- and you just acknowledged?
13    A. Correct.
14    Q. What are your areas of expertise?
15    A. My areas of expertise are forensic and law
16 enforcement psychology, so I do pre-employment
17 psychological evaluations for safety-sensitive
18 positions, such as law enforcement officer,
19 correctional officer, and I also do fitness for duty
20 evaluations and I do threat assessments and I do
21 disability determinations. Those are my main areas.

Page 9

1    Q. Is it fair to say that you have been
2 affiliated in the psychology field for the last
3 twenty years?
4    A. Well, I got my bachelor's degree in
5 psychology, if you're counting that, and I started
6 that in 1986, so I suppose that's fair to say if
7 you're counting that as --
8    Q. I am counting that.
9    A. Okay.
10    Q. With regard to this case that we're here,
11 Sminkey versus State of Delaware, how much were you
12 pay by the State of Delaware to look over your
13 documents and transmit your March 11th letter and
14 that kind of thing?
15    A. I charge a fee of three hundred an hour.
16    Q. And how many hours did you work on the
17 case; do you know?
18    A. I have got to add it up. Hold on a
19 second. I have it written here.
20      About four hours, approximately.
21 Approximately four hours. A little less than four

3 (Pages 6 to 9)

Page 10

1 hours.
2    Q.  How many MMPI-2 tests have you
3 administered in the three-year period from about
4 February 1st, 2005 through February 1st of this
5 year? An approximate.
6    A.  I approximately do five to six hundred
7 pre-employment screenings a year, so that's time
8 three, and then I also give that MMPI for fitness
9 for duty evaluations, and I probably do about thirty
10 of those a year, so if you want me to do the math
11 real quick, I can --
12    Q.  A couple of thousand; is that fair to say?
13    A.  Sure, that's fair to say.
14    Q.  How about the three-year period going from
15 approximately February 1st of '02 to February 1st of
16 '05?
17    A.  It would probably be about the same as
18 what I have just estimated, because I have been in
19 the field.
20    Q.  How many tests have you validated or
21 scored in that time, in, let's say, the six-year

Page 11

1 time frame?
2    A.  That would be the same.
3    Q.  Same thing?
4    A.  Same thing. I administer them and score
5 them all myself.
6    Q.  Are the MMPI-2's scored with a computer
7 system?
8    A.  Yes.
9    Q.  Is the MMPI-2 considered an objective
10 test?
11    A.  Yes, it is.
12    Q.  Is it possible for two different
13 psychologists to score or validate the same test
14 differently?
15    A.  Not possible for them to score it
16 differently, because it is a particular scoring that
17 you have to do, and there is no variant -- variance
18 in that. So the score is the same for everybody.
19    Q.  Can the interpretation of the scoring data
20 that comes off that test be interpreted by the
21 psychologist differently?

Page 12

1    A.  It's possible, but we are trained in a
2 similar manner, so it should be similar. But it's
3 possible to have different interpretations.
4    Q.  Now, what training did you have in scoring
5 the MMPI-2?
6    A.  We learned that in school, in graduate
7 school. I took several classes in the doctoral
8 level of assessment and testing. MMPI is one of the
9 main tests that we use as psychologists. And then I
10 did a two-year postdoctoral fellowship in forensics
11 and law enforcement psychology, so I had training
12 for two further years using the MMPI as one of the
13 instruments to learn to do my specialty area.
14    Q.  Is this training listed on your CV?
15    A.  Yes. It's under my postdoctoral
16 fellowship at Sheppard Pratt Hospital.
17    Q.  Have you taught courses in psychology and
18 abnormal psychology?
19    A.  Yes, I have.
20    Q.  Are you an expert in detecting whether a
21 person is honest with you?

Page 13

1    A.  No.
2    Q.  Does the MMPI-2 have scales to detect if a
3 person is being honest?
4    A.  It does have validity scales, they call
5 them, and they are to determine if the person is
6 taking a test in a reliable and valid manner. It
7 tries to determine if the person is being honest
8 with the test questions, reading the questions
9 consistently and responding to them in a consistent
10 manner.
11    Q.  So if a person was trying to fake bad or
12 fake good, the test should pick it up?
13    A.  The test should pick it up. Of course, it
14 depends on the person's ability to see through the
15 test. It's a self-report test, so a person is
16 reading the items themselves and is possibly able to
17 see those items and figure out what the test is
18 trying to pick up.
19    Q.  How likely is it for the average person to
20 fool the test?
21    A.  I can't say.

4 (Pages 10 to 13)

Page 14

1    Q.  We don't have any statistics on that one?
2    A.  I don't know.
3    Q.  Okay.  Why do you not give other tests to
4 applicants, like the 16PF or the Rorschach -- I
5 might be mispronouncing it; in our particular case
6 it was only the MMPI-2 -- why would you not give
7 other tests for psychological purposes?
8    A.  Right.  Well, the MMPI, I found from
9 research and literature in this particular field in
10 law enforcement pre-employment evaluations that it's
11 the best, most researched instrument and the one
12 that's most commonly used.  It's also been around
13 the most.  To give a 16PF or a PAI or some of these
14 other instruments, they're very similar to the MMPI,
15 so it's sort of redundant to make someone fill out
16 567 questions that are on the MMPI and then also
17 another additional 300 or 500 if they're evaluating
18 the same thing, which is pretty similar to the MMPI.
19        The reason I wouldn't give a Rorschach in
20 this particular case -- it's the ink blot test, for
21 those people who don't know what that is -- is that

Page 15

1 it's not evaluated for this particular use.  It's a
2 subjective test, a projective test, we call it, so
3 it's really not appropriate in this environment to
4 give that kind of test.  I would give it to maybe a
5 psychiatric patient who is psychotic or something
6 like that, but in this particular field it's not
7 accepted to use the Rorschach.
8    Q.  Is it fair to say the more tests you give
9 and the more time you observe the applicant, the
10 better or more accurate feel you have for the
11 applicant?
12    A.  Could you repeat that question again?
13    Q.  Is it fair to say the more tests you give
14 and the more time you observe the applicant, the
15 better and more accurate your exam is?
16    A.  I suppose that would be fair to say.  It
17 also would matter how much information I got from
18 the applicant, and there is a lot of different
19 factors like that.  I suppose that's fair to say.
20    Q.  Do factors such as age, sex, education,
21 social class, religious background, place of

Page 16

1 residence, et cetera, affect the results of the
2 test?
3    A.  No.
4    Q.  So if I am a 21-year-old who lives in
5 Sussex County, Delaware, that's a very rural area,
6 or I'm another applicant that lives in Los Angeles,
7 California, in the big city, you're saying that the
8 results of the test should be the same and they're
9 not influenced by where the person grew up versus it
10 being, you know, a big city, fast-paced, versus, you
11 know, nothing going on in Sussex County, Delaware?
12    A.  I don't see that there would be any
13 difference in that particular example.  The MMPI is
14 normed on a variety of people from a variety of
15 different background, ages and so forth.  You have
16 to be 18 -- 16 -- I can't remember if it's 16 or 18.
17 I would have to look that up.  But you have to be a
18 certain age in order to take it, because it's an
19 adult test, but it's been normed on a variety of
20 populations of people.
21    Q.  Fair to say the MMPI-2 is a

Page 17

1 well-researched and reliable test?
2    A.  Yes.
3    Q.  Does the MMPI-2 provide clear, valid
4 descriptions of people, problems, symptoms and
5 characteristics?
6    A.  "Clear" is kind of a --
7    Q.  I don't mean clear as mud.
8    A.  It provides symptoms -- it provides a
9 description of symptoms that people have reported
10 from the test.  So if the person is reporting, for
11 example, depressive symptoms, then it would show
12 that.  Or paranoid symptoms or anxiety or something,
13 it would show those particular symptoms that that
14 person is endorsing.  But like I said, it's a
15 self-report measure, so the person has to endorse
16 those.
17    Q.  Is the field of psychology an exact
18 science?
19    A.  I wouldn't say so.  I think it's a science
20 and we have a lot of good research, but exact
21 science, probably not.

5 (Pages 14 to 17)

Page 18

1    Q.  Do you have the original copy of my
2 MMPI-2?
3    A.  Yes, I do.
4    Q.  Do you mind giving that to me at some
5 point in time?
6    A.  I'm actually not allowed to release the
7 information, because it's proprietary, so you would
8 have to have a court order to release it, and also
9 agree that it is not going to be released to anybody
10 else because of the -- trying to protect the
11 integrity of the test.
12        The more people are exposed to the test,
13 obviously the validity goes down, so we can't
14 release the test through my ethics or my legal code
15 as a psychologist to anybody else besides a
16 psychologist, who is able to interpret the test, so
17 in order to get it, would have to have a court order
18 in order for the report to come to you.
19    Q.  Does that hold true with your entire file?
20    A.  No, just the MMPI part.  Just because it's
21 proprietary, and obviously I didn't develop the

Page 19

1 MMPI, so the makers of the MMPI have rights to it.
2    Q.  Is it fair to say that you're allowed to
3 give me all the other documents in your file from
4 our interview and all the other stuff?
5    A.  Yes.
6    Q.  I would like a copy of it at some point in
7 time.
8        MR. NIEDZIELSKI:  There's a copy of it.
9    A.  This is a copy of the notes, and the
10 report is the only other thing.  I do have a copy of
11 the consent form if you do want that.
12 BY MR. SMINKEY:
13    Q.  That consent form is for what?
14    A.  To consent for the evaluation when we did
15 the evaluation.  That was the only other thing in
16 the file that we do have.
17    Q.  No, that's okay.  So basically what you're
18 saying is this here, I have everything except the
19 MMPI-2 itself?
20    A.  And the report, which I believe you have
21 already.

Page 20

1        MR. NIEDZIELSKI:  I gave it to you.
2 BY MR. SMINKEY:
3    Q.  Okay.  So you have possession of the
4 actual report, correct?  You can't release it.  You
5 know on the back of the test it says something like
6 "This person has a high probability to be a drug
7 user," that kind of thing.  Well --
8    A.  It doesn't say that.
9    Q.  It doesn't say that?
10    A.  No.
11    Q.  Will the test spit out statements about
12 the applicant on the back?
13    A.  No.  You can get that kind of computerized
14 report, but I don't have that.  I just do it based
15 on the scales and the scores.
16    Q.  Okay.
17    A.  I know what you're talking about.  It's a
18 computerized program that you can pay in order for
19 the computer to spit out a particular interpretation
20 of it, but I don't do that; I interpret it myself.
21 So there is -- what the computer printout does it

Page 21

1 has scales, so it has a --
2    Q.  A T and an L and --
3    A.  Correct, and it has a number of those and
4 it has a profile, basically, so you interpret that
5 profile based on books or information or whatever
6 you have learned.  But you could also have a
7 computer program that could spit out particular
8 paragraphs.  I personally don't use that, that
9 program that you spit out particular paragraphs.
10    Q.  By not having that, is it possible that
11 the test becomes more subjective or a higher
12 probability of error?
13    A.  No, actually, the computerized program
14 that spits out things is really frowned upon in our
15 profession, because we should be interpreting the
16 results ourselves and using appropriate textbooks
17 instead of using a computerized program to write a
18 report, basically.
19    Q.  Did you administer the MMPI-2 test to me?
20    A.  Yes.
21    Q.  Did you monitor the test as you

6 (Pages 18 to 21)

Page 22

1 administered it?
2    A.  I had Jill Rush, who is the assistant,
3 monitoring the test while I was in a separate room,
4 but I monitored the test in terms of explaining it
5 to people and how to administer it.  It's a
6 self-report test, true and false, so we just explain
7 how to do it and let the person do it.
8    Q.  Could the way the test was administered
9 affect the validity of the test?
10    A.  In this particular case?
11    Q.  Yes.
12    A.  I don't believe so.  The test was
13 administered in a room that was quiet and the person
14 was explained what to do and how to take the test
15 and the questions are pretty straightforward, so the
16 person just has to bubble in true or false on the
17 test, so they read the test question and bubble in
18 true or false, so it's not that difficult.
19    Q.  Has anyone other than yourself seen your
20 original documents of my test or the critical
21 interview?

Page 23

1    A.  No.
2    Q.  Have the test results been altered in any
3 way?
4    A.  No.
5    Q.  Did the scoring of my test differ in any
6 way whatsoever from the scoring method set forth in
7 the MMPI manual?
8    A.  No.
9    Q.  What steps have you taken to insure the
10 scoring of this test is accurate and free from
11 errors?
12    A.  I scan it into a computer system, which is
13 based on the Pearson, which is the actual makers of
14 the test, and it goes directly into the computer
15 through a scanner, and then that computer scores the
16 test, and the computer program is made by the makers
17 of the test.  So it's a software program that you
18 have to pay every time you administer the test, pay
19 to Pearson, who is the makers of the test.
20    Q.  If somebody took this test a number of
21 times, like a dozen times, would they be able to

Page 24

1 trick the test?
2    A.  They might be able to.  It's possible,
3 certainly, being familiar with the test items.  I
4 can't say for sure.  It's possible, I suppose.
5    Q.  Would they be likely to answer the
6 questions the same way if they took the test a dozen
7 different times?
8    A.  Well, hopefully they would if they were
9 answering them correctly, honestly.
10    Q.  Truthfully.
11    A.  Right.  It could change over time, though,
12 so I just want to add that.  If you took the MMPI
13 today and you took it ten years from now, your
14 symptoms might be different, your -- and so forth,
15 so you might answer the test questions different
16 there and you might have a different profile,
17 depending on the time period.
18    Q.  Is this report based on an interview of me
19 on February 9th, 2005?  The report you generated on
20 March of this year?  So in other words --
21    A.  Say that again.

Page 25

1    Q.  Yeah, it sounds confusing.
2       Basically, the test and clinical interview
3 was based on the test and the interview from around
4 February 9th, 2005.
5    A.  Correct.  Right.
6    Q.  If I went through the same process today,
7 could that test and results be different because
8 we're talking three years later?
9    A.  Yes.
10    Q.  Is it fair to say that your testing, your
11 piece of this, is just one part of the process?
12    A.  Yes, that actually is stated in the report
13 that I wrote.
14    Q.  And it should be combined with other
15 factors and background information, et cetera.
16    A.  Yes.
17    Q.  Is it better for you to do your piece
18 after the background investigation is done and look
19 at everything, or doesn't it matter?
20    A.  I don't have access to the background
21 information in this particular case.

7 (Pages 22 to 25)

Page 26

1  Q. Fair to say you recommended me for
2 employment based on my MMPI-2 test results and your
3 clinical interview at that time?
4  A. Right. All the information that I knew at
5 the time. And I also stated that in my report, that
6 based on the -- the last paragraph on the report
7 says based on the information available, which did
8 not include a background investigation, the
9 applicant was recommended.
10  Q. Do you have any training as a medical
11 doctor?
12  A. No.
13  Q. Any training as a pharmacist?
14  A. No.
15  Q. Do you have a lot of knowledge of
16 prescription medication?
17  A. Psychotropic medication, I have some
18 knowledge of. That would be applying to psychology.
19 But certainly I would not say that I'm an expert in
20 the medical field in terms of dispensing medication.
21 I don't prescribe medication.

Page 27

1  Q. If there were inconsistencies, does that
2 mean that the person is being dishonest with you?
3  A. I don't know for sure. What I was -- what
4 I would mean from an inconsistency is that the
5 information that I provided -- was I provided was
6 inconsistent with the records that I obtained later.
7  Q. What does the word psychotopic --
8  A. Psychotropic.
9  Q. I'm sorry. I'm looking right at it.
10 Psychotropic. What's the definition of that?
11  A. That means basically medication that's for
12 psychiatric reasons. So it would pertain to the
13 psychology field; medication for depression,
14 anxiety, schizophrenia, those sorts of medications.
15  Q. And so how many antidepressant medications
16 are there out there?
17  A. A lot. I don't know a number, but there's
18 a lot of them.
19  Q. So everybody that you interview, would
20 they know them all?
21  A. I have no idea. But I do ask questions

Page 28

1 about if they have been on any kind of medication
2 for a psychiatric reason, and then I give example,
3 such as Prozac, Valium, Ritalin, and then I ask them
4 if they have ever been diagnosed with a mental
5 disorder, and I also ask them if they have ever been
6 to counseling or therapy or seen a psychologist or a
7 psychiatrist. So I try and give them some hints to
8 make sure that they understand what I'm asking.
9  Q. So for example, if you said to me, "Hey,
10 Jack, have you ever been on Prozac, Paxil or
11 Zoloft," I may have said to you no, no, no?
12  A. You could have said that, but I would have
13 asked a question prior, "Have you ever been on any
14 kind of medication for a psychiatric reason, such as
15 Prozac," giving you an example of that.
16  Q. Since there are so many different types,
17 is it possible I didn't know that it was classified
18 as a psychiatric medicine?
19  A. It's possible that you didn't, but
20 probably not likely, because when a doctor
21 prescribes medication, the doctor is going to

Page 29

1 explain the reason that they're giving a medication
2 to a person, and there is also an insert that is --
3 that comes along with the medication that explains
4 what the medication is and what it does and what it
5 treats, so I would assume that most people who are
6 on medication for depression or anxiety or whatever
7 other reason, that they would be knowledgeable at
8 least of why they were taking the medication. And
9 in addition, the doctor would probably be asking
10 what kind of symptoms you would have that you would
11 need this kind of medication, so I'm sure that there
12 was some sort of conversation with a doctor about
13 the reason that you would take the medication.
14  Q. You're assuming that, correct?
15  A. I'm assuming that.
16  Q. Would the doctor prescribe a medication,
17 say, "I'm giving you this medicine for this reason,"
18 and not gone on to a whole litany about it fits in
19 this category and all the nuts and bolts of it?
20  A. I suppose it's possible. Usually doctors
21 do describe what the medication is for and there is

8 (Pages 26 to 29)

Page 30

1 also, again, the handout that they give you to
2 explain the side effects and the reasons that you're
3 taking the medication and so forth.
4    Q. How about the dosage of the medication; is
5 that a factor of it? If you're on a low dosage of
6 something versus a high dosage?
7    A. Is that a factor for what?
8    Q. Well, from your standpoint of interviewing
9 somebody and what you're doing.
10    A. I would ask that. If somebody told me
11 that they were on medication, I would follow up with
12 a question -- a series of questions, actually -- but
13 one of the questions would be, what the dosage and
14 how long have you been taking it and so forth.
15       It might be a factor; it might not. It
16 depends on the medication, it depends on the person.
17 You know, people, obviously, who are on a higher
18 dosage usually have more symptoms. In general,
19 that's just a --
20    Q. Do you know what Bextra is?
21    A. Bextra? No.

Page 31

1    Q. Therefore, you don't know what it's used
2 for, the medication?
3    A. I'm assuming it's a medication, but I
4 don't know what it's used for.
5    Q. Therefore, you wouldn't know if it's a
6 narcotic, because you're not familiar with the
7 medication.
8    A. I'm not familiar with the medication.
9    Q. Before we started today, did you get an
10 opportunity to read some of the documents that you
11 provided to Mr. Niedzielski?
12    A. That I provided to him?
13       MR. NIEDZIELSKI: Or that he provided to
14 her.
15 BY MR. SMINKEY:
16    Q. Well, I'm really thinking -- it could be
17 either way.
18    A. The only thing I provided to him was the
19 report that you already have and my CV and --
20    Q. Correct. Did you review the report that
21 you wrote on February 9th, 2005?

Page 32

1    A. Yes, I did.
2    Q. I guess that's what I'm actually alluding
3 to. There is no trick questions here.
4    A. Okay.
5    Q. I'll tell you what, rather than root
6 through all that, I'll just give you each a copy and
7 we will mark it as an exhibit. There's only going
8 to be about three exhibits here.
9    A. So that's just my report?
10    Q. That's a copy of it, yes. And we can mark
11 that as an exhibit.
12       (Deposition Exhibit No. 1 marked for
13 identification.)
14 BY MR. SMINKEY:
15    Q. So you have read this rather recently?
16    A. Right. I read it this morning.
17    Q. Okay. Based on your recollection of
18 everything, fair to say you stand behind this
19 report; is that correct?
20    A. I do; in terms of when I wrote it.
21 Obviously I have more information now that I did not

Page 33

1 have then.
2    Q. So based on when you wrote this report,
3 did I look like a good applicant for a law
4 enforcement position?
5    A. Yes. I recommended you, so I didn't have
6 any problems based on the information I had at the
7 time.
8    Q. Do you recall what dates I was with the
9 Department of Correction? Would you have any reason
10 to know that?
11    A. You mean after you were hired?
12    Q. Yes.
13    A. I don't know, no.
14    Q. So I need to tell you that.
15    A. Okay.
16    Q. All right. So you generated this report
17 on February 9th of 2005.
18    A. Right.
19    Q. Human resources received it February 15th
20 of 2005; is that correct?
21    A. That's correct.

9 (Pages 30 to 33)

Page 34

1    Q.  My first day of training with the
2 Department of Correction was February 25th of 2005.
3    A.  Okay.
4    Q.  Which would be ten days after they got the
5 report.
6    A.  Okay.
7    Q.  My last day of training was April 28th of
8 2005.
9    A.  Okay.
10    Q.  Okay?
11        MR. NIEDZIELSKI:  You're asking her to
12 assume those facts?
13        MR. SMINKEY:  No, no, I'm -- well, I'm
14 telling her the transition of the dates.
15        MR. NIEDZIELSKI:  Yeah, I know, but you
16 see, she's the one under oath; you're not.  So you
17 can't provide her with information.  Now, if you're
18 asking her to assume those to be the facts and then
19 you're going to ask her questions on that, that's
20 fine.
21        MR. SMINKEY:  Exactly.  That's what I'm

Page 35

1 asking.
2    Q.  I'm asking you to assume that information
3 I gave you is accurate, because I have a few
4 questions regarding that.
5    A.  Okay.
6    Q.  So if I just learned my mother took
7 Welbutrin in July of 2005, how would I have known
8 about that in February of 2005?
9    A.  I don't know.  Did you just find -- I'm
10 assuming that you're telling me the truth right now,
11 that you just found out that your mother was on
12 Welbutrin and that you didn't know at that time.
13    Q.  If my uncle committed suicide twenty years
14 ago, what would that have to do with me in applying
15 for a position in a law enforcement agency?
16    A.  I have it written there in the report that
17 he committed suicide?
18    Q.  Yes.
19    A.  Well, basically it's a question I ask
20 about suicide to see if there is suicide in the
21 family and also to see if there is mental illness in

Page 36

1 the family, how relevant that was.  It might or
2 might not be relevant; it's just a fact that I
3 reported.  It's a question that I ask and -- because
4 it might not -- might be relevant or it might not.
5        If, for example, your mother committed
6 suicide, if a person's mother committed suicide,
7 that might be relevant to your risk of suicide.  So
8 that's why I ask that question about suicide.
9    Q.  So it's a subjective question.  You're
10 asking the question to gain information, but it may
11 have relevance and it may not?
12    A.  All my questions might have relevant or
13 might not.  That's why I ask them.  But I'm just
14 reporting the facts.  So it's not really a
15 subjective question, it's just a question.
16    Q.  When a person is on different medications,
17 can that affect sleeping patterns?
18    A.  Some medications could affect sleeping
19 patterns.
20    Q.  Is Alprazolam commonly used to treat
21 anxiety and panic attacks?

Page 37

1    A.  Yes.
2    Q.  Would a doctor prescribe that for other
3 reasons as well?
4    A.  I'm not familiar with any other reasons,
5 but you would have to ask a medical doctor.
6        MR. SMINKEY:  We can mark this as the next
7 exhibit.  Actually, it's going to be a two-page
8 exhibit.
9        (Deposition Exhibit No. 2 was marked for
10 identification.)
11 BY MR. SMINKEY:
12    Q.  The first of the two pages is a
13 prescription.  On the top right, it says 09/06/2004.
14 Do you see that on one of your pages?
15    A.  Yes.
16    Q.  All right.  You see under my name it says
17 Bextra?
18    A.  Um-hmm.
19    Q.  This prescription was given to me prior to
20 my hire with the Department of Corrections, correct?
21    A.  Sure, based on what you told me, yes.

10 (Pages 34 to 37)

Page 38

1    Q.   Then if you look at the next prescription,
2 it's dated 3/17/2008, Alprazolam, and then right
3 underneath that, can you tell me what that says?
4    A.   "Take one tablet by mouth at bedtime as
5 needed for sleep"?  Is that what you're talking
6 about?
7    Q.   That's it.  Fair to say that my doctor
8 probably prescribed this medication because I was
9 having sleeping difficulties?
10       MR. NIEDZIELSKI:  Well, I'm going to
11 object, but you can go ahead and answer.
12    A.   I'm not sure why your doctor prescribed
13 the medication.  I didn't know that information at
14 the time that I interviewed you, because I was not
15 told that you were taking any kind of medication
16 that would be relevant for psychological reasons,
17 any psychotropic medications, so I didn't follow up
18 in any questions about why you were taking the
19 medication, because I was told you weren't taking
20 any medication, so I don't know if that's a fair
21 question.

Page 39

1 BY MR. SMINKEY:
2    Q.   Are medications by a doctor sometimes
3 prescribed together?  In other words, they're given
4 prescription A for something, but commonly, they
5 also give prescription B for something else
6 associated with it?
7    A.   Again, I'm not a medical doctor.  Based on
8 the knowledge that I have, people take more than one
9 medication at a time on occasion, sure.
10    Q.   When you interviewed me, February, 2005,
11 is it possible that I didn't know that Lexapro is in
12 the antidepressant family?
13    A.   It's possible, but probably not likely,
14 since Lexapro is a pretty common antidepressant
15 medication.  It says on the label that it's an SSRI
16 antidepressant medication, and it would say on the
17 booklet that you received with the medication that
18 it's used to treat depression.
19    Q.   If a person is mistreated, harassed,
20 sexually harassed and subsequently fired, might that
21 person have some problems with depression as a

Page 40

1 result of that?
2    A.   It's possible.  We're talking
3 theoretically, of course.  I don't know the person.
4    Q.   Well, it's a major change in somebody's
5 life, so that could certainly upset the apple cart a
6 little bit; fair to say?
7    A.   It's possible they could develop
8 depression.
9.    Q.   Do you recall reading the reports from
10 Dr. Slater and Dr. Rosenfeld?
11    A.   Yes.
12    Q.   Those reports were transmitted, or
13 authored, actually, in the summer and fall of 2005;
14 is that correct?
15    A.   That's correct, um-hmm.
16    Q.   So those reports were after I left the
17 employ of the State of Delaware; is that correct?
18    A.   That's correct.
19    Q.   Fair to say honesty and integrity are a
20 significant part of the law profession, the law
21 enforcement profession?

Page 41

1    A.   I would say yes.
2    Q.   Have you refused to recommend someone for
3 hire because of integrity issues before?
4    A.   Yes, I have.
5    Q.   What percentage of persons would that be,
6 based on the number of people that you interview?
7    A.   Just for integrity reasons, or not
8 recommending for any reason?
9    Q.   Well, I'll ask about that, but just for
10 integrity.
11    A.   This is purely guessing.  Probably one
12 percent.
13    Q.   Okay.  What would be, you know, the top
14 three or four reasons that you would not recommend
15 somebody?
16    A.   Alcohol or substance abuse issues, some
17 sort of vulnerability to stress and inability to
18 cope with the stress of the profession, and that
19 could be a variety of things.  It could be mental
20 illness, it could be just a history of poor coping.
21 Those would probably be the top two.  And then the

11 (Pages 38 to 41)

Page 42

1 third one would probably be judgment/integrity
2 issues, a pattern of poor judgment, integrity
3 issues, impulsivity. That all sort of falls into
4 the same, similar category for number three.
5    Q.  So if a person lied about something one
6 time, would that be enough for you to not recommend
7 them?
8    A.  It depends what it is. If it's a little
9 white lie when they were five years old and they
10 stole a cookie from a cookie jar, it's very
11 different than lying when they're taking the
12 polygraph about using marijuana or cocaine. I mean,
13 it's hard to answer that question.
14    Q.  So the way you interpret it, it's
15 subjective, depending on the totality of the
16 circumstances.
17    A.  Right. You would want to gather all the
18 facts that you have and of course make a decision
19 based on a pattern of behavior or all the
20 information that you know.
21    Q.  If a law enforcement applicant has a

Page 43

1 criminal record for theft or shoplifting, would that
2 make you not recommend them to be hired?
3    A.  Again, it depends on how old the applicant
4 is, what, exactly, they stole, how many times they
5 stole it. I can't say a blanket statement yes or no
6 for that, because there are so many variables.
7    Q.  How about if it was a drug offense? Same
8 thing, it depends on how -- you know, how long
9 ago --
10    A.  Drug, right. I mean, a DUI might be
11 different than selling cocaine. So, again, you
12 know, I can't make a blanket statement about whether
13 or not I would recommend. I would really need to
14 take it on a case-by-case basis and all the facts
15 that I have.
16    Q.  Do most law enforcement agencies take your
17 recommendation?
18    A.  As far as I understand, yes, they do.
19    Q.  And what law enforcement agencies are you
20 actually contracted out for right now?
21    A.  Maryland State Police, Delaware State

Page 44

1 Police, Baltimore County Police, a bunch of small
2 agencies in Delaware and Maryland, just smaller
3 agencies which you probably wouldn't have heard of,
4 but I can list them. There's probably a lot of
5 them.
6    Q.  Based on your testing, is everybody kind
7 of in one bunch, or do you have a higher level of
8 integrity per se or pass-fail rate if they're a
9 correctional applicant versus probation and parole
10 versus a state police applicant or a small town
11 applicant?
12    A.  I would say that I'm pretty fair across
13 the board. There all law enforcement positions, so
14 they all need to pretty much meet standards that are
15 set forth.
16    Q.  Are you actually setting the standard at
17 some point in time as far as who passes and who
18 doesn't, based on your professional opinion?
19    A.  What do you mean?
20    Q.  Well, are you using some guideline that's
21 recommended by the APA for this, or are you using

Page 45

1 your own judgment and standards?
2    A.  There are standards to follow within our
3 profession, a number of standards, of course, are
4 ethics, the APA, legal issues. Also we have
5 standards by the -- the International Chiefs of
6 Police have set out standards for pre-employment
7 screenings, and I follow those. We have to also
8 follow the ADA guidelines and, you know, civil
9 rights guidelines, and all those -- all that goes
10 together. Of course -- I don't know if you're
11 familiar with them, but, you know, basically you
12 would follow them as being a psychologist and a
13 professional, you would follow all those guidelines.
14    Q.  Okay. The next exhibit.
15       (Deposition Exhibit No. 3 was marked for
16 identification.)
17 BY MR. SMINKEY:
18    Q.  All right. If you look at this flyer, at
19 the very bottom it says "You cannot be hired if you
20 have been on probation within the last four years or
21 had a felony drug or domestic violence conviction."

12 (Pages 42 to 45)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 46

1      Do you think that is an unusual statement
2 to put on a hiring type flyer or a recruitment type
3 flyer?
4      A. I don't know. I have never made a
5 recruitment flyer. I really don't know what they
6 put on it.
7      Q. Do you read that statement to be that, as
8 long as you don't have a criminal record for those
9 kind of things, we will consider hiring you?
10      A. Again, it's a hard question to answer. I
11 suppose that would be a disqualifier, what they're
12 saying is that is disqualifying, but it doesn't
13 necessarily mean that they're going to hire you just
14 because you don't have those things. That's how I
15 would interpret it, at least.
16      Q. Have you ever recommended people for hire
17 when they have a criminal conviction on their
18 record?
19      A. Yes, depending on the criminal conviction.
20 Again, you know, as a juvenile, it depends on the
21 conviction. Not felony, of course; that would be

Page 47

1 different.
2      Q. So in other words, you have recommended
3 people for hire that are right now Delaware state
4 troopers, Maryland State Police, other law
5 enforcement agencies in this area with a criminal
6 conviction on their record?
7      A. Yes, um-hmm.
8      Q. Have you ever --
9      A. Usually -- can I just add something? It's
10 usually as a juvenile, and it's something minor. It
11 wouldn't be something major, like assault or
12 something like that, a criminal, violent -- but
13 there are people who have been, for example,
14 convicted of shoplifting when they were twelve, and
15 they have been recommended for hire.
16      Q. I'm going to read you a synopsis, and I
17 want you to tell me if you think you would recommend
18 this person for hire.
19      A. Okay. I'm not sure if I could do it based
20 on the --
21      Q. Do the best you can.

Page 48

1      "This person is sluggish, mopey, last in
2 line, doesn't blend with the class, unable to
3 perform satisfactorily, has contact with offenders,
4 plays cards with offenders, has a problem
5 understanding instructions, no listening skills,
6 poor verbal skills, failed a test, weakened
7 scenarios, not available to verbalize in a confident
8 manner, timid."
9      Does this sound like somebody that would
10 make a good law enforcement officer to you?
11      A. I would need to know more information.
12      MR. NIEDZIELSKI: And just so we're clear,
13 she's a psychologist. She's not necessarily a
14 hiring manager. In other words, she merely says,
15 based on her preview, her expertise, she would
16 recommend someone. She doesn't mean that that --
17 certainly that hiring manager can have their own
18 decisions, correct?
19      MR. SMINKEY: I know, that but --
20      MR. NIEDZIELSKI: And what you just said
21 to her is, to put it in context, it's a hearsay

Page 49

1 statement, it's in some notes that was not typed in,
2 okay, that was made by a person that was at a
3 meeting who other people were speaking at and she
4 was making notes, and those notes were never
5 finalized in the minutes for that meeting. Those
6 were that person's notes. So for that reason, I
7 think it's very unfair to ask this witness to
8 comment on that, that's all.
9      MR. SMINKEY: But in this proceeding,
10 we're allowed to use hearsay, correct?
11      MR. NIEDZIELSKI: But the problem is,
12 that's not from a professional. That's the problem.
13 It's someone's understanding of what was going on at
14 meetings and what people may or may not have said.
15      The fact is that those handwritten notes
16 were never formalized, those parts of the notes were
17 never formalized. So that should tell you
18 something. If the person who made the formalized
19 set of notes did not include those handwritten part
20 of the notes, it should tell you that they weren't
21 accepted, okay?

13 (Pages 46 to 49)

Page 50

1 BY MR. SMINKEY:

2    Q.  If you were examining somebody like this
3 character I just read to you, would your MMPI-2 pick
4 up on certain things?

5    A.  You know, that's -- I can't really answer
6 that question, because, you know, who is observing
7 the person?  Is it me?  Is it somebody else
8 observing?  I need to consider the source, I need to
9 consider how long that happened.  Maybe the person
10 just had a bad day.  I can't possibly say that.  I
11 can't make a comment about that.

12    Q.  On a clinical interview, would you pick up
13 something like this by talking with the person?

14    A.  My observation?

15    Q.  Yes.

16    A.  I would hope that I would.

17    Q.  But because you're human, it's possible
18 that you may not have, though?

19    A.  Sure.  Of course.

20        MR. NIEDZIELSKI:  Just so we're clear, I'm
21 not sure that "mopey" by itself -- I'm not sure what

Page 51

1 that means.

2        THE WITNESS:  Well, I just don't think I
3 could really comment on that, because I just -- you
4 know, it's too limited amount of information for me
5 for me to make any kind of judgment.

6        MR. NIEDZIELSKI:  If somebody said
7 somebody was smarmy, I don't know if that's a
8 negative.  It's a description.  Being mopey could be
9 a description.

10        MR. SMINKEY:  Kind of like inappropriate
11 behavior.

12        MR. NIEDZIELSKI:  No, that's different.
13 Pulling your pants down in public is inappropriate
14 behavior.  It's true that you can do it in some
15 circumstances, like in a fraternity house, and it's
16 not inappropriate.  But the truth of the matter is,
17 most people agree what inappropriate behavior is.

18        MR. SMINKEY:  I don't know that I agree
19 with that, but that's okay.

20    Q.  So now I'm going to read you something
21 from formalized notes, and I want to ask you if you

Page 52

1 think this person should be a law enforcement
2 officer.

3        "Had inappropriate response during
4 blocking drill.  He displayed an inability to
5 maintain control in responding to blocking/punches
6 with excessive force -- with excessive use of force
7 when he attacked instructor, Harold Mack."

8        MR. NIEDZIELSKI:  Let her read the rest of
9 it.

10        MR. SMINKEY:  Okay.

11        MR. NIEDZIELSKI:  Why don't you let her
12 read it.  I think she can read.

13        MR. SMINKEY:  I'm sure she can read.
14 Let's enter that into an exhibit, then, and
15 basically, where it says Jack D. Reyes is what
16 you're going to read.

17        (Deposition Exhibit No. 4 was marked for
18 identification.)

19        THE WITNESS:  And I just -- it's too
20 limited information for me to make judgments on.  I
21 just don't think I can do this.

Page 53

1        MR. NIEDZIELSKI:  But I think more
2 importantly, it doesn't go to a psychological
3 profile, necessarily.

4        MR. SMINKEY:  Well, Dr. DeBernardo says
5 one thing she looks for, is impulsiveness, things
6 along those lines, correct?

7        MR. NIEDZIELSKI:  Um-hmm.

8 BY MR. SMINKEY:

9    Q.  I think that's pretty impulsive behavior
10 that I would think her testing or clinical interview
11 would pick up on that.  That's what I'm asking her.
12 I'm not asking her if she is perfect and has never
13 made a mistake in her life, I'm just saying that
14 basically, for a paragraph like that, is it fair to
15 say or ask you that, as a clinical psychologist,
16 wouldn't you have a tendency to pick up on something
17 like that?

18    A.  Well, if I didn't know the information, I
19 wouldn't be able to pick up on it.  If that happened
20 before I interviewed the person and we talked about
21 it, I would have more information to go on, but if

14 (Pages 50 to 53)

Page 54

1 it never happened before I met them, how would I
2 know that? I'm not psychic.
3        So if we're talking about something that
4 happened that we can have a discussion about and I
5 can evaluate whether that was an impulsive or
6 inappropriate behavior with the candidate that I'm
7 talking with and we can talk about it, that's a
8 different story, but if it never happened before we
9 talked, then I can't make a judgment on it.
10    **Q. Part of being a psychologist, are you able**
11 **to somewhat predict future behavior?**
12    ·A. No. We make a risk assessment and we can
13 present -- basically, my job in the preemployment
14 screening is to rule out high-risk people, try and
15 screen out the people who are probably going to be a
16 big problem for the department. I in no way say
17 that I can predict behavior; I in no way say that
18 I'm a hundred percent accurate, and we need to put
19 all the information we have available at the time to
20 make a risk assessment, basically. And we want to
21 get the people who are high-risk out and the

Page 55

1 low-risk people in, basically. So there is no way
2 that you can predict behaviors.
3    **Q. Is the best prediction of future behavior**
4 **past behavior?**
5    A. That is accurate. The best predictor of
6 what would happen in the future is based on past
7 behavior. That's what they say in psychology and
8 I'm sure you have heard that before, since you
9 quoted that.
10    **Q. I have.**
11        **Is it possible that you or another**
12 **psychologist could evaluate somebody, and a month or**
13 **two later they go rob a bank?**
14    A. Anything is possible, sure. Again, we try
15 and get as much information as we can and hopefully
16 screen people out, but it's possible that anything
17 could happen. I mean, I certainly say that I am not
18 predicting behavior. People can act in
19 unpredictable ways.
20    **Q. So what you're saying is that you**
21 **basically admit that the science isn't perfect, the**

Page 56

1 **psychologist is not perfect; you do the best you**
2 **can.**
3    A. Exactly.
4    **Q. And that's really all you can do?**
5    A. Right.
6    **Q. Is it fair to say that sometimes your**
7 **interpretation of the data, your clinical**
8 **interviews, maybe they're not right on all the time.**
9 **Is that fair to say?**
10    A. I would say so, sure.
11        MR. SMINKEY: Doctor, I appreciate your
12 time. It was very nice talking to you, and I hope I
13 didn't interrupt your day too much.
14        MR. NIEDZIELSKI: I have a few questions I
15 would like to ask the doctor.
16        THE WITNESS: Okay.
17    EXAMINATION BY COUNSEL FOR THE DEFENDANT
18 BY MR. NIEDZIELSKI:
19    **Q. What I would like to do, Doctor, is have**
20 you -- I'm going to have marked as the next exhibit
21 your report, and I'll ask the court reporter to mark

Page 57

1 it and hand it back to you.
2        (Deposition Exhibit No. 5 was marked for
3 identification.)
4 BY MR. NIEDZIELSKI:
5    **Q. Would you just identify this for the**
6 **record, please?**
7    A. Are you talking to me?
8    **Q. Yes.**
9    A. Okay.
10        (Discussion off the record.)
11    A. This is a letter that I wrote on March
12 11th, 2008.
13 BY MR. NIEDZIELSKI:
14    **Q. And that was after you were provided**
15 **certain medical records; is that correct?**
16    A. That's correct.
17    **Q. And you did that at my request; is that**
18 **correct?**
19    A. That's right.
20    **Q. And you expressed a number of things in**
21 **here. What's the central thrust of this report that**

15 (Pages 54 to 57)

Page 58

1 you issued on March the 11th, 2008?

2    A.   The general theme is that my

3 recommendation in 2005 was not accurate, because I

4 didn't have all the information.

5    Q.   What was that information you did not

6 have?

7    A.   I did not have the information that

8 Mr. Sminkey was on any kind of psychotropic

9 medication.  I also didn't know that he had been to

10 psychiatric treatment and I didn't know that he had

11 a family history of mental illness or any kind of

12 symptoms of anxiety or depression.

13    Q.   Did you specifically ask him those

14 questions to elicit that information?

15    A.   I did.

16    Q.   What were his responses to those

17 questions?

18    A.   His responses were no.

19    Q.   All right.  Now, also in your -- we have

20 another document that you have provided, and I'm

21 going to ask you just to identify this and then hand

Page 59

1 it to Mr. Tudor, if you would, please.

2    A.   Okay.        - ·9

3    Q.   What is this document?

4    A.   These are my actual notes when I was in

5 the clinical interview with Mr. Sminkey.

6        MR. NIEDZIELSKI:  Okay.  Would you mark

7 this as the next exhibit, please?

8        (Deposition Exhibit No. 6 was marked for

9 identification.)

10 BY MR. NIEDZIELSKI:

11    Q.   Again, those are the actual notes you made

12 while you were interviewing Mr. Sminkey?

13    A.   Correct.

14    Q.   Back to what has been marked as DeBernardo

15 number one, which is the initial consultation report

16 you gave.  If you turn to page two, and you see the .

17 second full paragraph there?

18    A.   "Has been self-employed as a private

19 investigator"?

20    Q.   Yes.

21    A.   Yes.

Page 60

1    Q.   At the end, it indicates that he had

2 worked eight months as an officer with Delaware

3 River and Bay Authority, eight months with the

4 Delaware State Capital Police, three years with New

5 Castle City Police, and ten years with the

6 Philadelphia Transit Police.  He reported a good

7 work history; he received minor reprimands as police

8 officer.  Is that what he told you?

9    A.   That's what he told me.

10    Q.   He did not tell you, in fact, he testified

11 on Monday that in fact he was fired from two

12 different agencies.  Did he tell you that?

13    A.   He did not.

14    Q.   Did he tell you that his firing from the

15 Philadelphia Transit Authority was changed into a

16 suspension of six months?

17    A.   He did not.

18    Q.   Would you have considered that a minor

19 reprimand?

20    A.   No.

21    Q.   Did Mr. Sminkey ever tell you that in

Page 61

1 fact, while he worked for SEPTA, the police

2 department, he was required to see a psychiatrist on

3 two separate occasions?

4    A.   He did not.

5    Q.   Did you elicit that kind of information

6 from him?

7    A.   Yes, I asked that question.  I asked the

8 question "Have you ever been to a therapist,

9 counselor, seen a psychologist or a psychiatrist for

10 any reason at all?"

11    Q.   And his response was?

12    A.   No.

13    Q.   In addition to those documents -- and this

14 may be included in the documents you have already

15 reviewed...

16        (Deposition Exhibit No. 7 was marked for

17 identification.)

18 BY MR. NIEDZIELSKI:

19    Q.   Would you take a minute and look at that?

20 I think you were provided with this document.  Am I

21 correct --

16 (Pages 58 to 61)

Page 62

1   A.  In the pile here?

2   Q.  Yes.  Am I correct that appears to be a
3 handwritten progress note?

4   A.  Yes.

5   Q.  What appears to be the date on it?

6   A.  5/21/04.

7   Q.  If you go down to the middle of the page,
8 can you read what the doctor or whoever is writing
9 that says?

10   A.  Not really.

11   Q.  If I were to suggest it says "Depressed,
12 mood swings"?

13   A.  "Depressed, mood swings --" I can't read
14 the writing, I'm sorry.  I see that where you
15 saying, but I don't see the rest of it.

16   Q.  And you see at the right there, at the
17 lower part of the page it says, "Samples of
18 Lexapro"?  Do you see that?

19   A.  Yes.

20   Q.  And this would have been --

21   A.  "Psychological counseling" here, I see.

Page 63

1   Q.  Oh, it says "Needs psychological
2 counseling."

3   A.  Right.

4   Q.  And that's long before you saw him,
5 correct?

6   A.  That would be, yes, a year -- over a year.

7        MR. NIEDZIELSKI:  That's all the questions
8 I have.  Thank you.

9        MR. SMINKEY:  I would actually like to
10 redirect.

11       MR. NIEDZIELSKI:  Would you?

12       MR. SMINKEY:  I really would.

13       MR. NIEDZIELSKI:  It's your deposition.
14 It's your nickel.

15       FURTHER EXAMINATION BY MR. SMINKEY:

16   Q.  Dr. DeBernardo, do you recall how you
17 asked the question.

18   A.  Yes.

19   Q.  All right.

20   A.  I ask the same questions of everybody.
21 That's why I know.  I'm not saying that I remember

Page 64

1 the particular interview, but I ask the same
2 questions of everybody.

3   Q.  I believe you probably do, so I'm not
4 arguing that point.  What I'm saying is that I have
5 just been handed these notes, okay, and they're
6 fragmented, because they're your notes.

7        For example, it looks to me like -- okay,
8 if you go to the form that says Interview Form
9 FFDIS, or whatever it says?

10   A.  AS, yes.

11   Q.  AS?  Okay?

12   A.  That stands for applicant screening.

13   Q.  Okay.  These notes are reminders to you,
14 it's like your script, that you answer certain --
15 that you ask certain questions.

16   A.  Correct.

17   Q.  Okay.  I have just been handed this not
18 even an hour ago, so when I look at this, is it fair
19 to say that what I really get out of it is something
20 different than what you get out of it?

21   A.  Yes.

Page 65

1   Q.  So I see, you know, a couple of words, you
2 know, grades, peer interaction, behavior, and then,
3 you know, a bunch of handwritten notes that for the
4 most part are pretty legible, and there's three
5 pages of that.  But there is nothing that says how
6 you asked me the question about pain medications or
7 antidepressants.  It doesn't say how you asked the
8 question or what, exactly, you said; is that
9 correct?

10   A.  That's correct, it doesn't say it on my
11 notes, but I do so many of these that I have the
12 same questions that I ask for everybody.

13   Q.  Okay.  If you look at document D002341,
14 which was the notes from my doctor --

15       MR. NIEDZIELSKI:  That's been marked as
16 DeBernardo number 7.

17 BY MR. SMINKEY:

18   Q.  Prior to me bringing suit, would I have
19 known the existence of this note?

20   A.  I don't know if you would have or not.

21   Q.  Would I have known the existence of your

17 (Pages 62 to 65)

ESQUIRE DEPOSITION SERVICES
302-426-9857

Page 66

1 notes?
2    A.  Well, you were in the interview with me
3 and you saw me writing down.
4    Q.  I saw you writing something, that's
5 correct.  Would I have had any idea what you were
6 writing on this paper?
7    A.  No.  I'm assuming that you would think I
8 was writing what you told me, but I don't know.
9    Q.  So it's fair to say that while you're
10 writing and I'm talking, I have no idea what you're
11 writing, if your writing is accurate or anything
12 like that?
13    A.  That's true.
14    Q.  Okay.
15    A.  I guess you would have to trust me.
16    Q.  Now, same thing with my doctor.  If I'm
17 sitting in a doctor's office and the doctor is
18 writing notes, do I have any idea what my doctor is
19 writing?
20    A.  I don't know if you do or not.  Does he
21 explain things to you?

Page 67

1    Q.  No.  So he could write "depressed, mood
2 swings," I think that's what Mr. Niedzielski -- I
3 can't read it, but he writes these notes?  Does that
4 mean that he told me what he is writing?
5    A.  I don't know.  You would have to ask your
6 doctor.  But I know if I have a patient and I'm
7 going to treating them, that I would talk with them
8 about what I wrote.
9       It's a different situation than what
10 you're asking me, because we were in an interview, I
11 was not treating you, but if I had a therapy patient
12 and I felt they were depressed, I would talk with
13 them about that.
14    Q.  Give me one second.  I want to look --
15    A.  So that's a little different.
16    Q.  No, I hear you.  Give me one second.
17       If a person you're interviewing says that
18 they're taking Lexapro or Alprazolam, whatever,
19 would you automatically not recommend them for hire
20 or would you just probe that further to find out the
21 relevance and the connection?

Page 68

1    A.  I would probe further and find out more
2 about that.
3    Q.  So the fact that they're on Alprazolam or
4 Lexapro or pain medicine or whatever in and of
5 itself wouldn't necessarily disqualify them.
6    A.  Well, if they're on pain medication, that
7 would interfere with their ability to handle a
8 firearm safely, and there are pain medications that
9 would be that way, then that would disqualify them,
10 but I would have to know more information.  Just
11 being on Lexapro, for example, is not necessarily
12 going to disqualify a person totally; it depends on
13 a variety of further questioning.
14    Q.  And how would you have asked the question
15 about the psychologist in your interview?
16    A.  If you have ever seen a psychologist, you
17 mean?  Is that the question?
18    Q.  Would you have asked it that way?
19    A.  I would ask -- this is my question.
20 "Have you ever -- let's start from the beginning.
21 "Have you ever been on any kind of psychiatric

Page 69

1 medication for any reason at all, such as Prozac,
2 Valium, Ritalin, Zoloft, for example?  Have you ever
3 been diagnosed with a mental disorder?  Have you
4 ever been to a therapist, a counselor or
5 psychologist or psychiatrist for any reason at all?
6 Have you ever been admitted to a psychiatric
7 hospital?  Have you ever been admitted to a
8 substance abuse treatment program?  Does anybody in
9 your family have a history of mental illness?"
10       Those are my questions.
11    Q.  Do you go down your list pretty quickly?
12    A.  If they say no.  But obviously if they
13 said yes to any of those questions, I would follow
14 them up with a series of other questions.
15    Q.  And okay.  So if a person was terminated
16 from their job and then the charges were
17 subsequently withdrawn or there were a couple of
18 little episodes of discipline, like not wearing a
19 hat, silly little stuff, and that was rescinded and
20 a discharge was rescinded, where do we draw the line
21 of the person was discharged or the person was not?

18 (Pages 66 to 69)

Page 70

1    MR. NIEDZIELSKI: I believe the question
2 was "disciplined."
3    A. Right. My question in that -- now we're
4 talking about a different thing, now. You just
5 asked me about the mental illness, and now we're
6 going back to the termination.
7    What I ask about work history is, "Have
8 you ever been in trouble on the job, written up or
9 reprimanded for any reason?" And then I follow it
10 up if the person says yes or no.
11    I also ask, "Have you ever been fired or
12 terminated from a job for any reason?"
13    Those are my questions. And then I talk
14 about supervisors and co-workers. I ask some
15 questions about that.
16    Q. So when you're asking the question about
17 termination, are you intending the question to mean
18 you were terminated, but then you were given your
19 job back, or are you looking for the final
20 disposition?
21    A. Any kind of termination is what I would

Page 71

1 want to hear about. We would talk about it more and
2 find out what happened, but my question would be,
3 have you ever been terminated from a job, and I have
4 made people tell me "I have been terminated, but I
5 was rehired the next day because my boss just lost
6 his temper," or whatever, so there would be reasons
7 somebody would be rehired, but they were terminated
8 at the time, so I would want to know that.
9    Q. Could the question be interpreted as the
10 final disposition of the case?
11    A. I suppose it's possible to interpret
12 questions any way a person wound interpret them.
13    Q. So if a person interprets a question
14 differently than you intended, does that make it
15 wrong?
16    A. I think the questions are pretty clear,
17 though. They're pretty simple questions. I don't
18 think that -- I mean, even if they didn't understand
19 the terminated part of it, I do ask about reprimands
20 or in trouble on the job, so that would fall in that
21 category, even if it didn't lead to termination.

Page 72

1    Do you understand?
2    Q. Yeah. I think we misunderstand each other
3 a little bit. See, I would interpret the question
4 and I interpret the question of what's the final
5 disposition.
6    It's almost like saying have you ever had
7 a traffic ticket, and somebody says "Yes, I have,
8 but I was found not guilty," or "I'm going to answer
9 the question with no, because I wasn't found guilty
10 of it."
11    A. But you got a speeding ticket, though. So
12 I would interpret that as, "Have you ever had a
13 speeding ticket?
14    "Yes, I did. I was found not guilty, but
15 I still had a speeding ticket."
16    It didn't not exist because -- so in that
17 example, I would still answer "Yes, I got a speeding
18 ticket."
19    Q. Could you see where I might answer the
20 question no? From the standpoint that I was found
21 not guilty or it was expunged or whatever?

Page 73

1    A. I would still want to hear that.
2    Q. You would want to hear that as a
3 psychologist, because you want to evaluate it; is
4 that correct? That's my question. You would want
5 to hear it as a psychologist --
6    A. Of course.
7    Q. -- because you would want to evaluate
8 that.
9    A. Of course.
10    Q. Okay. As the applicant, could you see
11 where an applicant might say, "Listen, I was
12 arrested in 1981 for something, but it was expunged.
13 It doesn't exist. I ran a red light and I had a
14 traffic ticket, but the judge found me not guilty."
15 So, you know --
16    A. But I don't think that's being honest,
17 though, because the question is, have you ever had a
18 red light ticket or -- you know, what you're saying,
19 giving examples, "Have you ever been arrested
20 before?" My question is, have you ever been
21 arrested before. That's my question. And just

19 (Pages 70 to 73)

Page 74

1 because you got it expunged or it was when you were
2 a juvenile, that doesn't mean it doesn't count. It
3 still counts. That's not my question.
4        My question is not have you ever been
5 found guilty of these things, my question is have
6 you ever had these things happen.
7    **Q. I hear you, and all I'm saying is, I think**
8 **that there is the practical sense from your**
9 **standpoint of you're asking about these things**
10 **because you want to know all the goodies so you can**
11 **evaluate it. But I also think that there is a legal**
12 **sense of it is that --**
13        MR. NIEDZIELSKI: Are you giving a speech?
14        MR. SMINKEY: No.
15        MR. NIEDZIELSKI: Is this a question?
16        MR. SMINKEY: It is a question. It's
17 leading up to a question.
18        MR. NIEDZIELSKI: The foreplay is so
19 incredible.
20 BY MR. SMINKEY:
21    **Q. The question becomes does the person**

Page 75

1 **really have to reveal it because they were found not**
2 **guilt or it was expunged or whatever.**
3    A. I believe, yes, that they should reveal
4 it, because it's an integrity issue and I'm asking a
5 question -- I think the question is pretty
6 straightforward, the person should reveal it, and we
7 can discuss it, and if it doesn't mean anything, it
8 doesn't mean anything, but we need to discuss it,
9 and if it was never told to me, then we couldn't
10 discuss it; therefore, I would never know it and the
11 evaluation is done based on misleading or
12 inappropriate information or -- inaccurate
13 information.
14    **Q. But you're also saying in the first**
15 **paragraph of your report that this really isn't the**
16 **whole pie, you know, the Department of Correction or**
17 **the employing agency needs to do their background**
18 **and their homework and, you know --**
19    A. Of course. It's only one -- obviously I'm
20 only the psychologist and only doing the
21 psychological evaluation part of it, and I'm not the

Page 76

1 hiring authority. I don't hire. .
2    **Q. No, I hear you, but what you're saying is**
3 **that there is another piece of this, you know, from**
4 **the hiring agency's end, too, to do their thing.**
5    A. Of course.
6        MR. SMINKEY: That's all I have.
7        MR. NIEDZIELSKI: One other exhibit.
8        MR. SMINKEY: I'm sorry, I thought you
9 were done. .
10        MR. NIEDZIELSKI: I will be shortly.
11        (Deposition Exhibit No. 8 was marked for
12 identification.)
13 FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT
14 BY MR. NIEDZIELSKI:
15    **Q. Could you identify that document that's**
16 **been marked as DeBernardo number 8?**
17    A. This is my vitae.
18    **Q. And is it current?**
19    A. Yes.
20    **Q. All right. You have been asked a number**
21 **of questions today about your reports, and you have**

Page 77

1 **expressed responses to those questions. Are your**
2 **opinions that you expressed within a reasonable**
3 **degree of scientific probability?**
4    A. Yes.
5    **Q. All right. Would you turn -- one last**
6 **question on exhibit number one. That's the very**
7 **first screening report that you did.**
8    A. My report?
9    **Q. Yes. The very last -- well, the last**
10 **paragraph before the numbered paragraph. It reads,**
11 **"In 1981, Mr. Sminkey was arrested for criminal**
12 **mischief. He indicated that he broke off a car**
13 **mirror. The charges were dropped. There is no** .
14 **further legal history, pattern of antisocial acts,**
15 **or history of violence. So he did disclose that,**
16 **even though it was expunged.**
17    A. Correct.
18        MR. NIEDZIELSKI: Thank you.
19        (Signature not waived.)
20        (Deposition concluded at 3:45 p.m.)
21            - - -

20 (Pages 74 to 77)

Page 78

1       ACKNOWLEDGMENT OF DEPONENT

2       I, CAREN R. DeBERNARDO, Psy.D., do hereby

3 acknowledge that I have read and examined the foregoing

4 transcript of testimony, and the same is a true, correct and

5 complete transcription of the testimony given by me, and any

6 changes and/or corrections, if any, appear in the attached

7 errata sheet signed by me.

8

9 _____   _____

10 Date          Caren R. DeBernardo, Psy.D.

11

12 .

13

14

15

16

17

18

19

20

21

Page 79

1 ESQUIRE DEPOSITION SERVICES

2 1020 19TH STREET, N.W.

3 SUITE 620

4 WASHINGTON, D.C. 20036

5 (202) 429-0014

6          ERRATA SHEET

7 Case Name: SMINKEY VS. STATE OF DELAWARE

8 Witness Name: CAREN R. DeBERNARDO, Psy.D.

9 Deposition Date: Friday, March 28, 2009

10 Job No.: 186527

11 PAGE   LINE   CORRECTION

12

13

14

15

16

17

18

19 _____   _____

20 Caren R. DeBernardo, Psy.D.          Date

21

Page 80

1 Caren R. DeBernardo, Psy.D.
   c/o Marc P. Niedzielski, Esquire
2 Deputy Attorney General
   820 N. French Street, 6th Floor
3 Wilmington, Delaware 19801
4 In Re: Sminkey vs. State of Delaware
5    We enclose for your review and signature a copy of the
   above-referenced transcript. We ask that you read the
6 transcript carefully. If it is necessary to make any
   corrections, please do so on the enclosed errata sheet,
7 indicating the page, line number, correction, and reason for
   such correction. The errata sheet must be signed and dated.
8 Also, you must sign the certificate of deponent enclosed in
   the transcript.
9
   If you do not complete the reading and signing within
10 thirty days, you may have waived your right to make
   corrections; therefore, your prompt attention to this matter
11 would be appreciated.
12    Upon completion of your review, please return the
   transcript with certificate of deponent and errata sheet to
13 Esquire Deposition Services, 1020 19th Street, N.W., Suite
   620, Washington, D.C. 20036.
14
15 Sincerely,
16
17 George W. Tudor
18
19
20
21

Page 81

1       CERTIFICATE OF NOTARY PUBLIC

2       I, George W. Tudor, the officer before whom the

3 foregoing deposition was taken, do hereby certify that the

4 witness whose testimony appears in the foregoing deposition

5 was duly sworn by me; that the testimony of said witness was

6 taken stenographically by me and thereafter reduced to

7 typewriting by me or under my direction; that said

8 deposition is a true record of the testimony given by said

9 witness; that I am neither attorney nor counsel for, nor

10 related to or employed by any of the parties to the action

11 in which this deposition is taken and that I am not a

12 relative or employee of any attorney or counsel employed by

13 the parties hereto or financially interested in this action.

14

_____   _____

15 Date          George W. Tudor
               Notary Public in and for
16 My Commission Expires   the State of Maryland
   March 1, 2011          County of Howard

17

18

19

20

21

21 (Pages 78 to 81)

Certificate of Service

ON June 30, 2008, I JACK Sminkey hand
Delivered a Motion to strike Expert witness
to the person addressed below.

MR. Marc Niedzielski, ESQ
820 N. French St, 6th FL
Wilmington, DE 19801

Jack Sminkey, Plaintif
3402 Edgmont Ave #33
Brookhaven PA 19015
610-620-3670